**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | |
|---|---|
| BENJAMIN HENDREN, | |
| Plaintiff, | Civil Action File<br>No.: 1:24-cv-2921-TWT |
| v. | |
| JOHN PATTON,<br>JAMAR REED,<br>ANTHONY EWING,<br>DERONALD DAVIS,<br>JEREMIAH BLAXSTONE,<br>BRASFIELD & GORRIE, LLC,<br>BRASFIELD & GORRIE, LP,<br>JACKSON BUSSEY, and<br>MOSES PAIGE, | **JURY TRIAL DEMANDED** |
| Defendants. | |

**SECOND AMENDED COMPLAINT**

1.    This is a case about the unlawful detention of a photojournalist who was just doing his job. The Georgia State University Police Department Defendants arrested and detained Plaintiff Benjamin Hendren for approximately seven hours because they did not like that he was photographing their arrest of protestors who had allegedly damaged a construction site. The GSU Defendants knew Plaintiff was not involved but detained and arrested him anyway.

2.    The GSU Defendants' unlawful conduct was aided and abetted by two construction workers employed by Brasfield & Gorrie. Encouraged by the

officers, the Brasfield & Gorrie Defendants falsely reported that Plaintiff committed crimes at the construction site. In fact, Plaintiff did not go to the construction site. Plaintiff first photographed the protestors about half a mile away from the construction site, well after whatever the protestors had done.

## JURISDICTION AND VENUE

3.      This case is brought pursuant to the First, Fourth, and Fourteenth Amendments of the United States Constitution and 42 U.S.C. § 1983. Plaintiff also brings claims under state law against the Brasfield Gorrie Defendants.

4.      This Court has jurisdiction of federal claims under 28 U.S.C. §§ 1331 and 1343. The Court has pendent jurisdiction of state law claims under 28 U.S.C.  1367.

5.      Plaintiff seeks monetary damages, attorney fees, and costs under 42 U.S.C. § 1988.

6.      Venue in this Court is proper pursuant to 28 U.S.C. § 1391 because the events giving rise to Plaintiff's claims arose in this district and division.

## PARTIES

7.      Plaintiff Benjamin Hendren is a photojournalist and a Georgia resident.

8. John Patton is a Sergeant with the Georgia State University Police Department. He is sued in his individual capacity. At all times relevant to this complaint, he acted under color of law.

9. Jamar Reed is an officer with the GSUPD. He is sued in his individual capacity. At all times relevant to this complaint, he acted under color of law.

10. Anthony Ewing is an officer with the GSUPD. He is sued in his individual capacity. At all times relevant to this complaint, he acted under color of law.

11. Deronald Davis is an officer with the GSUPD. He is sued in his individual capacity. At all times relevant to this complaint, he acted under color of law.

12. Jeremiah Blaxstone is an officer with the GSUPD. He is sued in his individual capacity. At all times relevant to this complaint, he acted under color of law.

13. Patton, Reed, Ewing, Davis, and Blaxstone are sometimes collectively referred to as the GSU Defendants.

14. Brasfield & Gorrie, LLC is a Delaware entity with its principal place of business in Alabama. It is registered to do business in Georgia. It may be served via its registered agent CT Corporation System, 289 S Culver St., Lawrenceville, GA, 30046.

15. Brasfield & Gorrie, LP is a Delaware entity with its principal place of business in Alabama. It is registered to do business in Georgia. It may be served via its registered agent CT Corporation System, 289 S Culver St., Lawrenceville, GA, 30046.

16. Jackson Bussey is a Brasfield & Gorrie employee. He is a Georgia resident.

17. Moses Paige is a Brasfield & Gorrie employee. He is a Georgia resident.

18. The two corporate entities, Bussey, and Paige are sometimes referred to as Brasfield Gorrie or the Brasfield Gorrie Defendants.

## FACTUAL BACKGROUND

19. On the afternoon of July 29, 2022, a group of protestors seeking to protest the construction of the Atlanta Public Safety Training Center entered a Brasfield & Gorrie construction site housing the GSU Convocation Center.

20. The Atlanta Public Safety Training Center, also known as "Cop City," was a controversial project and had been the subject of local, national, and international media coverage.

21. Brasfield & Gorrie was also involved in constructing the Atlanta Public Safety Training Center.

-4-

22. According to police reports, the small group trespassed at the construction site, yelling things like "Stop Cop City" and "Stop Brasfield Gorrie."

23. Police reports further stated that there was property damage to walls and signage at the construction site. This ended up not being accurate.

24. Video of the protest in progress shows that a group entered and exited the construction site within minutes. No property damage is captured, and the Plaintiff was not on the video because he was never there.

25. At the time of the protest at the construction site, Benjamin Hendren was a credentialed, freelance photojournalist working for the Atlanta Journal-Constitution.

26. Hendren was parked downtown, away from the construction site.

27. Hendren never entered the construction site.

28. Hendren was not a part of the protestor group.

29. Hendren did not even observe the protestors at the construction site.

30. Instead, Hendren heard over police radio that there was a traffic stop related to a protest and drove towards the location of the traffic stop to document it.

31. The traffic stop was in a mostly residential area of the Summerhill neighborhood about a half mile from the construction site.

-5-

32.     Hendren was hired by the Atlanta Journal-Constitution on a freelance basis to document activity including opposition to "Cop City" and law enforcement's response.

33.     The first Hendren saw any of the alleged protestors was at the traffic stop in the Summerhill neighborhood, approximately half a mile from the construction site.

34.     Hendren lawfully parked his car and began to photograph the detention of the alleged protestors from a public sidewalk across the street from where the protestors were being detained.

35.     At no point did any officer give Hendren any order to back up, and no such order would have been lawful given his location, conduct, and status as a licensed photojournalist. *See Reese v. Herbert,* 527 F.3d 1253, 1273 (11th Cir. 2008) (unlawful to "command to clear the general area entirely beyond the zone of police operation").

36.     At no point did Hendren commit any crime, and at no point did he do anything that any officer could have mistaken as a crime.

37.     Further, Hendren did not interfere in any way with the traffic stop that was being conducted.

38.     The GSU Defendants did not like that they had been photographed. They sought to manufacture a reason to detain Hendren.

39.    At around the 5:50-mark in Reed's bodycam, for example, Patton pointed at Hendren and told Reed, "I'm pretty sure he was there too."

40.    Patton was wrong. Hendren had *not* been to the construction site. Patton also had not been to the construction site while protestors were present, so he would have no basis to be "pretty sure." Instead, Patton was irritated that a journalist was watching him arrest protestors.

41.    Reed nevertheless got the message from the prompting of Patton. He walked across the street to speak with Hendren. Hendren immediately identified himself as a photographer with the Atlanta Journal-Constitution. Reed returned and assured Patton that he would do a show-up.

42.    Around the same time, Davis asked another officer whether the guy across the street taking pictures was "one of them" protestors.

43.    None of the GSU Defendants had any evidence that Hendren had been at the construction site. They would have to manufacture it.

44.    Reed and Davis left the scene of the traffic stop and drove to the construction site. They asked two Brasfield Gorrie workers to hop in their car and ride over to the Summerhill neighborhood for a show-up. Bussey and Paige enthusiastically volunteered. These two were apparently selected from the large number of construction workers due to their enthusiasm.

45.     At all times, Bussey and Paige were Brasfield Gorrie employees undertaking actions within the scope of their employment on behalf of their employer.

46.     While Reed and Davis were getting the construction workers, Patton continued his campaign of retaliatory accusations. He told Officer Fraser, "I'm sure the cameraman was with 'em. . . . *I wanna grab him too* but I can't." Fraser and Patton then joked about going up to ask Hendren if they could see his ID, "for shits and giggles." The "joke" may be that in some circumstances, officers use failure to produce an ID as pretext to arrest a person.

47.     Meanwhile, during the drive back to the Summerhill neighborhood, Reed was improperly prodding the construction workers. Before Bussey and Paige saw the detained individuals, Reed told them, "yeah, we got 'em."

48.     He then said, "Oh, we're red," meaning that he realized his body camera was activated and he should not have said that on camera.

49.     "We wanna bring y'all over here so y'all can ID 'em for us. . . . They say they not in the building . . . so because they saying that, we want to positively get some witnesses to say . . . just so we can say, 'y'all verified, y'all saw them in the building.' These are the ones we have."

50.    Encouraged by this repeated prodding, Bussey and Paige relented and despite not being able to see the people Reed was talking about, responded, "They did went into the building. They fucking lying."

51.    Instead of discouraging this improper pre-ordained identification in any way, Reed and Davis further encouraged Bussey and Paige.

52.    Reed said, "Thank you," in response to Paige's comment that the detained individuals had been inside the building and were liars.

53.    When they arrived to the area near where the detainees were seated, Reed told Bussey and Paige that they did not have to get out of the vehicle for the identification (even though they clearly could not see the detainees from their vantage point),[1] Bussey and Paige joked that they wanted to get out so they could do something to the handcuffed detainees.

54.    In response, Reed and Davis laughed, but did not provide any rebuke. This acted to further encourage Bussey and Paige.

55.    When Bussey and Paige reached the traffic stop that Hendren was photographing, Reed and Davis saw that they would and did readily identify the detainees despite not being able to see them.

---

[1] As the Superior Court noted, the witnesses only "saw seven people seated on the ground—all wearing facemasks—who were facing perpendicular to them and who were never brought closer for more reliable identification." *See State of Georgia v. Leckert*, 23SC189700 at *8 (Fulton Super. Ct. Aug. 12, 2024).

56. At this point, Reed and Davis knew that Bussey and Paige only needed the slightest invitation.

57. When Reed said that Hendren "could possibly be" part of it, Bussey and Paige eagerly followed his cue. First, they were cautious, "That's the video guy?" And then they fed off each other and the officers, quickly stating "That's him right there. *Get his ass*. He's the video guy. He's a liar."

58. Within seconds, Hendren was in handcuffs.

59. In other words, following Reed and Davis' prompting, Bussey and Paige falsely identified Hendren as a person who committed criminal offenses at the construction site, despite knowing that Hendren had not been at the construction site.

60. Bussey and Paige's false identification was significantly encouraged by the GSU Defendants' improper comments and suggestions.

61. The GSU Defendants knew that Hendren had not been at the construction site and that Bussey and Paige's inculpatory statements were made at Patton and Reed's prompting.

62. The GSU Defendants also had no information that Hendren was part of the protestor group.

63. While the small group of protestors were all in one vehicle, Hendren arrived after the traffic stop in a separate vehicle that had no connection to the small group of protestors.

64. While the small group of protestors were wearing uniform clothing, to include black and camouflage and masks, Hendren was wearing a white shirt and no mask.

65. Hendren had a conspicuous lanyard carrying a photo identification of himself as a photojournalist.

66. Despite all of the above, Reed and Davis approached Hendren as he was taking photographs, put him in handcuffs, and told him to sit on the curb.

67. At that moment, Hendren was detained and arrested.

68. Hendren could no longer take photographs or film.

69. Hendren told Patton, Reed, Ewing, Davis, and/or Blaxstone what was already obvious—that he was photographing the arrests for the Atlanta Journal-Constitution but was not involved in the underlying conduct in any way.

70. Hendren asked that Patton, Reed, Ewing, Davis, and/or Blaxstone look at his press credential and talk to his editor at the Atlanta Journal-Constitution, but they refused to do so, even when Hendren got his editor was on the phone for them to talk to.

71. Instead of releasing Hendren, the GSU Defendants attempted to humiliate him for engaging in his protected speech activity of silently photographing.

-11-

72.    Blaxstone forcibly took photographs of Hendren while he was handcuffed and sat on the curb, despite Hendren protesting that he did not want his photo taken, while the other officers looked on.

73.    When Hendren tilted his head down to avoid being photographed, Blaxstone grabbed his hair and yanked his head up so he could be photographed against his will.

74.    Instead of releasing Hendren, the GSU Defendants conspired to manufacture a justification to prolong his ordeal.

75.    The GSU Defendants did so with the express encouragement of a Major with the Atlanta Police Department. When she arrived on the scene, the GSU Defendants told her that the protestors' crimes were "not really chargeable." But she responded, "anything guys, *anything* we can get would help us out tremendously with this group. I know it's a reach." Fraser then placed his hand over his bodycam and turned it off.

76.    Bussey and Paige's false identification was part of a joint enterprise with the GSU Defendants to falsely inculpate persons potentially involved with the Stop Cop City protests.

77.    After seeing Hendren placed under arrest, Bussey and Paige said, "You got his ass. He can't lie about [being a credentialed AJC photographer]."

78.    But it was Bussey and Paige who were lying, not Hendren.

79.    Reed authored a report stating that Hendren was handcuffed because Bussey and Paige identified him as a protestor inside the construction site, but, in fact, the GSU Defendants had already conspired to retaliate against Hendren before the false identification.

80.    Patton, Reed, Ewing, Davis, and/or Blaxstone, along with Atlanta Police Department officers, continued to search for any justification to hold Hendren.

81.    But there was no justification whatsoever.

82.    Hendren also told the Atlanta Police Department supervisor the truth—he wasn't involved. He offered to show her the photos on his camera to prove it. She declined to take him up on his invitation.

83.    Hendren also asked her about his legal status. No one had made it clear whether he was detained or arrested, he said. The supervisor told Hendren that he was only "detained," but deferred to the other officers.

84.    Whatever the officers claimed was happening, however, Hendren was of course handcuffed and not free to leave.

85.    During this time, Atlanta Journal-Constitution officials repeatedly called law enforcement without apparent success. The Atlanta Police Department supervisor confirmed that they were aware of that and were trying to communicate with AJC. It would be at least *six more hours*, however, before Hendren was released.

-13-

86.  Hendren was transported to a police station, where he continued to be detained.

87.  In total, Hendren was held for approximately seven hours before he was released.

88.  Hendren was never charged with any offense.

89.  After hearing testimony from GSU Defendants Ewing and Reed and Brasfield Gorrie Defendants Bussey and Paige, the Fulton County Superior Court found that the "police officers used impermissibly suggestive tactics to ensure a positive identification that ultimately rendered the identification unreliable." *See State of Georgia v. Leckert*, 23SC189700 (Fulton Super. Ct. Aug. 12, 2024). The Superior Court further concluded that "the showup here was a textbook example of what *not* to do." *Id.* at *7. The law enforcement tactics were so egregious that they violated the Due Process rights of the arrestees.[2]

---

[2] Hendren was not ultimately charged, so his Due Process rights were not specifically addressed by the Superior Court's ruling. Of course, no preclusive effect would be given to that ruling in this case given that lack of identity of parties. But the false identification of Hendren was a prominent part of the Superior Court's conclusion that the GSU Defendants violated their constitutional obligations. Further, a reasonable jury could reach the same conclusion as the Superior Court—that law enforcement concocted a sham identification with a preordained outcome with the ready assistance of the Brasfield Gorrie Defendants.

90.    The Superior Court specifically found that Bussey and Paige were not credible, in part, because of their false identification of Hendren. *See id.* at *5 n.3, *9–10. The order noted their "expletive-laden testimony" was plagued by "anger" and "bias." *Id.* at *9.

91.    The show-up also plainly violated GSU PD standard operating procedures on show-ups, which ban the use of multiple witnesses at the same time, require witnesses not to communicate with each other before their identification, require the officer to instruct the witness that they may not have identified the correct perpetrator, and ban words or conduct that suggest that the individual is or may be a perpetrator.

92.    These repeat violations of policy evince consciousness of wrongdoing.

93.    Even assuming the GSU Defendants could have believed what Bussey and Paige told them about Hendren being inside the convocation center site—and to be clear, they knew the report was false when it was made—there remained no legal justification to arrest Plaintiff.

94.    The GSU Defendants knew that the convocation center had unlocked doors without any no trespassing signage.

95.    The GSU Defendants knew that the protestors left expeditiously when asked to do so by the construction workers—well before law

enforcement arrived in the short drive from one side of the former Olympic stadium to the convocation center.

96.    The GSU Defendants knew that there was no property damage to the convocation center.

97.    The GSU Defendants photographed a sign that was on its side with a piece of painter's tape on it as evidence of purported property damage. But context was clear, and the construction workers confirmed, that the sign was like that before the protestors entered and the tape was a signal to the people doing punch list work. The GSU Defendants photographed two minor scuffs on the wall, but those were also part of the punch list items to be addressed, which were not caused by the protestors.

98.    Bussey and Paige said nothing about Hendren doing anything unlawful inside the convocation center, and neither did anyone else.

99.    There were no facts to believe that Hendren had committed criminal trespass, or any other offense.

100.    Patton, who was the lead officer on the scene, originally planned to only issue warnings to the detained individuals because there was no evidence that they committed criminal trespass or any other criminal offense. Indeed, they had stated their assessment that there was nothing chargeable. But he, and the GSU Defendants, changed course in response to another agency's prodding.

101.  Defendant Reed stated and admitted that he did not believe there was probable cause to arrest Plaintiff at the time he put Plaintiff in handcuffs.

102.  The GSU Defendants contend that they did not arrest Plaintiff, but merely detained him.

103.  Video of this incident and sequence of events is attached hereto and incorporated herein as Exhibit A, previously filed at Doc. 38.

### COUNT I
*Fourth Amendment Unlawful Seizure*
*Against All Defendants*

104.  Patton, Reed, Ewing, Davis, and/or Blaxstone arrested Plaintiff by handcuffing him, refusing to let him leave, keeping him confined for many hours, and transporting him to a secure police facility.

105.  Patton, Reed, Ewing, Davis, and/or Blaxstone did not have probable cause, or arguable probable cause, to arrest.

106.  The GSU Defendants significantly encouraged the Brasfield Gorrie Defendants to falsely inculpate Hendren, and Bussey and Paige were happy to oblige by falsely reporting that Hendren had committed crimes when he had not. Hendren's arrest was part and parcel of a joint enterprise

and joint conspiring between the GSU Defendants and the Brasfield Gorrie Defendants.[3]

107.   Hendren suffered damages as a result of Defendants' actions in an amount to be determined by the enlightened conscience of a jury.

**COUNT II**
*First Amendment Retaliation*
*Against All Defendants*

108.   Patton, Reed, Ewing, Davis, and/or Blaxstone interfered with Plaintiff's filming and ultimately arrested Plaintiff because they did not like that he was photographing their actions.

109.   Patton, Reed, Ewing, Davis, and/or Blaxstone's interference with filming and ultimate arrest of Plaintiff were adverse actions undertaken in retaliation for his speech and for the purpose of chilling his speech.

110.   The GSU Defendants significantly encouraged the Brasfield Gorrie Defendants to falsely inculpate Hendren, and Bussey and Paige were happy to oblige by falsely reporting that Hendren had committed crimes when he had not. Hendren's arrest was part and parcel of a joint enterprise

---

[3] Under these circumstances, private actors can be considered state actors for claims under 42 U.S.C. § 1983. *See generally Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 152 (1970); *see also, e.g., Charles v. Johnson*, 18 F.4th 686, 693–97 (11th Cir. 2021) (discussing private party liability standards in § 1983 claims).

and joint conspiring between the GSU Defendants and the Brasfield Gorrie Defendants.

111. Bussey and Paige were upset because protestors were interfering with their work and sought to retaliate against anyone who might be involved, no matter how tangentially.

112. Plaintiff had a First Amendment right to photograph and film police officers carrying out their official duties in public, without police interference. *See Smith v. City of Cumming*, 212 F.3d 1332, 1333 (11th Cir. 2000); *Bowens v. Superintendent of Miami South Beach Police Dept.*, 557 Fed. Appx. 857, 863 (11th Cir. 2014).

113. Plaintiff was photographing citizens' arrest from a safe distance away, without interfering with police activity in any way, when he was confronted and arrested.

114. The interference with Plaintiff's photographing and his arrest were triggered by, and in retaliation for, his protected activity of taking pictures of public police activity and public activity protesting police activity, and therefore violated the First Amendment.

115. Hendren suffered damages as a result of Defendants' actions in an amount to be determined by the enlightened conscience of a jury.

## COUNT III
### *State Law Unlawful Seizure and False Imprisonment*
### *Against Brasfield Gorrie Defendants*

116.  Defendants manufactured a false reason to arrest Plaintiff.

117.  There was no probable cause.

118.  There was no exigency.

119.  No Defendant observed Plaintiff commit a crime within their presence.

120.  Plaintiff was subjected to unlawful detention for approximately seven hours as a result of Defendants' actions.

121.  Bussey and Paige knowingly made a false report to the GSU Defendants that Plaintiff had committed a crime.

122.  The two Brasfield Gorrie entities are vicariously responsible for Bussey and Paige's actions because they were employees undertaking actions within the scope of their employment on behalf of their employer.

123.  Hendren suffered damages as a result of Defendants' actions in an amount to be determined by the enlightened conscience of a jury.

## COUNT IV
### *State Law Negligence*
### *Against Brasfield Gorrie Defendants*

124.  Defendants Bussey, Paige, and the two Brasfield Gorrie entities, owed Plaintiff a duty of care to ensure that they make a reasonable

investigation before reporting that a citizen had committed a criminal offense to law enforcement.

125. In the event that Bussey and Paige did not act knowing that they were falsely inculpating Plaintiff, they acted negligently in misidentifying Plaintiff despite the fact that he was obviously not in the convocation center and/or in allowing themselves to be unduly pressure by law enforcement.

126. Defendants breached that duty of care by failing to recognize that Plaintiff had never entered or been near the construction site but telling law enforcement the opposite.

127. Hendren suffered damages as a result of the Brasfield Gorrie Defendants' actions in an amount to be determined by the enlightened conscience of a jury.

### COUNT V
### *Punitive Damages*
### *Against all Defendants*

128. Defendants acted with conscious indifference, reckless disregard for the consequences of their actions, an intent to injure, and malice such that an award of punitive damages is authorized under federal and Georgia law.

## COUNT VI
### *Attorney Fees*
### *Against all Defendants*

129.   Plaintiff is entitled to recover expenses personally of litigation under O.C.G.A. § 13-6-11 because Defendants have acted in bad faith, been stubbornly litigious, and/or caused Plaintiff unnecessary trouble and expense.

130.   Plaintiff is entitled to attorney fees under 42 U.S.C. § 1988 to the extent he is a prevailing party on a federal claim.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff requests this Court:

a)  Hold a trial by jury on all issues so triable;

b)  Award nominal, presumed, compensatory, special, and punitive damages to Plaintiff against Defendants in an amount to be proven at trial;

c)  Award Plaintiff attorney fees under federal and state law;

d)  Tax all costs of this action against Defendants;

e)  Award any additional or alternative legal or equitable relief that is just and appropriate.

Respectfully submitted, this 30th day of October, 2025.

*/s/ Andrew Canter*
Andrew Canter
Georgia Bar No. 365212
Zack Greenamyre

-22-

Georgia Bar No. 293002

MITCHELL, SHAPIRO, GREENAMYRE & FUNT, LLP
881 Piedmont Ave NE
Atlanta, GA 30309
404-812-4751
404-812-4740 (fax)
andrew@mitchellshapiro.com
zack@mitchellshapiro.com

*/s/Gerald Weber*
Gerald Weber
Georgia Bar No. 744878

LAW OFFICES OF GERRY WEBER, LLC
Post Office Box 5391
Atlanta, GA 31107
404-522-0507
wgerryweber@gmail.com

-24-

## <u>CERTIFICATE OF SERVICE AND CERTIFICATE OF COMPLIANCE</u>

I hereby certify that in accordance with LR 5.1A, I have this date electronically filed the within and foregoing in the above-styled civil action with the Clerk of Court by using the Court's CM/ECF system, which will automatically send notice of same to attorneys of record.

Pursuant to LR 7.1(D), I further certify that the within and foregoing has been prepared in accordance with Local Rule 5.1(B) and is in a 13-point Century Schoolbook font.

This 30th day of October, 2025.

*/s/Zack Greenamyre*
Zack Greenamyre
Georgia Bar No. 293002
