Exhibit I

# In The Matter Of:

*Benjamin Hendren vs.*
*John Patton, et al.*

*Jamar Reed*
*June 25, 2025*

*LYON REPORTING, INC.*
*Certified Court Reporters*
*P.O. Box 81124*
*Atlanta, Georgia 30366*
*770/458-5500    800/767-2030*

Original File Jamar Reed - 6-25-25.txt
**Min-U-Script® with Word Index**

1

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

BENJAMIN HENDREN,        )
                         )
    Plaintiff,           )
                         )  Civil Action No.:
         vs.             )
                         )  1:24-cv-2921-TWT
JOHN PATTON, et al.,     )
                         )
    Defendants.          )
_ _ _ _ _ _ _ _ _ _ _    )


DEPOSITION OF


JAMAR REED


Wedesday, June 25, 2025, 9:36 a.m.


Georgia Department of Law
40 Capitol Square, S.W.
Atlanta, Georgia


Pia A. Kebede, CCR, CVR


LYON REPORTING, INC.
Certified Court Reporters
P.O. Box 81124, Atlanta, Georgia 30366
770/458-5500   800/767-2030
www.lyonreporting.com

2

A P P E A R A N C E S

On behalf of the Plaintiff:

ZACK W. GREENAMYRE, ESQ.
Mitchell Shapiro Greenamyre & Funt LLP
881 Piedmont AveNUE, N.E.
Atlanta, Georgia 30309
404/812-4747
zack@mitchellshapiro.com

GERALD R. WEBER, ESQ.
Law Office of Gerald Weber
P.O. Box 5391
Atlanta, Georgia 31107
404/522-0507
wgerryweber@gmail.com

On behalf of the Defendants:

JASON H. KANG, ESQ.
Georgia Department of Law
40 Capital Square, S.W.
Atlanta, Georgia 30334
404/458-3559
jkang@law.ga.gov

On behalf of the Current Non-Participating Defendants:

BRADEN PRESSMAN, ESQ.
Busby & Negin, Inc.
Suite 201
8200 Roberts Drive
Atlanta, Georgia 30350
470/275-3045
braden@busbynegin.com

Also Present:

Videographer - Frank Lemmon
Desiree Cortes
Daniel Finan
Ashney Francis
Jasmin Jones

3

INDEX TO EXAMINATIONS


WITNESS: JAMAR REED

EXAMINATION                                        Page

By Mr. Greenamyre                                    8

By Mr. Kang                                         99



                    INDEX TO EXHIBITS
              PREVIOUSLY MARKED EXHIBITS

Exhibit              Description                    Page

Exhibit 1          Order to Suppress - 8/12/24     93

Exhibit 2          Body Camera                     53

Exhibit 3          Map                             21

Exhibit 6          Text Message Photo              88

Exhibit 7          Photos of Damage                84

Exhibit 8          Incident Report                 84




              *   NO NEW EXHBITS MARKED   *

4

Deposition of Jamar Reed

June 25, 2025

THE COURT REPORTER:  Do you want me to swear the witness first?

MR. GREENAMYRE:  Yeah.  I'll say a couple things first and then we'll go.  All right.  This will be the deposition of Sergeant Jamar Reed in Hendren v. Patton, et al., 1:24-cv-2921 pending in the Northern District of Georgia, taken pursuant to agreement of counsel.  And notice there are a couple stipulations from the deposition yesterday that the parties would like to continue into this deposition and we hereby do so.  Okay.  We can swear the witness.

THE COURT REPORTER:  Please raise your right hand.  Do you solemnly swear or affirm that the testimony you're about to give today is the truth, the whole truth, and nothing but the truth?

THE WITNESS:  Yes.

THE COURT REPORTER:  Thank you.

JAMAR REED, after having been first duly sworn, was examined and testified under oath as follows:

MR. GREENAMYRE:  Sergeant Reed?

5

THE WITNESS:  Yes, sir.

MR. GREENAMYRE:  All right.  Thank you for being here today.  I appreciate it.  We will try and get this -- get you out of here as soon as we can.  What we want to do today is get everything you know about this situation on the record.  And it'll be streamlined a little bit because there's video.  And you've given prior sworn testimony about this, correct?

THE WITNESS:  Okay.  Yes.

MR. GREENAMYRE:  All right.  Have you ever had the pleasure of giving a deposition before?

THE WITNESS:  No.  First one.

MR. GREENAMYRE:  Okay.  I'm sure you and your attorney have generally talked about this, but just a couple things that I'd like to highlight.  For the Court Reporter's sake and clarity's sake, let's just try and talk one at a time.  And that includes, you know, your attorney may object and he'll say, like, "objection, form,"  right?  That is not a signal to you. You still answer the question unless he says, "I'm instructing you not to answer that question," okay?  Or we got to talk about it or something, but I don't think that's going to come up.  Alright?  But if I ask you a question and you

6

start to answer and he throws in an objection in the middle, just try and repeat your answer so that the record is clear.

THE WITNESS:  Okay.

MR. GREENAMYRE:  This is not, like, a memory test.  If there's something you want to see that's going to refresh your recollection, let me know, and if I have it, I'll try and show it, right?  It's also not a memory exercise in that you can go back if you say something at minute 15 and then at minute 45 you say, I got to add something to what I said earlier, or I got to tweak it in some way.  Please do so, okay? Interrupt me.

THE WITNESS:  Okay.

MR. GREENAMYRE:  What we just want to do is make sure that we get your full testimony here today; is that fair?

THE WITNESS:  Yeah.

MR. GREENAMYRE:  All right.  I'm going to try to ask clear questions.  I may not always do that.  Will you let me know if I'm asking a question that's confusing?

THE WITNESS:  Will do.

MR. GREENAMYRE:  All right.  And fair for me to assume that if you answer a question, you

7

understood the question?

THE WITNESS:  Yeah.

MR. GREENAMYRE:  All right.  We can take a break anytime.  Just let us know.  Again, it's not an endurance test, it's not going to go too long, but you got the right to take a break whenever you want.  I just say that anything -- any conversations that you have with your counsel during the break are not privileged unlike every other conversation that you have with your counsel, okay?

THE WITNESS:  Okay.

MR. GREENAMYRE:  Understood.

MR. KANG:  I disagree with that statement on its face, but I think with caveat.  So generally, well taken, but --

MR. GREENAMYRE:  Sure.  Yeah, if there's a discussion about whether to assert a privilege or something like that, that's one thing.  Otherwise, I may, you know, if there's a break I may ask you what you talked about with your attorney, and generally you would need to answer that, okay?

THE WITNESS:  Okay.

MR. KANG:  And I'll assert my objection if necessary.

LYON REPORTING, INC.

8

MR. GREENAMYRE:  Sure.

EXAMINATION

BY MR. GREENAMYRE:

Q.   All right.  Have you ever been involved in any kind of legal proceeding before where you've sued somebody or someone sued you?

A.   No.

Q.   Okay.  No bankruptcy, no divorce, no --

A.   Bankruptcy.

Q.   -- lawsuit?

A.   Bankruptcy.

Q.   Okay.  When did you file for bankruptcy?

A.   I don't know.  I don't remember the year off the top of my head.  My wife keeps that paperwork --

Q.   Sure.

A.   -- typically.

Q.   This incident happened in 2022.  It was before that?

A.   Yeah.  Prior to that.

Q.   All right.  Closed before that?

A.   Yeah.

Q.   Nothing since then?

A.   No.

Q.   All right.  Where would you consider that you grew up?

9

A.   Metropolitan Atlanta area.

Q.   Okay.

A.   Kind of moved around a lot.

Q.   Got you.  Where did you go to high school?

A.   High school?  Campbell High School and Morrow High School.

Q.   Campbell, up in Cobb?  Morrow, down in Clayton?

A.   Clayton County, yeah.

Q.   All right.  And I think I saw from your interrogatory response that you got a -- you didn't get a high school degree from Morrow, but you got a GED--

A.   GED.

Q.   Got it.  I also saw from that --

MR. KANG:  Yeah.  Allow him to finish asking -- -- asking his question.

THE WITNESS:  I'm sorry.

MR. KANG:  -- his question before you answer.

BY MR. GREENAMYRE:

Q.   Yeah, it's going to be conversational but for her sake.

A.   I got you.

Q.   I also saw that you were a teacher or a para-professional?

A.   Yes.

10

Q.   At Rivers Elementary School?

A.   Yes.

Q.   Okay.  I went to elementary school in that same cluster growing up, and then I taught at North Atlanta, same cluster, for a few years.

I couldn't tell from your interrogatory responses, and this doesn't really matter in large part, but I saw that there was a  like, a FTA, failure to appear situation.  Was it -- was there ever an arrest or was it just a warrant that was issued?

A.   A bench warrant.

Q.   But did you get arrested on that warrant or you just --

A.   I mean, once you turn yourself in -- I'm sorry.

Q.   Go ahead.  Go ahead.

A.   Once you turn yourself in, technically arrested, so, yes.

Q.   Okay.  Sometimes you may have -- like, you may figure out you have a bench warrant and then you can call in and get it sorted out, but you, like, handcuffs on, that kind of thing?

THE WITNESS:  Yeah, I went  --

MR. KANG:  Object to form.

THE WITNESS:  Yes.  I went to -- once I

11

realized I had a bench warrant, I went to Clayton
County in reference to the bench warrant, and then
they had to process me in.

BY MR. GREENAMYRE:

Q.   Okay.  How long were you detained?

MR. KANG:  Object to form.

THE WITNESS:  Well, I was --

BY MR. GREENAMYRE:

Q.   In full, right, like, from when you walk into
Clayton County jail to when you walk out of Clayton
County jail?

A.   Five hours.

Q.   Okay.  In addition to your work, you're still
employed with GSUPD, correct?

A.   Yes.

Q.   In addition for your -- to your work with
GSUPD, do you have any, like, secondary or additional
employment?

A.   Break that down for me.  Elaborate.

Q.   Yeah, maybe not employment, but do you do
secondary jobs?

A.   Yes.

Q.   Okay.  What kind of jobs?

A.   Most of them are security-type jobs.

Q.   At, like, restaurant kind of places or where -

12

- what kind of security?

A.   It could be restaurants, stores.

Q.   Okay.  Got it.  For purposes of picking a jury in this case, we want to make sure that there are no people on the jury that are immediately related to you, so I just need names. I don't need addresses, but if you can give me names of people who are adults, either spouse, parent, adult children, brother, sister, in the 10 metro counties.  So, you know, Metro Atlanta and going out a little bit.

A.   Okay.  In-laws included?

Q.   Probably so.

A.   Probably so.  All right.

Q.   Let me get in-law parents.  I don't know that I need, like, sister-in-law.

A.   Okay.  In-law parents.  Okay.  I got you.  That's Bernard Sawyer, Caprice Pace or Lowe.  I'm sorry, her last name is Lowe.

Q.   L-O?

A.   Lowe.  L-O-W-E.

Q.   Got It.

A.   Sheila Reed.  You need my siblings?

Q.   Yeah.

A.   Jason Reed, John Reed, Tamika Brown, Tysheena Reed.  T-Y-S-H-E-E-N-A. Isaiah Oglesby.  That's it.

13

Q.   All right.  GSUPD is the only law enforcement agency that you work for, correct?

A.   Yes.

Q.   And you came in as an officer, and now you've been promoted to a sergeant last year?

A.   Yes.

Q.   Okay.  Have you applied to other law enforcement agencies?

A.   Yes.

Q.   Okay.  What other agencies did you apply to?

A.   Atlanta.  City of Atlanta Police Department, Clayton County.

Q.   CCPD or?

A.   Sheriff's office.

Q.   Okay.

A.   Those are the only ones I can think of.

Q.   Okay.  And what was the result of those applications?

A.   Didn't get hired at Atlanta and Clayton County.  I was at the beginning of the process, supposed to do the PAT, the physical assessment.  Never did the physical assessment.  I believe, I was already in the academy in Georgia State.

Q.   Got you.  You applied to those agencies around the same time that you applied to GSU?

14

A.   Yes.

Q.   Okay.  No application since GSU?

A.   Since GSU, I've applied at Atlanta again.

Q.   Okay.  Got it.  Same result?

A.   Yeah.  Same result.

Q.   In preparation for your deposition today, did you talk with anyone other than Mr. Kang?

A.   No.

Q.   Okay.  Have you talked with anyone about this day and this incident other than, you know, on the day of the incident, and then you go testify at the suppression hearing, and then, you know, in the last, you know, week or two you're prepping for deposition perhaps, right?

A.   Yeah.

Q.   What other conversations have you had outside of those related to the day of these arrests?

MR. KANG:  Object to form.

THE WITNESS:  No conversations that I can recall.  Just, I have a deposition coming up.

BY MR. GREENAMYRE:

Q.   Nothing substantive about what happened or anything like that?

A.   No.

Q.   Okay.  Have you talked to any of the other

LYON REPORTING, INC.

15

officers about the lawsuit when you learned about the lawsuit or anything like that?

A.    When I originally learned about it?

Q.    Sure.

A.    It's hard to recall whether or not I had conversations about it.  I saw a link going around originally, but that was the extent of the conversation I recall.

Q.    Link to news media?

A.    News media, yes.

Q.    Just, like, guy files lawsuit, that kind of --

A.    Yeah, against Georgia State.

Q.    Got you.  Okay.  What video or documents did you review in preparation for a deposition today?

A.    I've seen the court documents from last time I testified and body-cam footage.

Q.    Okay.  Court documents, I assume you mean, like, the transcript of your testimony?

A.    Yes.

Q.    Okay.  So you read that in the last, like, week or so?

A.    Yes.

Q.    All right.  Body camera.  Your body camera?  Other people's body camera?  What body camera did you watch?

16

A.    Only mine.

Q.    Okay.  Have you ever watched other people's body camera from the day of this incident?

A.    No.

Q.    Okay.  I may show you one or two clips from other people's, but just to ask about your involvement or this or that.

A.    Okay.

Q.    What other documents did you look at, paper?

A.    My report.

Q.    Okay.  And I'll show you that.  I'll ask you a few questions about that.  That's just your -- I think you wrote, like, a short supplemental on the day of, correct?

A.    Yes.

Q.    And then, like, even shorter supplemental that just says, "I testified," later on, correct?

A.    Yes.  If -- if it's on there.  I don't -- I don't remember that right now.

Q.    Sure.

A.    I can't say.

Q.    Fair enough.  I'll show you if it matters, right?  Okay.  Any other documents?

A.    Not that I can think of.

Q.    Okay.  Other than the body camera video, are

17

you aware at any time of any other video that captured anything at the Convocation Center, outside the Convocation Center, or related to the arrest detention of the people who were picked up, including Mr. Hendren?

A.    Am I aware of any other body camera?

Q.    Any video?

A.    Any camera footage outside of my own?

Q.    Any video other than body camera video?

A.    No.

Q.    Okay.  Like, specifically, any video from inside the Convocation Center?

A.    No.

Q.    Any video from, like -- I don't know that this would necessarily be like a pole camera, but like a camera out on Hank Aaron or something like that?

A.    No.

Q.    Okay.  Do you know whether or not there was any video at the Convocation Center or surveillance video or anything like that?

A.    Not that I'm aware of.

Q.    Okay.  You don't know one way or the other?

A.    (gesturing)

Q.    Just --

A.    No.

18

Q.   All right.   For the Court Reporter's sake.

A.   Got you.

Q.   All right.   On the day of the incident, where are you when you first hear something, you know, radio traffic about something going on at the Convocation Center?

A.   I'm not sure.

Q.   Okay.   In your car, do you know whether, like, you're north or south of Memorial?   You got any idea where you are?

A.   No.

Q.   Okay.   In your car or at the precinct, you don't know?

A.   No, I'm not sure.

Q.   All right.   What was your role within GSUPD at that time?   Like, what were you -- were you on patrol?   Were you on crime suppression?   What was your unit?

A.   Bike response team.

Q.   Bike response team.   What is it?   What is that?

A.   Bike response team, we're assigned to bikes; we can get in vehicles, pretty much -- on a day-to-day basis, we get, you know, check parking decks, check areas, maybe, you can't get to in cars as easy.   It just

19

-- it depends on the day.  That's just if we're on bikes.  They also respond to protests if necessary.  If we get activated, we typically connect with Atlanta and work in that capacity.  But day-to-day basis is direct to patrol, just patrol campus on bikes.  That's typically -- that's -- that's the section or the unit I was a part of at the time.

Q.   All right.  Same role and responsibility generally as patrol, but you got an option to be on a bike?

A.   Yes, and I -- I'm not dispatched to calls.  Patrol is dispatched to calls.

Q.   Uh-huh.

A.   When you are assigned to -- assigned to that unit, you are not dispatched.  You can respond.  You can be dispatched.  However, shift units are dispatched first.

Q.   Okay.  And how did you come to be dispatched to this?  I mean, I -- over the radio, I assume they just say, units respond.

A.   Yes.

Q.   Okay.  And it seemed like, you know, at some point in that, like, first hour where everybody's detained down on by the convenience store, just about everybody who was on duty at GSUPD, you know, was there

20

or at least came through for a minute, right?

MR. KANG:  Object to form.

THE WITNESS:  There were a lot of officers out there.  I don't know, just about everybody.  I can't say, but there were a lot of officers out there, APD and GSU.

BY MR. GREENAMYRE:

Q.   Okay.  And tell me, when you get there, are you in a vehicle or are you on your bike?

A.   I was training someone.

MR. KANG:  Object to form.

THE WITNESS:  I was training someone, so I was in the vehicle.

BY MR. GREENAMYRE:

Q.   With Officer Davis?

A.   Yes.

Q.   Got it.  All right.  So you're in the vehicle that day. When you first get to the area, do you know whether you have a memory of whether you're coming north from, like, Georgia Avenue area or whether you're coming south from downtown?

MR. KANG:  Object to form.

THE WITNESS: Not sure which direction I was coming from.  It would depend on where I was patrolling.

BY MR. GREENAMYRE:

21

Q.   Sure.

A.   Prior to the call.

Q.   When you first get to the general area, where is the first, you know, potential suspicious person that you see?  Or, let me -- let me back up a second.  Do you go to the Convocation Center first or, like, drive by it before anything else?  Or you pass by that and go down Fulton into Summer Hill?

MR. KANG:  Objection to form.

THE WITNESS:  Convocation area.  The general area of the Convocation site.  I would go there first.  I'm sorry.  I went there first.

BY MR. GREENAMYRE:

Q.   Okay.  So you go to that general area first.  Do you see any individuals that may be protestors at that time, like, you know, at the Convocation Center?

A.   Not that I can recall.

Q.   Okay.  Where do you go from there?

A.   Based on what I remember, by the time I got to the area, radio traffic was saying that the individuals are in the area of Martin Street.  So that would be the area that I went towards.

Q.   Okay.  I'm going to hand you what's previously been marked and we'll re-mark as Exhibit 3.  I don't

LYON REPORTING, INC.

22

have one for you.  I have -- but you're not really here.

(Exhibit 3 marked for identification.)

MR. KANG:  Can the witness see it or?

MR. GREENAMYRE:  Do you have stickers?

THE COURT REPORTER:  Yes, I do.

MR. GREENAMYRE:  Okay.  Just if this becomes helpful, let me know.  I can also put it up on the screen if there's something that needs to be zoomed in on or anything like that.  Do you mind if we do the yellow stickers or the plaintiff's stickers?

THE COURT REPORTER:  Yeah.

MR. GREENAMYRE:  She's got it.  Sorry.  Just because it says defendant versus plaintiff.

MR. GREENAMYRE:  She got it, Gerry.

MR. WEBER:  Okay.

BY MR. GREENAMYRE:

Q.  All right.  So, Convocation Center is at Hank Aaron and Fulton Street, the northwest corner?

MR. KANG:  I need help.

MR. GREENAMYRE:  Yeah.  All right.  All right.  So, first, flip it up the other way, right, so the words at the top are at the top, right?  You got it.  All right.  All right.  So you see the connector, right?  Just to the east of the connector, you got, you know, below of 20, right?

23

MR. GREENAMYRE:  Excuse me.

BY MR. GREENAMYRE:

Q.   Right here.  That's the Convocation Center, right?

A.   Yeah, you said 20, so I was looking at 20.

Q.   Yeah.  So just south of 20.  Just east of 75, 85.  At the intersection of Hank Aaron and Fulton Street, we got the Convocation Center, right?

A.   Yes.

Q.   That northwest corner?

A.   Capitol.  That would be Capitol and Fulton.

Q.   Okay.  Where does -- where does it switch from Hank Aaron to the Capitol--

A.   At Fulton Street.

Q.   All right.  Got it.  Okay.  So you get to the general area of Hank Aaron and Fulton Street, don't see anybody there, and then you go down into the area around Martin Street, correct?

A.   Yes.

Q.   Okay.  And it's not until you get on Martin Street that you see anybody; is that correct?

MR. KANG:  Object to form.

BY MR. GREENAMYRE:

Q.   That is a potential protestor?

A.   Yes.

LYON REPORTING, INC.

24

Q.   And there's a -- we have a video of, I think, you, in your car, and there's, like, you know, brief, like, foot pursuit or you're driving around for a minute.  And I believe you and Davis apprehend two suspected protestors?

MR. KANG:  Object to form.

BY MR. GREENAMYRE:

Q.   Is that right?

A.   I don't recall exactly right now.

Q.   Okay.

A.   It was a while ago, sorry.

Q.   A hundred percent.  Do you recall you and Officer Davis making any arrests of protestors?

A.   I didn't -- I didn't arrest anyone.

Q.   Okay.  All right.  First, so tell me what you see when you -- when you get to Martin Street and you see the suspected protestors.

A.   Tell you what I remember?

Q.   Yeah.

A.   For the most part, maybe around Martin and -- you don't have the street highlighted on here.  At the end -- near where the convenience store is, I believe that's Crumley?

Q.   Yeah.

A.   That's around the time that I recall seeing

25

potential protestors.

Q.   Got it.  And Crumley just is -- I'll represent to you as the block, one south or a half block south of Richmond.  Where it says like the words "public supermarket," that's Crumley.

MR. KANG:  Can you give me a second to find that?

MR. GREENAMYRE:  Yeah.

MR. KANG:  What's your question?

BY MR. GREENAMYRE:

Q.   You see where I'm at?

A.   That pub -- no, that's not Crumley.

Q.   Okay.

A.   You would have to go back north a couple of blocks.  You see  - you see Reed Street?

Q.   Yeah.

A.   That Crumley would be somewhere in that area.  One of those blocks right there.

Q.   Okay.  I don't know that's going to much matter.  But you get -- the first thing that you recall seeing is people near the convenience store?

A.   Running.

Q.   Running.  Okay.  When you get there, do you see people running into that red Subaru that ends up getting stopped or are -- has that car already been

26

stopped?

A.   I'm not sure about that.  I wasn't involved in the Subaru.

Q.   Understood.  But you don't know whether you saw people running, you know, into the Subaru or you saw people running after that traffic stop?

A.   No, I don't -- I'm not sure about that.

Q.   Okay.  All right.  We will, maybe, agree about some things, disagree about other things, but part of what I want to do today is find out where that area of agreement and disagreement are, all right?

A.   Okay.

Q.   Do you agree that if Mr. Hendren was not inside the Convocation Center, he should not have been arrested?

MR. KANG:  Object to form.

THE WITNESS:  I wasn't aware he was arrested.

BY MR. GREENAMYRE:

Q.   We'll get to that.

A.   Okay.

Q.   This is the question:  Would you agree that if Mr. Hendren was not inside the building, he should not have been arrested?

MR. KANG:  Same objection.

THE WITNESS:  Rephrase it for me.

27

BY MR. GREENAMYRE:

Q.   Yeah.  Let's assume Mr. Hendren was not in the building.  Just -- that's a fact, right?  Assume that fact.  If that's the case, can we agree that Mr. Hendren should not have been arrested?

MR. KANG:  Object to form.

THE WITNESS:  Based on what I knew at the time or based on what I know now?

BY MR. GREENAMYRE:

Q.   Not based on what you know now, not based on what you knew at the time, based on your assumption that he was never in the building.

MR. KANG:  Object to form.

THE WITNESS:  Do I agree that if he was never in the building, he shouldn't have been arrested?

BY MR. GREENAMYRE:

Q.   Yeah.

A.   For me, I need more details, but -  but --

Q.   All right.  Tell me what you're thinking or what detail would be important for you to make that call.

A.   So if -- if he -- if he was never in the building --

Q.   Yeah.

A.   -- never around the building, had nothing to

28

do with anything that was going on, then no, he shouldn't have been arrested.

Q.   Okay.   But if he was around the building, he might've been arrested?

MR. KANG:   Object to form.

THE WITNESS:   You need probable cause to arrest someone.

BY MR. GREENAMYRE:

Q.   Yeah.

A.   So that's why I'm getting hung up with you saying arrested.

Q.   Yeah.

A.   That's why I said I wasn't aware he was arrested.

Q.   Okay.

A.   So no one should be arrested just hanging around a building.   I'm -- I'm not sure if that answers your question.

Q.   It does.   Right.

A.   Okay.

Q.   Like, I think we can, you know, hopefully agree about that, right?   If he -- if he hadn't been in the building, he shouldn't have been arrested, right?   Okay.

MR. KANG:   I object to form.

LYON REPORTING, INC.

29

BY MR. GREENAMYRE:

Q. And so I take from that that you're not aware of any other basis, besides the report from the Brasfield & Gorrie witnesses, that Hendren was inside the building that provided any basis to arrest Mr. Hendren?

MR. KANG: Object to form.

THE WITNESS: Break it down for me a little bit.

BY MR. GREENAMYRE:

Q. Yeah. Was there any other reason that you knew of, or that you know of today, that Mr. Hendren could have been arrested lawfully other than the -- what, the report you got from the Brasfield & Gorrie folks?

MR. KANG: Object to form.

BY MR. GREENAMYRE:

Q. Not aware of anything?

A. No, I'm not aware of anything.

Q. All right. And just to, like, clarify, break this down a little bit, he didn't interfere with the traffic stop that you observed?

A. I didn't observe --

MR. KANG: Object to form

THE WITNESS: -- the traffic stop.

30

BY MR. GREENAMYRE:

Q.   And you -- so you -- if you didn't observe the traffic stop, you certainly didn't observe him, like, interfering with it in any way, correct?

A.   Yeah, I'm not aware of him--

MR. KANG:   Object to form.

BY MR. GREENAMYRE:

Q.   Yeah.

A.   I'm sorry.  I wasn't aware of him interfering with a traffic stop.

Q.   Sure.  And you're not aware of anybody saying anything about Mr. Hendren having committed a moving violation, are you?

A.   No.

Q.   You're not aware of anybody saying or you personally observing Mr. Hendren committing a pedestrian violation, are you?

A.   What's a pedestrian violation?

Q.   Jaywalking.  Pedestrian in the roadway.

A.   Oh, okay.  No, I'm not aware of anything.

Q.   Okay.  You're not aware of -- either from your personal observation or from anybody saying anything, that there was any reason to believe that Mr. Hendren committed a firearm violation?

A.   Not that I recall.

LYON REPORTING, INC.

31

Q.   We can -- do you agree that you never had any information, whether firsthand or reported from others, that Mr. Hendren damaged any property?

A.   At that time?

Q.   Ever.

A.   Ever is kind of broad for me.  So ever that day, in general?

Q.   I guess I'll ask it like this, right, and we can -- we can get narrower if we need to, but, like, do you have any information as you sit here today from any source that Mr. Hendren damaged any property anywhere, ever?

A.   No.  I wasn't part of that investigation.

Q.   Okay.  Are you aware of anybody saying that Mr. Hendren committed an assault against anyone else?

A.   No.

Q.   Okay.  Can we agree that, at least as a general matter, there is a First Amendment right to record public officials in public places so long as they're not interfering?

A.   Yes.

MR. KANG:  Objection; calls for legal conclusion.

BY MR. GREENAMYRE:

Q.   To be clear, your answer was yes?

32

A.   Yes.

Q.   All right.  I want to get to some -- what do you -- what's your understanding of the difference between a Terry stop and an arrest?

A.   Arrest is --

MR. KANG:  Objection.  Object to form.

THE WITNESS:  Arrest is probable cause to make an arrest based on a reasonable prudent person's understanding that a crime has been committed.

BY MR. GREENAMYRE:

Q.   All right.  So the justification you need for an arrest is probable cause, right?

A.   Yes.

Q.   All right.  But in terms of what is done to the arrestee, like, what is the scope of a permissible Terry stop, and when does that change into being an arrest that needs full-blown probable cause?

MR. KANG:  Objection; calls for legal conclusion.

THE WITNESS:  You want to know when does it change from?

BY MR. GREENAMYRE:

Q.   Yeah.

A.   Well, it would depend on the case.  If -- if it's a Terry stop and it's an investigator detention,

33

then the officer should be gathering information, and based on the information collected, then that individual can be arrested based on that.

Q.   Okay.  I agree that Terry stops are generally short in duration.

MR. KANG:  Objection; calls for legal conclusion.

THE WITNESS:  Don't know about short.  Brief, but it has to be reasonable and it's going -- the reason -- it being reasonable is based on what's being investigated.

BY MR. GREENAMYRE:

Q.   Say a little bit more about that.  So are you -- is it your understanding that, like, I guess, you know, the severity of the crime may lead to a longer, permissible Terry stop?

MR. KANG:  Object to form, and calls for legal conclusion.

THE WITNESS:  Severity of the crime could be a part of it, but it could be resources, it could be other things involved.  So totality of the circumstance, not just what's happening in front of us, but what's happening behind the scenes, whether that be an investigation, whether that be how quick you can receive information.  So it's -- everything kind of determines

34

how quick things can go during an investigative detention.

BY MR. GREENAMYRE:

Q.   Okay.  I don't know -- I believe you said some words to the effect earlier of, I wasn't aware that Mr. Hendren was ever arrested.  Is that more or less what you said earlier?

A.   Yes.

Q.   Okay.  I got some questions about that.  Is it that you do not know one way or another whether Mr. Hendren was arrested,  or are you saying that it is your belief that Mr. Hendren was never arrested?

A.   I wasn't aware of one way or another that he -- whether or not he was or wasn't.  I was aware he was detained.  I wasn't aware that he was arrested.

Q.   Okay.  In terms of determining whether someone is, you know, subjected to a Terry or a full-blown arrest, you mentioned a number of factors.  Would you agree that one of those factors is whether that person is transported to a different location?

MR. KANG:  Objection; calls for legal conclusion.

THE WITNESS:  Which determines what?

BY MR. GREENAMYRE:

Q.   Whether it's a Terry stop or an arrest,

35

right?

A.    It would really depend on what's going on.  So it is hard to say arrest is only if you're not -- I mean, you are only detained if you're in this one place or position.  If there's an investigation going on, then you may be moved somewhere else.  Number -- a number of factors can, you know, take place or why are we moving this individual?  Why is it necessary that we move from the general area to conduct a proper investigation?

Q.    Okay.  I want you to assume some facts, right?  And if you need more facts or you got questions about them, we can talk about that, right?

A.    Okay.

Q.    But assume the following:  Mr. Hendren is arrested, held at the scene of the convenience store, right, for one to two hours, and at some point is transported to a precinct, is put into a holding cell, and is not released for seven to nine hours after his initial detention.  Assume those things to be true.  That's an arrest, isn't it?

MR. KANG:  Object to form; calls for speculation and calls for a legal conclusion.

THE WITNESS:  You said two things.  You said assume that he's arrested and then you reference his detention.  So is he detained or arrested?

36

BY MR. GREENAMYRE:

Q.   Assume handcuffs are put on him, assume at the scene, right, assume handcuffs are kept on him, assume he is transported in a law enforcement vehicle to a precinct, assume he is put into a holding cell, assume he is not released for seven to nine hours.  That's an arrest, isn't it?

MR. KANG:  Object to form --

THE WITNESS:  I would disagree with you on that.

MR. KANG:  -- calls for speculation, calls for a legal conclusion.

BY MR. GREENAMYRE:

Q.   Go ahead.

A.   I would disagree.

Q.   All right.  Tell me why.

A.   Because, once again, it depends on what's going on.  If there's an active case being investigated, if there's something being investigated at that time, then we're still at a detention, so there's no time limit placed on the detention.

Q.   You mentioned -- I think the last thing you said was there's no time limit on how long a detention can last before it turns into an arrest, so long as there is an investigation ongoing; is that what you said?

LYON REPORTING, INC.

37

MR. KANG:  Object to form.

THE WITNESS:  Not so long as there's an investigation.  I'm saying if -- as long as something is going on.  There's an active investigation, so I'm not saying it's so long.  It is, once again, totality of circumstance, everything that's going on, everything that's involved in what's happening.

MR. GREENAMYRE:  Can we mark this as 8, yeah?

MR. KANG:  Do you have an extra copy?

MR. GREENAMYRE:  I do.

MR. KANG:  You said 8?

MR. GREENAMYRE:  Yeah, this has previously been marked.

(Exhibit 8 was marked for identification)

BY MR. GREENAMYRE:

Q.  So this is the incident report that we talked about earlier, correct?

A.  Okay.

Q.  Yes?

A.  Yes.

Q.  All right.  And you'll see on a couple locations, it says "arrest information," "location of arrest," correct?  Arrest date?

MR. KANG:  Can you point to a specific --

BY MR. GREENAMYRE:

38

Q.   Look at halfway down the first page, right?  There's a box that says "arrest information," below that, below location of arrest, arrest date, right?

A.   Arrest information.  Okay.

Q.   Do you see that?

(Sotto voce conversation.)

        MR. GREENAMYRE:  And that applies to Walter, not to him.

BY MR. GREENAMYRE:

Q.   All right.  So I want to understand where you are at with this.  So earlier, I understood your testimony to be that you are not sure whether Mr. Hendren was arrested or not arrested.  But, maybe, it's your contention that he was never arrested.  Like -- and so my question is, do you not know whether he was arrested or not, or you know or believe that he was never arrested?

        MR. KANG:  Object to form.

        THE WITNESS:  I don't know whether or not he was arrested or not.

BY MR. GREENAMYRE:

Q.   Okay.  All right.  You gave testimony at the suppression hearing, correct?

A.   Yes.

39

Q. You were under oath at that time, same as right now, correct?

A. Yes.

Q. Truthful at that time, same as right now, correct?

A. Yes.

Q. After you reviewed your testimony recently from that suppression hearing, anything that you'd like to change or revisit in any way, shape, or form?

A. I don't remember everything I said at that time.

Q. Okay.

A. So it's -- it's hard to say.

Q. Sure. But you re-read it recently, right?

A. I did get a chance to go over it.

Q. And as you re-read it recently, you didn't -- nothing jumped out at you, like, that's not right?

A. Not really.

Q. Okay. Not really is sort of, it's a little squishy.

A. I'm sorry. Nothing jumped out at me.

Q. All right. And I believe you said in that testimony that you don't recall any conversations that you had with any of the Brasfield & Gorrie folks prior to your body camera turning on; is that still the

40

case?  Do you recall any conversation you had with any Brasfield & Gorrie person before your body camera turned on?

MR. KANG:  Object to form.

THE WITNESS:  By recall, it would be I don't know what was said, so it's hard for me to recall or remember something, you know, that I don't remember, you know, so no, I wouldn't be able to change that.

BY MR. GREENAMYRE:

Q.   You had some -- like, there may have been some words that you exchanged with Brasfield & Gorrie folks, but you're not sure how much of a conversation you had, right?

A.   Yes.

Q.   And you're certainly not sure what you said or what they said, right?

A.   Yes.

Q.   All right.  Same question, but after you turned your body camera off, right?  After you turned your body camera off, do you recall anything that you said or that the Brasfield & Gorrie folks said in any way, shape, or form?

A.   No, I do not.

Q.   Okay.  Do you recall whether you had any conversation with them after you turned your body camera

41

off?

A.   No, I do not.

Q.   All right.  At the time, you know, day of, right?  Are you -- do you have any information, one way or the other, whether the doors to the Convocation Center were, like, broken into, like, whether they smashed any glass or, like, forced entry or they -- the protestors opened an unlocked door, you know, a Brasfield & Gorrie person, like, held the door for them, or do you have any information about that in any way, shape, or form?

A.   I don't --

MR. KANG:  Object to form.

THE WITNESS:  I don't recall any of that information.

BY MR. GREENAMYRE:

Q.   All right.  No information about forced entry?

A.   Not that I recall.

Q.   No information one way or the other about whether the door was unlocked?

A.   Not that I recall.

Q.   I didn't see on any of the body cameras, but tell me if there's something that you recall.  Was there anything like no trespassing signs on the exterior of

42

the Convocation Center at that day?

MR. KANG:  Object to form.

THE WITNESS:  Not that I recall.

By MR. GREENAMYRE:

Q.    You got information about the size of the group from -- of protestors from the witnesses.  But before that time, how many protesters did you ever lay eyes on or see?

MR. KANG:  Object to form.

BY MR. GREENAMYRE:

Q.    Approximately?

A.    It is hard to say.  People -- people were scattered.  So it was -- I wouldn't want to assume a number.

Q.    Did you see people scattering?  Like, you -- actually laid eyes on people scattering that were never arrested?

A.    That, I'm not sure.

Q.    All right.  Some of the protestors were inside the building and some of the protestors were outside of the building.  It's, you know, what people have said.  I'll represent that to you, right?  Did you know anything about how many protestors went into the building versus were outside of the building?

MR. KANG:  Object to form.

43

THE WITNESS:  No.  I -- I don't have any information.

BY MR. GREENAMYRE:

Q.   Okay.  You know, this isn't captured on the body camera.  But I just want to make it clear, did you have -- the two Brasfield & Gorrie witnesses that got in the back of your car, did you have any information about what they were doing at the Convocation Center when the protesters came?

A.   I'm not sure.

Q.   You don't -- you don't have any recollection of that?

A.   About what the Brasfield employees were doing?

Q.   Those two in specific.

A.   When the protestors came?

Q.   Yeah.

A.   No, I'm not sure.  I couldn't tell you one way or another.

Q.   Okay.  You don't know, like, what part of the building they were in or how close they were or anything like that?

A.   No.

Q.   Did they give you any description -- "they" being the Brasfield & Gorrie folks in the back of your

44

car -- any description of the protestors before they got to the scene?  They tell you it's women, it's -- you know, they're wearing this, they're doing that, that you can recall?

MR. KANG:  Object to form.

THE WITNESS:  None that I can recall.  They may have.  I'm just -- based on what I remember right now, I don't recall.

BY MR. GREENAMYRE:

Q.   Okay.  And you would agree with me that the two people in the car expressed certainty that GSUPD had arrested the protesters as opposed to people who were not protesting before they arrived to the convenience store?

A.   Can you rephrase that?

Q.   Yeah.  Before you got to the convenience store, before they laid eyes on these people face to face, the Brasfield & Gorrie folks said, you know, you got them, they're lying about not being in the building?

A.   Before they saw them?

Q.   Yeah.

A.   I'm not sure how they'd say it before they see them, so I don't --

Q.   We can play part of the video, but that's not on in the video, so I'm not sure that it matters.  Did you

45

ever tell the people that you -- the two Brasfield &
Gorrie witnesses -- tell them that the people who were
in handcuffs may not be the right people?

A.   No, I don't recall saying that.

Q.   All right.  And then we'll go through the
video in a little bit of detail, but, you know, at the
end of the day, you would agree that Mr. Hendren would
not have been placed in handcuffs at all if it wasn't
for Mr. Bussey and Mr. Page saying that he was inside of
the building?

MR. KANG:  Object to form.

THE WITNESS:  Yeah.  He wouldn't have been detained
if they hadn't said anything in reference to him.

BY MR. GREENAMYRE:

Q.   Right.  And he was only put into handcuffs
after and immediately after they identified him as being
inside the building, correct?

A.   Correct.

Q.   And at that point when they say that, did you
feel that you had probable cause to arrest him?

MR. KANG:  Objection; calls for legal
conclusion.

THE WITNESS:  Yes, I can make probable cause
based off of that.  That wasn't a decision made,
but --

46

BY MR. GREENAMYRE:

Q. Right. And my question is: probable cause of what?

A. Probable cause of what?

Q. Yeah.

A. Well, I didn't arrest him. I detained him. So --

Q. I understand.

A. -- if -- if there was a criminal -- so I said if there was criminal activity that had happened as far as him, you know, doing something criminal, I would have had probable cause.

Q. Let me make sure I understand.

A. Yeah.

Q. I thought a second ago, you said after you got the identification from the Brasfield & Gorrie folks, while you're not saying that you arrested him, you were saying that you had probable cause to have arrested, him if you wanted to have arrested him.

A. If -- if there's a criminal activity.

Q. Okay. So I mean, help me understand that caveat. Obviously, you can't have probable cause without criminal activity, right?

A. Yes.

MR. KANG: Object to form and calls for a

47

legal conclusion.

THE WITNESS: You can't -- yes, you have to have criminal activity for that to be probable cause. It has to be a prudent person. A reasonable person would have to be able to observe that criminal activity is afoot.

BY MR. GREENAMYRE:

Q. Yeah. My question to you is: Did -- at the time that you and Davis put Mr. Hendren in handcuffs, is it your belief that you had probable cause?

A. To do--

MR. KANG: Object to form.

THE WITNESS: To do what then? Break it down. Because I made it clear several times that I detained him, that he was detained. So I'm not saying he was arrested. So you have to tell me based on what?

BY MR. GREENAMYRE:

Q. So you can see the probable cause of a violation, you don't have to arrest somebody, right?

MR. KANG: Object to form.

THE WITNESS: If I see probable cause to make an arrest, I don't have to make an arrest at the time; is that what you're asking?

BY MR. GREENAMYRE:

Q. Yeah.

A. Yeah. I don't have to make an arrest at the

LYON REPORTING, INC.

48

time.

Q.   Right.   You see someone jaywalking, right? In the state of Georgia, that is a misdemeanor and punishable up to a year in custody, right?

A.   I'm not sure.

MR. KANG:   Object to form.

BY MR. GREENAMYRE:

Q.   All right.   But you don't have to arrest somebody when you see them jaywalking in downtown Atlanta, do you?

MR. KANG:   Object to form.

THE WITNESS:   No.   I have discretion.

BY MR. GREENAMYRE:

Q.   Right.   All right.   My question to you is not whether you arrested Mr. Hendren or detained Mr. Hendren or anything like that.   Did you believe at the moment he was put in handcuffs that there was probable cause to believe that he had committed any crime?

A.   No.

MR. KANG:   Objection to form.

MR. GREENAMYRE: So --

MR. KANG:   Calls for legal conclusion.

BY MR. GREENAMYRE:

Q.   At that time, you didn't believe that there was probable cause to believe he had committed any

49

crime?

A. To effect an arrest.

MR. KANG: Object to form.

BY MR. GREENAMYRE:

Q. Okay. Why not?

A. Because right now we're just doing an investigation. So there has to be a conclusion of the investigation to determine whether or not the crime -- a crime has been committed. So if this is at the very beginning of the investigation for this person in particular, then we hadn't gotten to that point to where a conclusion of arrest could be made.

Q. Sure. And you can get, like, a -- I mean, just -- you can imagine a situation where you got probable cause right at the outset that a crime has been committed, but that doesn't mean that you stop your investigation. You keep going, right?

MR. KANG: Object to form.

THE WITNESS: Say it again.

BY MR. GREENAMYRE:

Q. You could agree that you don't have to stop your investigation as soon as you obtain probable cause, correct?

MR. KANG: Object to form.

THE WITNESS: Nor do you have to place him under

50

arrest just because you have probable cause.

BY MR. GREENAMYRE:

Q.   A hundred percent, right?  And so -- sorry for belaboring this, but to -- so that I totally understand what you're saying.  It is your personal belief that there was not probable cause to believe Mr. Hendren had committed any crime at the time he was put into handcuffs.

MR. KANG:  Object to form.

THE WITNESS:  What I'm saying is I'm not aware of any crime that he had committed.  So, it's my belief that he was detained at the time.

BY MR. GREENAMYRE:

Q.   Understood.

MR. KANG:  Zack, can we take a break?

MR. GREENAMYRE:  Yes, sir.

MR. KANG:  Either now or after your next line of questions.

MR. GREENAMYRE:  We're going to get into the video.  I'm not going to spend a whole lot of time on the video, but let's take a break now.  Natural.

MR. KANG:  Off the record.

(Recess taken at 10:34 a.m.)

(Proceedings resumed at 10:42 a.m.)

BY MR. GREENAMYRE:

51

Q.   All right.   So we just took an eight-minute break.   During this break, did you talk with your attorney?

A.   Yes.

Q.   Did you talk with your attorney about whether or not to assert a privilege?

A.   No.

Q.   Okay.   What was the conversation that you had with your attorney?

MR. KANG:   I'll object to attorney-client privilege.

MR. GREENAMYRE:   You can answer unless he tells you not to.

MR. KANG:   I'll instruct you not to answer.

BY MR. GREENAMYRE:

Q.   Okay.   I think we had a pretty clear record that he did not have a conversation about whether or not to assert a privilege.   And so far as I know, that is the only potential basis for a mid-testimony conversation with counsel to retain its privileged status.   Am I wrong about that?

MR. KANG:   Show me the case law.   I'll have to see it.   But we did not talk about the substance of this case, so -- or the testimony.

MR. GREENAMYRE:   Okay.   Then tell me what you-

52

all talked about.

MR. KANG:  Go ahead.

THE WITNESS:  He told me that when you play a video, make sure I can hear it and see it.

BY MR. GREENAMYRE:

Q.   What else?

A.   I asked him how long he's been working here. I asked him about Chris's car.

Q.   You-all were on the first floor here right now, right?

A.   Yes.

Q.   You-all took an elevator up to a different floor?

A.   Yes.

Q.   Okay.  And we were breaking for approximately eight minutes.

A.   We didn't determine to break for eight minutes.

Q.   No, no.  But that was how long it was, I'll represent to you.

A.   Okay.

Q.   Yeah.  Okay.  So from the start of the deposition to now, I invited -- you know, outside of the deposition, you recall that I invited you to go back, and if there was any issue with any testimony, you

53

wanted to add something, tweak something, anything like that. From the start of the deposition to right now, is there anything that you would like to change, modify, tweak, in any way, shape, or form?

MR. KANG: I object to form.

THE WITNESS: It would be hard for me to remember everything we just went through. So, it's hard to say. Right now, there's nothing I can think of.

BY MR. GREENAMYRE:

Q. Understood. All right. Let's move on. All right. You may need to -- it may be easier if you go that way and look this way.

THE WITNESS: Okay.

MR. GREENAMYRE: But Frank will tell us if there's a better way to do it. All right.

BY MR. GREENAMYRE:

Q. So this is part of Exhibit 2. This is your body camera that is approximately 12 minutes and change.

(Exhibit 2 was marked for identification.)

MR. KANG: Can you specify which, like, the file name of this, just so we know it?

MR. GREENAMYRE: Yeah. It ends in 169. Is that what it says, or is that 168?

MR. KANG: 169.

LYON REPORTING, INC.

54

          MR. GREENAMYRE:  Okay.

          MR. KANG:  Yeah.

          MR. GREENAMYRE:  My eyes are not what they
     should be.
BY MR. GREENAMYRE:

     Q.   All right.  You recognize this to be the video
that you -- that's your body camera video that you've
previously reviewed?

     A.   It looks like it.

     Q.   All right.  If it's not, let me know.

     A.   Okay.

     Q.   Okay.  And this is -- at this point in time,
you've already been down to the scene of the traffic
stop on Martin Street, and you come back up to the
Convocation Center for purposes of doing a show-up,
correct?

     A.   I don't recall responding to a traffic stop.

     Q.   You were at the scene where people were taken
out of a car, right?

          MR. KANG:  Object to form.

          THE WITNESS:  I never responded to people
     being taken out of a car.  We're talking about
     individuals running, that's what I testified to
     earlier, who were allegedly inside the Capitol,
     then yes.  But I'm saying I never responded to a

LYON REPORTING, INC.

55

traffic stop.

BY MR. GREENAMYRE:

Q.    Okay.  I'll represent to you that there was a traffic stop, four people were taken out of the car, and those were some of the people that were handcuffed and on the ground when you got to Martin Street.

A.    Okay.  I had no involvement in a traffic stop.

Q.    Understood, right.  So what should we call that, if I'm just trying to use, like, shorthand?

A.    We go to the convenience store scene.

Q.    All right.  Let's call it that, right?  All right.  So, you go to the convenience store scene, and then you come up, back up here for the purposes of doing a show-up, correct?

A.    Yes.

Q.    All right.  How do you -- is there any, like, selection process for how the two people that came to be in the back of your car, came to be in the back of your car of all the people at Brasfield & Gorrie that's not depicted in the video?

A.    There was a process.  I don't recall how those two individuals were selected at this time.

Q.    You don't have any information --

A.    No.

Q.    -- that you can give us about that?

LYON REPORTING, INC.

56

A.   No, sir.

Q.   All right.  I'm going to go to about 1:38 and play it, and at some point in the next 10 or 20 seconds, I hear one of the people in the back seat say something along the lines of, "It's a wonder them motherfuckers don't get hurt," or something like that.  And I want you to listen for that and tell me if you hear something like that.

A.   Okay.

(Video playing.)

BY MR. GREENAMYRE:

Q.   All right.  So I'm pausing it at 1:48.  You hear somebody say that?

A.   Yes.

Q.   All right.  And that's, certainly, not Officer Davis, that's one of the Brasfield & Gorrie folks?

A.   Yes.

Q.   All right.  And when they're referring to "them motherfuckers," fair to assume that that's a reference to the protestors?

A.   I'm not sure.

MR. KANG:  Objection; form.

BY MR. GREENAMYRE:

Q.   Okay.

A.   I didn't hear the conversation that led up to

57

it, so it'd be hard to say.

Q. Okay. We can play that. And as we listen to this, let me know if you have any other hypothesis for who the reference to "them motherfuckers" would pertain to besides the protesters.

A. Okay.

MR. KANG: Objection; form.

(Video playing.)

BY MR. GREENAMYRE:

Q. All right. So we heard, at least, all the context that is available via the body camera. You got any idea who "them motherfuckers" that might get hurt could be, if not the protesters?

A. No. They didn't say anything prior, so.

Q. Okay. Just fair to assume, right, that's who they're talking about?

MR. KANG: I object to form.

THE WITNESS: I couldn't say.

BY MR. GREENAMYRE:

Q. Okay. All right. We'll zoom forward a little bit in time, but if you want to go back at any time, just let me know. So we'll go to 2:20.

(Video playing.)

BY MR. GREENAMYRE:

Q. All right. So I hear one of the Brasfield &

58

Gorrie folks say, "They went this way."  Right?

A.    Yes.

Q.    And then you say, "Yeah, we got them," right?

A.    Yes.

Q.    "We just want to bring you-all over here."  And then you say, "Oh, we're red."

A.    Recording.

Q.    Right.  Why did you say that at that time?

A.    To make sure I was recording.

Q.    Okay.

(Video playing.)

BY MR. GREENAMYRE:

Q.    After you say, "We want to bring you-all over here, so you-all can ID them for us," you hear someone from the back pipe in and say, "I sure will."

A.    Yes.

Q.    Okay.

(Video playing.)

BY MR. GREENAMYRE:

Q.    All right.  I hear you say, "Because they say they didn't go in the building."  You hear yourself say that?

A.    Yes.

Q.    How do you get information that somebody said protesters didn't go in the building?

59

A.   It could've been information on the radio, it could've been information from the scene.

Q.   Okay.  But you knew at that point that some protesters went in the building and some protesters were not in the building?

A.   Yes.

Q.   All right.  And you were trying to figure out who was, at least at the outset, who was inside the building?

A.   Yes.

Q.   Because, you know, being out on the sidewalk is not criminal trespassing, right?

MR. KANG:  Object to form.

THE WITNESS:  Yes.

(Video playing.)

BY MR. GREENAMYRE:

Q.   All right.  Sorry.  I can play that last bit again, but -- if it's helpful, but do you recall the response to your statement being this guy saying they did went in the building, they're fucking liar?

A.   Yes.

Q.   Okay.  And at this point, this person is saying that the people that are detained went in the building without anyone ever having seen them, correct?

A.   Yes.

60

Q.   So you would agree when they say, you know, "They're fucking lying," that guy has no basis to make that statement at that time?

MR. KANG:  Object to form.

THE WITNESS:  Yes.

BY MR. GREENAMYRE:

Q.   I'm going to play about a minute.  I'm starting at 2:57.

(Video playing.)

BY MR. GREENAMYRE:

Q.   All right.  So just pause it for a second.  That was you saying that -- saying to them that they don't have to get out of the vehicle, correct?

A.   Yes.

Q.   All right.

(Video playing.)

BY MR. GREENAMYRE:

Q.   All right.  So I'm pausing it at the 3:54 mark.  And that's, again, you saying, "This is the most we're going to do right here?"

A.   Yes.

Q.   All right.  And at that point, your -- you know, the arrestees are on the other side of the convenience store, correct?

A.   Yes.

61

Q.   And they're sitting down?

A.   Yes.

Q.   And they're facing the street?

A.   Yes.

Q.   And they're wearing masks?

A.   We can see, I don't recall really.

Q.   All right.  We're going to -- we'll play the video in a second, and you'll see them wear a mask at that point in time.

A.   Okay.

Q.   But, I guess, my question is: Do you have any recollection of, like, you show up, they're all sitting down, and they have their masks off, and then in between, like, in the next 10 seconds, they all put their masks back on?

MR. KANG:  Object to form.

BY MR. GREENAMYRE:

Q.   You don't have any memory like that?

MR. KANG:  Object to form.

THE WITNESS:  I don't have any recollection.

BY MR. GREENAMYRE:

Q.   That probably didn't happen, did it?

MR. KANG:  Object to form.

THE WITNESS:  I can't say whether or not it did or didn't.

62

BY MR. GREENAMYRE:

Q.   All right.  Let's see.  We'll play it again.

A.   Okay.

(Video playing.)

BY MR. GREENAMYRE:

Q.   All right.  So at least at this point, 4:17, all these folks are wearing masks, right?

A.   Yes.

Q.   All right.  Why not have those two folks get out?

A.   Safety for those individuals at the time.  A show-up is another version of a lineup.  That wouldn't be any different than you bringing the individuals out in front of the lineup and showing them at that time.  So that's not -- that wouldn't be the proper way of doing a show-up.

Q.   Okay.  Does GSUPD have written policies about lineups, show-ups, photo identification?

A.   I can't recall.

Q.   Okay.  But you're saying it would be inappropriate for them to be face-to-face?

A.   At that time, yes.

Q.   Okay.  And that is because of a security concern with the arrestees, or, you know, detainees?

A.   Detainees and witnesses.

63

Q.   All right.

A.   At that time, yes.

Q.   All right.  Are you worried about the detainees attacking the witnesses?

A.   All parties involved.

Q.   You were -- you were a little bit worried about --

A.   I'm not worried about anybody attacking anybody at the time, but safety does come first.

Q.   Okay.  Well, I was going to ask, I think -- I think you've anticipated my question, but just to be clear, do you have any worry after the, "it's a wonder that motherfuckers don't get hurt" comment that these witnesses might do something to these arrestees?

A.   No.

Q.   Okay.  But you were primarily concerned -- the safety concern arose from the potential that these individuals that we see here could have attacked Bussey and Page?

A.   No, I never said that.  It's just safety for all parties involved.  When you're going through police academy, they teach you about doing show-ups and lineups.  It's taught in police academy that the proper way of doing a show-up is to do it in a vehicle behind a tent where the individuals can't be seen.

64

Q.    Okay.

A.    So just doing what I'm trained to do at this time.

Q.    Okay.  If you can find any written document anywhere that says a show-up should be done by only having the witness identify from inside a car, please share that with your attorney.  Okay?

A.    Okay.

Q.    So we got -- I think there's not much more to say about why they didn't get out.  Why didn't you ask that these individuals stand up, come closer?

MR. KANG:  Object to form.

THE WITNESS:  I'm not sure.

BY MR. GREENAMYRE:

Q.    No good reason?

MR. KANG:  Object to form.

THE WITNESS:  Just not sure why I didn't ask.

BY MR. GREENAMYRE:

Q.    All right.  As you sit here today, you don't have any specific reason why you didn't ask those folks to stand up?

A.    No, just not -- yeah, I'm not sure why I didn't.

Q.    All right.  Any reason why you did not ask that these folks lower their masks?

65

A.   No.

Q.   Okay.  Any reason you didn't pull up further?

A.   No.

Q.   Okay.

A.   There was cars in the road, so -- but, on recollection, no.

Q.   Okay.

(Video playing.)

BY MR. GREENAMYRE:

Q.   That's Davis asking, "Did they say he's a part of it?"

A.   Yes.

Q.   Okay.  And he's pointing at Mr. Hendren at the 5:26 mark?

A.   Yes, it appears so.

Q.   Okay.  Did they say he's part of it?  Is the -- do you have any idea whether the -- "they" there is referring to other GSUPD officers outside of the car, or whether that's referring to the witnesses in the back of the car?

A.   I have no idea.

Q.   Okay.  So it could be that that's a reference to the officers, right?

MR. KANG:  Object to form.

THE WITNESS:  It could be a reference to

66

anybody, I wouldn't know who they is.

BY MR. GREENAMYRE:

Q.   Okay.

A.   Or who "they" is -- who's referring to me says.

Q.   Sure.  But Davis didn't ask, you know, the people in the back of the car, did you see whether he's a part of it?

A.   No, I believe he was talking to me.

Q.   Okay.  And he could have been talking to you about the people in the back seat?

MR. KANG:  Object to form.

THE WITNESS:  Whoever "they" was.

BY MR. GREENAMYRE:

Q.   Okay.  You would agree that Mr. Davis previously -- or Officer Davis previously asked questions directly to the people in the back, right?

A.   Oh --

Q.   He said something like --

A.   I believe he asked some questions -- I'm sorry.

Q.   Which one or two can you say you recognize the most, right?

A.   Yeah, as I was walking out of the vehicle, yeah.

Q.   All right.

LYON REPORTING, INC.

67

(Video playing.)

BY MR. GREENAMYRE:

Q. All right. So, you would agree that only after Officer Davis's comment about Mr. Hendren, and your comment thereafter, that the two witnesses in the back direct their attention or have anything to say about Mr. Hendren?

MR. KANG: Object to form.

THE WITNESS: Yes.

BY MR. GREENAMYRE:

Q. Okay. And that was the guy -- you know, those -- you know, that identification is what led you to detain, if not arrest, Mr. Hendren, correct?

A. Detain.

Q. But that was the information that led you to do that, right?

A. Uh-huh.

Q. Yes?

A. Yes, I'm sorry.

Q. You would not have had any basis to put Mr. Hendren in handcuffs if those two guys hadn't said those -- what they said?

A. Yes.

Q. All right. So.

(Video playing.)

68

BY MR. GREENAMYRE:

Q.   All right.  So at about the six-minute mark, you would agree that you and Officer Davis detain Mr. Hendren, correct?

A.   Yes.

Q.   All right.  He's not free to go at that point, is he?

A.   No.

(Video playing.)

BY MR. GREENAMYRE:

Q.   All right.  So I'm pausing it at about the 6:40 mark, and in a second, somebody -- I got a couple questions for you.

A.   Okay.

Q.   Somebody's going to come in the driver's side, I don't think it's Davis, but if it's Davis, let me know.  If it's not Davis, let me know who it is, as best you can tell.  And then they say something, let me know what you think -- you hear them say.

(Video playing.)

BY MR. GREENAMYRE:

Q.   All right.  So the people in the back are asking to be taken back to the Convocation Center, right?

A.   Yes.

69

Q.   And then what -- do you recognize that officer to be Smith, maybe?

A.   Yes.

Q.   All right.  That's Smith?

A.   Yes.

Q.   All right.  And then I hear Smith say, "We don't violate rights here."  Is that what you heard?

A.   Can you go back?

Q.   Yeah.

(Video playing.)

MR. GREENAMYRE:  Oh, no, sorry.  Okay.  I'll do it again.  So I'll start back at 6:35.

(Video playing.)

BY MR. GREENAMYRE:

Q.   You hear them say that?

A.   Yep.

Q.   All right.  So within about 45 seconds, right, if Mr. Hendren is arrested at -- or put into handcuffs at about the six-minute mark, less than a minute later in the midst of a conversation about, you know, taking the witnesses back to the Convocation Center, Mr. Smith says, "We don't violate rights here."  Right?

A.   Yes.

Q.   Okay.  What do you mean by that?

A.   I'm not sure.  We would have to know who he

70

was talking to on the outside of the vehicle.

Q.   Okay.  Was he talking to you?

MR. KANG:  Object to form.

THE WITNESS:  I don't recall him talking to me.

BY MR. GREENAMYRE:

Q.   All right.

A.   It appeared to me that he was having a conversation before he opened up that door.

Q.   Okay.  All right.  I'm going to play a quick bit right at 8, you know, starting at 8:07.  My question is just: Who is the person who hands you the phone and asks you to take a picture?

A.   Okay.

(Video playing.)

BY MR. GREENAMYRE:

Q.   All right.  So pausing at 8:24, who is that?

A.   Can you go back to his name? I think his name was on his jacket.  That maybe -- that was one of our APD.  It looks like one of the APD officers.

Q.   Okay.  So that's not someone you know as a GSUPD officer?

A.   Not at all.

Q.   Okay.  I don't -- I was trying to find where -- tell me when to pause.

(Video playing.)

LYON REPORTING, INC.

71

THE WITNESS:  Colton.

BY MR. GREENAMYRE:

Q.  Colton?

A.  Colton.  Looks like Colton.

Q.  All right.

A.  Colton.

Q.  Do you know whether this is one of the, like, just a general APD officer, or do you know whether this person is one of the homeland security people that shows up?  What do you know about this person?

A.  I don't know anything about him.

Q.  All right.  You may not know the answer to this either, but why is he asking you to take a picture with his phone as opposed to him taking a step out and doing it?

MR. KANG:  Object to form.

THE WITNESS:  I have no idea.

BY MR. GREENAMYRE:

Q.  He's not in your chain of command in any way, shape, or form, is he?

A.  No.

Q.  Okay.

A.  He works for APD.

Q.  All right.  Do you -- can you tell what his role is at APD from any of this?

LYON REPORTING, INC.

72

A.   Lieutenant.

Q.   Okay.  All right.  So I'll start when you get back into the car around the nine-minute mark, and one of the people in the back is going to say some things, and just curious if you have any context you can offer.

(Video playing.)

BY MR. GREENAMYRE:

Q.   When you just said, like, "But without anybody here to verify that he was with them, we don't have anything," what do you mean by that?

A.   He didn't show any credentials, he just said he was with AJC.  There's no one from AJC that we know there to verify that he's with the AJC.

Q.   Got it.  Okay.  I guess, you know, some ambiguity there, like, without anybody to verify that he was in the Convocation Center, we don't have anything.  But you -- that was in reference to his press credential?

A.   Yeah.  Based -- based on -- it's -- it's hard to go and elaborate, like I said, it was a while ago, but there was no one there to verify he's working with AJC.

Q.   Understood.

(Video playing.)

BY MR. GREENAMYRE:

Q.   All right.  So I hear one of the people in the

73

back seat say something like, "I'm not a badass or shit like that, but if you come to my house, you can't assume we're normal people, that's some dangerous shit."  What is he talking about, to your knowledge?

    A.    Can we go back and replay it?

    Q.    Yeah.

    (Video playing.)

        THE WITNESS:  He was kind of all over the place.  It's hard to say what he was talking about.

BY MR. GREENAMYRE:

    Q.    Okay.  You're not sure what he was saying, one way or another?

    A.    No.

    Q.    All right.  He's not -- it could be that he's talking about protesters coming to his house, his construction site, and you can't assume that, you know, they're not going to react with violence?

        MR. KANG:  Object to form.

        THE WITNESS:  I can't assume what he was talking about.

BY MR. GREENAMYRE:

    Q.    All right.  Is that an unreasonable interpretation?

        MR. KANG:  Object to form.

        THE WITNESS:  It's your interpretation.  I

74

just -- I don't know what he's saying.

BY MR. GREENAMYRE:

Q.    I'm not saying that's my interpretation, I'm just asking if that's a -- that's out of bounds or something that would be unreasonable to say?

MR. KANG:  Object to form.

THE WITNESS:  And I'm telling you, I can't assume what he was talking about.

BY MR. GREENAMYRE:

Q.    All right.  Okay.  I'm going to bounce around in time a little bit. I want to show you one other video while we're doing video stuff, and then hopefully we'll be done with video stuff.

A.    Okay.

Q.    All right.  So for the record, this is part of Exhibit 2.  This is Patton's only body camera video, and it ends in 9:04.  All right.  And we're going to pick it up around the 5:22 mark.

(Video playing.)

BY MR. GREENAMYRE:

Q.    So just because of the camera, it's hard to tell that's not you, that's Blackstone that is walking to the right here at 5:54, and then you'll show up on the left in just a second.  I'll play it.

(Video playing.)

75

BY MR. GREENAMYRE:

Q.   Oh, no, that's you, right?

A.   That's me, yes.

Q.   All right.  At 5:55.  All right.

(Video playing.)

BY MR. GREENAMYRE:

Q.   I'm sorry.  I was asking you other questions, but I hear Mr. Patton say something along the lines, "I'm pretty sure he was there too.  I might as well stop him and ID him too."

(Video playing.)

MR. GREENAMYRE:  Sorry.

(Video playing.)

MR. GREENAMYRE:  Sorry.  I can't see the minutes that well, so I'm all over the place.

BY MR. GREENAMYRE:

Q.   All right.  Starting at 5:27.

(Video playing.)

BY MR. GREENAMYRE:

Q.   All right.  So at the 5:45 to six-minute mark, approximately, Sergeant Patton is pointing to Mr. Hendren, talking to you, and says something along the lines, "I'm pretty sure he was there too.  I might as well stop him and ID him too."

A.   Similar.  It was a little muddy at first, but

LYON REPORTING, INC.

76

it was definitely clear, "You might as well stop him and ID him too."

Q.   Okay.  And then just play it.

(Video playing.)

BY MR. GREENAMYRE:

Q.   And so immediately thereafter you go and talk to Mr. Hendren, correct?

A.   Yes.

Q.   I'll represent to you, I haven't seen any body camera of that conversation that you had from your body camera.  Are you aware of any body camera video of that conversation that you had with Mr. Hendren?

A.   There should be body camera.

Q.   Okay.  There should be.  Do you -- no reason to not have your body camera on at that point?

A.   No.

Q.   All right.  I don't know what was said.  Do you have any recollection of what was said in that conversation without looking at your body camera?

A.   Probably asked him for his ID.

Q.   Okay.  Do you know what he said?  Whether he gave you ID or didn't give you ID?

A.   I don't remember getting ID.

Q.   Okay.  But you're not sure whether you asked -- you asked for it or not?

LYON REPORTING, INC.

77

A.   Off the top of my head, no.

Q.   Okay.  And at this point, to be clear, you know, this is prior to the Brasfield & Gorrie folks identification, correct?

A.   Yes.

Q.   So you can ask anybody for ID, but you can't demand ID unless there is at least a reasonable suspicion, correct?

A.   Yes.

Q.   All right.  So if he had refused ID for some reason, he would've been perfectly fine to do that at that point in time, correct?

A.   Yes.

MR. KANG:  Objection; calls for legal conclusion.  And, Zack, can you give me the timestamp of where you say Mr. -- Sergeant Reed is talking to (inaudible)?  What is that?

MR. GREENAMYRE:  It's in the -- somewhere between 5:45 and 6:11.  It only pops up for a quick second.

BY MR. GREENAMYRE:

Q.   We're talking about body cameras generally.  Earlier, you know, without quizzing you on the details, it's fair to say that, generally, GSUPD policy is that if you're on a scene and doing

LYON REPORTING, INC.

78

investigative work, you're talking to witnesses, talking to officers on a scene, body camera is to be turned on, correct?

A.   Yes.

Q.   All right.  All right.  I want to show you something, starting at 4:34 in Patton's body camera.  It looks to me like he gets motioned over, he talks to a Lieutenant Harvey, and indicated to turn his body camera off.  Let me know if you see that or see something different.

MR. KANG:  Object to form.

(Video playing.)

BY MR. GREENAMYRE:

Q.   All right.  Is that what that looked like to you?

A.   Can you show me the motion you're referring to?

Q.   Yeah.

A.   It's a glare right here at --

Q.   Yeah, sure.

A.   He's literally in that corner where the glare is.

Q.   Yeah.  If you need to move, don't hesitate, right?  I'll show you a couple --

THE WITNESS:  I going to I switch this side

79

real quick.

MR. GREENAMYRE:  Yeah.

THE WITNESS:  I'm sorry.

BY MR. GREENAMYRE:

Q.   All right.  I'm sorry.  All right.  So 45:07, we see him make a "come here" gesture, right?

A.   Uh-huh.

Q.   Yes?

A.   Yes.

Q.   All right.  And that's Lieutenant Harvey, right?

A.   Yes.

MR. KANG:  Do you have a timestamp?

MR. GREENAMYRE:  This is approximately 45:00 to 45:11, in that range.

BY MR. GREENAMYRE:

Q.   And you see at about 45:14, it looks like -- it's not easy to see, but it looks like Harvey touches his chest, correct?

A.   Is that it right there?

Q.   So starting here, right, right hand goes to his chest, right?

A.   Uh-huh.

Q.   Yes?

A.   Yes.

LYON REPORTING, INC.

80

Q.    All right.  And then within seconds, Sergeant Patton turns off his body camera, correct?

A.    Yes.

Q.    All right.  I got one more short video for --

A.    Was that the question?

Q.    Yeah, that was it.

A.    You wanted to know if -- you asked if he gestured?

Q.    Yeah.

A.    I didn't answer whether or not he gestured.

Q.    Go ahead.

A.    Whether or not he touched himself, it just looks like he touched his chest to me.

Q.    Okay.  And in context, you know, the whole of that context, right?  So the gesture over, he starts talking, he stops talking, he taps his chest, and then the body camera immediately turns off.  Do you think that it was Lieutenant Harvey's preference that Sergeant Patton turn his body camera off at that point in time?

MR. KANG:  Objection; calls for speculation.

THE WITNESS:  I'm not sure what his preference is.  A supervisor can have support and turn off your body camera, though.

BY MR. GREENAMYRE:

Q.    Do you think that's what happened in this

81

case?

MR. KANG:  Object to form.

THE WITNESS:  I'm not sure what -- I'm not sure what his intentions or what the hand on the chest meant.

BY MR. GREENAMYRE:

Q.  Okay.  Or not just the hand on the chest, but the motioning over, the starting to talk, the stopping talking, the pointing at the chest, and then the body camera turning off?

MR. KANG:  Object to form.

THE WITNESS:  I'm not sure what the gesture meant.

BY MR. GREENAMYRE:

Q.  Okay.  I'll give you one more.  This is Frazier's body camera, part of Exhibit 2, ending in 698.  All right.  And I will zoom in at about the 25:58 mark.  You recognize this to be current APD Deputy Chief, Bruce?

A.  I'm not sure who she is.

Q.  Okay.  High ranking at -- you know, based on the white shirt, right, a high-ranking APD officer now on the scene, correct?

A.  Yes.

Q.  All right.  Let's start playing from here.

LYON REPORTING, INC.

82

(Video playing.)

BY MR. GREENAMYRE:

Q.   All right.  So we played from about the 26-minute mark to the end of this at about 27:40.  At the end there, I heard Lieutenant Harvey say, among other things, "We don't really have anything chargeable."  You heard him say that?

MR. KANG:  Object to form.

THE WITNESS:  I heard him say he was trying to figure out the --  can you go back to that point?

MR. GREENAMYRE:  Yeah.

(Video playing.)

BY MR. GREENAMYRE:

Q.   All right.  So APD higher-up says you-all got charges on them correct?  You heard that?

A.   Yes.  Sorry.

Q.   All right.

(Video playing.)

BY MR. GREENAMYRE:

Q.   You heard him say, "Not really chargeable, so we're filling out," correct?

MR. KANG:  Object to form.

THE WITNESS:  I heard him say they kicked over some stuff, not really chargeable.

BY MR. GREENAMYRE:

LYON REPORTING, INC.

83

Q.    Got it.  And then you hear the higher-up APD officers say something like, "Anything we can, anything guys, anything we can get will help out tremendously with this group.  I know it's a reach."

(Video playing.)

BY MR. GREENAMYRE:

Q.    You heard her say that, right?

A.    I did hear that.

Q.    All right.  And then immediately thereafter, Sergeant Frazier turns off his body camera, correct?

A.    Shortly after, it looks like Smith walks over, but, yes.

(Video playing.)

BY MR. GREENAMYRE:

Q.    Within 10 seconds?

A.    Yeah.  Yeah.  Yeah.

Q.    I hope to be done with video, so you can get more comfortable.

A.    Are you done?

Q.    Yeah.

A.    Okay, okay, okay.

Q.    All right.  There's conversation about a potential assault, right?

A.    Yes.

Q.    That you heard there?

LYON REPORTING, INC.

84

A.    Yeah.

Q.    We can agree that no one was ever charged with assault, were they?

A.    I'm not sure.

Q.    Okay.  If it would be helpful to look back at Exhibit 8, do you see any assault charge evidenced in there?

A.    No.

Q.    Okay.  Are you aware of -- okay.  I'll show you what's previously been marked as Exhibit 7, but can we remark?

        (Exhibit 7 marked for identification.)

A.    Thank you.

BY MR. GREENAMYRE:

  Q.    Alright. So I'll represent to you that this document, which is five pages of photos, are the only photos that have been produced in connection with this case.  Are you aware of any other photos taken by GSUPD or Brasfield & Gorrie -- in connection with -- in connection with this incident?

A.    Not that I know of.

Q.    All right.  Who took these photos?

A.    I'm not sure right now.

Q.    Okay.  Is it possible you took these photos?

A.    It could be.

85

Q.   Did you go into the Convocation Center that day?

A.   I believe I did.

Q.   Okay.  But, not 100 percent?

A.   Not right now.

Q.   Okay.  Okay.  So in pages 3, 4, and 5, the non-witness statements, what are we looking at?

A.   Look like the sign, it appears to be damage on items or things.

Q.   So on the sign, what damage do you see?

A.   I'm not -- I'm not sure what the sign -- what damage is on the sign right now.

Q.   Okay.  And then on the other two pictures, it looks like, you know, some mild scrapes on the wall?

A.   Yeah.

Q.   Do you have any information whether these -- do you have personal knowledge of whether these photographs depict damage that you were told was done by any protester?

A.   Right now, not that I recall.

Q.   I know you're not sure whether you took these pictures or not, but presumably, a law enforcement officer investigating potential damage to property would take photos of the most significant damage rather than the least significant damage, correct?

LYON REPORTING, INC.

86

MR. KANG:  Object to form.

THE WITNESS:  Damage significant or, you know, what's the other word you used?

BY MR. GREENAMYRE:

Q.  Insignificant.

A.  Insignificant.  Damage is damage, so they should take pictures of all damage.

Q.  All right.  But it would be -- it would be, like, wild and unreasonable, and it wouldn't make any sense, right?  Like, if there's a picture of a hole in the wall, to not take a picture of that, but then to instead take a picture of a tiny scrape on the wall.

A.  Yeah, we can agree to that.

MR. KANG:  Object to form.

BY MR. GREENAMYRE:

Q.  And I know you don't have personal knowledge of, like, anybody saying that these marks were caused by the protesters, but do you have any knowledge about whether these were -- from any source, about whether these scuffs were caused by the protesters or caused by the fact of a construction site?

MR. KANG:  Object to form.

THE WITNESS:  I couldn't say where the damage came from.

BY MR. GREENAMYRE:

LYON REPORTING, INC.

87

Q.   Okay.  Damage to property has, like, degrees, right?  Like, you know, small damage versus big damage, in part?

A.   Yes.  I'm sorry.

Q.   And the differences between a felony and a misdemeanor?

A.   Yes.

Q.   What's the threshold, $500?

A.   I can't recall off the top of my head.

MR. KANG:  Objection; calls for a legal conclusion.

THE WITNESS:  I'm sorry.  Usually, when we're doing our research or on calls, we'll get that information.  So the number's not off the top of my head right now; I just don't recall.

BY MR. GREENAMYRE:

Q.   Okay.  Sure.  So whatever the threshold is, as part of your investigation, would someone do some determination to see, like, what the value of the damaged property is?

A.   That should be done, yes.

Q.   All right.  So, you know, to make out a felony damage to property case, which is what this is, somebody would have needed to say that it -- somebody from presumably Brasfield & Gorrie, would have needed to say

88

that this was over whatever the threshold was?

A.   I'm not sure if Brasfield & Gorrie would have needed to say it, but there should have been a discussion between somebody.

Q.   Right.  Like, let's assume the threshold is $500, right?

MR. KANG:   Object to form.

BY MR. GREENAMYRE:

Q.   You can't say from looking at these three photos whether that's definitely more than $500, can you?

A.   I don't know.  I don't work in that field.  I couldn't answer that question.

Q.   Right.  If, you know, if you got those scrapes on, you know, your wall, you're not paying $500 for somebody to paint that over, are you?

MR. KANG:   Object to form.

THE WITNESS:   That wouldn't mean it's not worth it. It just, I mean, that wouldn't be what I want to do.

BY MR. GREENAMYRE:

Q.   Right.  All right.  This has previously been marked and will be remarked as Exhibit 6.

(Exhibit 6 marked for identification.)

Q.   Who sent you this text message?

89

A.   I'm not sure.

Q.   What did you respond?

A.   I'm not sure.

Q.   This looks like a screenshot of a text message, right?

A.   It does.

Q.   But the bottom part is cut off?

A.   Yeah.

Q.   Where there would be the response or whatever was said after, that's just cut off, right?

A.   Yeah.

MR. KANG:  Object to form.

BY MR. GREENAMYRE:

Q.   Yeah?

A.   Yes.

Q.   Okay.  All right.  If you look back in Exhibit 8, the incident report, just a couple questions about your -- just a couple of questions about that document.

A.   Okay.

Q.   If you look to -- there is a number in the system that says Hendren vs. Patton et al. def 0029.  Can you turn to that page?

A.   What page is it?

Q.   29.  0029.

A.   Oh, okay.

LYON REPORTING, INC.

90

Q.   It is, I think, your primary report.

A.   All right.

Q.   You see it there?

A.   Yes.

Q.   All right.  This is the main report that you wrote in connection with this, correct?

A.   A supplement.

Q.   But you didn't write a primary, did you?

A.   No, I wrote a supplement report.

Q.   Right.  And this is where you include -- there's not a document where you included more details than this document?

A.   No.

Q.   All right.  I guess just, you know, we have your body camera, we have this report, and we have the two witness statements that were in the Exhibit 7, right?  Is there anything else that you can recall in any way, shape, or form from talking to anyone from Brasfield & Gorrie that has any bearing on this case whatsoever?

        MR. KANG:  Object to form.

        THE WITNESS:  Not that I can recall.

BY MR. GREENAMYRE:

Q.   And you don't expect your memory about this to, like, get better in the future as more time passes?

LYON REPORTING, INC.

91

MR. KANG:  Object to form.

THE WITNESS:  I wouldn't even know how to answer that question.

BY MR. GREENAMYRE:

Q.   All right.  If you keep flipping to page 36, at the bottom, it indicates this is the additional supplemental where you make a note that you testified in connection with a motion to suppress, correct?

A.   Yes.

Q.   You're aware, at this point, that that motion to suppress was granted?

A.   Was it?

Q.   Are you aware that it was?

A.   I hadn't spoken to the DA since that day.

Q.   Okay.  Well, that's one of my questions, right?  So, like, if an officer is involved in a search that a court says is bad, right?  Whether it's a motion to suppress for, like, lack of warrant, or it is a statement from somebody who the officer believes was detained but was actually arrested, or a show-up that a court says is bad, how does that information ever get back to the officer involved?

MR. KANG:  Object to form.

THE WITNESS:  I wouldn't be able to answer that question.

92

BY MR. GREENAMYRE:

Q.   Okay.  You wouldn't hear about it unless the DA told you about it?

A.   Are you telling me or asking me?

Q.   I'm asking you.

A.   I'm not sure.  So that was the first motion hearing that I've been a part of.

Q.   Okay.

A.   So a lot of this is happening in real time --

Q.   Sure.

A.   Just like this is the first deposition I've been a part of, so I wouldn't be able to answer the question of how they -- who they reach out to, or, you know, what route they go as far as contacting officers.

Q.   But, like, generally speaking, right, if a -- if a court is saying you were involved, or any officer, I'm not -- I'm not trying to say you, but you would expect a -- if a court says an officer is doing something that's not right, you would want, or a reasonable officer would want that information brought to their attention so they can do something different in the future, right?

          MR. KANG:  Object to form.

          THE WITNESS:  If a court said an officer did something wrong?

LYON REPORTING, INC.

93

BY MR. GREENAMYRE:

Q.   Yeah.

A.   Would the officer want to know?

Q.   Yeah.

A.   Um, sure.

Q.   Yeah.  Rather than, like, you -- an officer would want to know about it before they're sitting down for a deposition, like, after the fact, right?

A.   Sure.

MR. KANG:  Object to form.

BY MR. GREENAMYRE:

Q.   All right.  So I'm going to show you what has previously been marked as Plaintiff's 1.

A.   Thank you.

Q.   All right.  I'll represent to you that this is an order granting a motion to suppress, based on a faulty show-up in this case.  Okay?

A.   Okay.

Q.   And I just want to ask you a couple questions about it to see whether you have any basis to agree or disagree with what's said here.  Okay?

A.   If you look on the second page, Footnote 1 says there was testimony that not all the protesters were inside the building, some remained on the outside.  That's consistent with your understanding of

94

what happened, correct?

A.   Yes.

Q.   If you turn to Page 5, and look at the only full paragraph, the last two sentences of that paragraph, starting with Officer Reed.  "Officer Reed testified that later he found out that the man," -- I'll represent to you this as referring to Hendren--

A.   Okay.

Q.   --"was not charged in this case and was not part of the protest." You agree with that?

A.   Yes.

Q.   Okay.  In her closing argument, the assistant district attorney conceded that the man was not charged because he had not committed any crimes at the Convention Center.  You agree with that?

A.   Yes.

Q.   Page 7, the second partial paragraph, the paragraph that starts in the middle of the page.  "This court has little trouble concluding that Officer Reed's multiple comments to the witnesses on the way to the show-up cross the line and were impermissibly suggestive." Do you agree or disagree with that?

MR. KANG:   Object to form.

THE WITNESS:   Can you put that in layman's terms?

95

BY MR. GREENAMYRE:

Q.   That first sentence in that paragraph.  Do you agree or disagree with that?

MR. KANG:  I'm going to object to form.

THE WITNESS:  I'm going to be honest. I don't even -- define impermissibly suggestive.

BY MR. GREENAMYRE:

Q.   Violating the Constitution.

A.   Okay.

MR. KANG:  I'll object to form.  Calls for legal conclusion.

THE WITNESS:  So the Court is having little trouble concluding that my multiple comments to the witnesses on the way to the show-up identification crossed the line, and that they were violating the Constitution.  So the Court is saying I was violating the Constitution, that's what you're saying?

BY MR. GREENAMYRE:

Q.   That's what it says.

A.   Okay.

Q.   Do you agree or disagree with that?

A.   I would disagree.

MR. KANG:  Object to form.

BY MR. GREENAMYRE:

LYON REPORTING, INC.

96

Q.   Okay.  And then if you look at the last sentence on that paragraph, starting  or, like, the partial sentence says, "Indeed, the show-up here was a textbook example of what not to do, rendering it little more than a check-the-box exercise to bolster the defendant's arrest."  Do you agree or disagree with that?

A.   Disagree.

MR. KANG:  Object to form.

BY MR. GREENAMYRE:

Q.   You said disagree?  Yes?

A.   I said, yeah.  I'm sorry, yes.

Q.   Just for her.  All right.  And then I presume that -- if you look at the very bottom of page 11, I presume that your answer is the same that you disagree with the sentence that reads, "This court easily concludes that the show-up here was impermissibly suggestive such that it rendered the witnesses' identification of the defendants unreliable in violation of due process."

MR. KANG:  Object to form.

BY MR. GREENAMYRE:

Q.   Do you agree -- disagree with that, correct?

A.   Show me where that line starts.

Q.   Oh, sorry.  On the bottom of page 11, right?

A.   Uh-huh.

97

Q.   Starting with this court, at the very bottom.

A.   "This court is the conclusion" -- okay, so 11 to 12?

Q.   Yeah.

A.   Okay.

Q.   Sorry.  That sentence, starting on 11 and continuing on to 12, I assume you disagree with that statement?

A.   Yes.

Q.   Okay.  What is the basis of your disagreement?

MR. KANG:  Object to form.

THE WITNESS:  I don't think my language was suggestive, sir.

BY MR. GREENAMYRE:

Q.   Okay.  Just a disagreement with the judge about that.

MR. KANG:  Object to form.

THE WITNESS:  Well, everything's based off of the language I used being suggestive, so, yes.

MR. GREENAMYRE:  Okay.

MR. KANG:  Zack, can I take a break soon, or do you have just a little bit left?

MR. GREENAMYRE:  Maybe, I can just do another couple minutes and then take a break, and hopefully we'll be done, or close to it.

98

BY MR. GREENAMYRE:

Q.   All right.  Let me start with this.  So I've tried to talk about everything that might be relevant to this case, including some things that may not be relevant to this case, while also respecting your time, right?  In the two-plus hours we talked so far, is there anything that we haven't talked about that you think is important to this case, or that you want to add, or that you think is important that we haven't talked about, or I haven't asked you about?

MR. KANG:  Object to form.

THE WITNESS:  Not that I can think of right now.

MR. GREENAMYRE:  Okay.  Yeah, let's take a --

MR. KANG:  Five minutes?

MR. GREENAMYRE:  A five-minute break.

MR. KANG:  Awesome.

MR. GREENAMYRE:  Cool.  Thanks.

(Recess taken at 11:55 a.m.)

(Proceedings resumed at 12:00 p.m.)

BY MR. GREENAMYRE:

Q.   All right.  My last question to you, or line of questions was, like, do you have anything to add?  I know we just probably would've been better if I had asked you that after you had the chance to take a

99

break.  But with a couple more minutes of reflection, anything you want to add?

A.    Not right now.

MR. GREENAMYRE:  All right.  That's all I got.

MR. KANG:  Okay.  I just have a few questions

MR. GREENAMYRE:  Here.  I'll pass this to you.

MR. KANG:  Sure.

EXAMINATION

BY MR. KANG:

Q.    Just a few questions.  Sergeant Reed, the Fulton County hearing, the motion to suppress hearing, do you remember whether that hearing was about Benjamin Hendren?

A.    No.  It was about the other individuals.

Q.    Okay.  And --

MR. KANG:  Zack, I might need your help here Pull up Sergeant Patton's video.  So I'm not -- I think it'd be easier since you're connected already.

MR. GREENAMYRE:  Happy to help.  What -- where would you like me to?

MR. KANG:  Sure.  5:45.

MR. GREENAMYRE:  5:41.

MR. KANG:  Okay.  Can you just play it from

100

there?

(Video playing.)

MR. KANG:  Okay.  Can you stop right there?

BY MR. KANG:

Q.    What's that timestamp, if you can move your mouse?  At 5:56, do you see who's on that body cam?  Who is that in the yellow?

A.    Oh, right here?

Q.    Yes.

A.    Me.

Q.    Okay.  And is this body cam yours?

A.    No.

Q.    Okay.  Have you ever seen this body cam footage before?

A.    No.

MR. KANG:  Okay.  Can you go back, Zack, to -- just play it?

(Video playing.)

MR. KANG:  And can you stop right there?  What is that time stamp?  6:03?

BY MR. KANG:

Q.    When you were briefly on the screen, did you see where you went?

A.    No, I do not.

Q.    Okay.  Do you remember where you went?

101

A.   No, I did not.

Q.   Okay.  And you see someone walking over towards -- with a yellow vest on?

A.   Yes.

Q.   Okay.  Can you see that person's face?

A.   No.

Q.   Okay.  Do you know who that person is?

A.   It appears to be me.

MR. KANG:  Okay.  And then can you play further?

(Video playing.)

MR. KANG:  Okay.  You can stop.

BY MR. KANG:

Q.   At 6:10, do you recall if that was you or not?

A.   I mean, it appears to be me.

MR. KANG:  Okay.  All right.  You can take the video down.  Give me one second.  Okay.  No further questions at this time.  Zack, do you have any follow-up?

MR. GREENAMYRE:  I do not.

MR. KANG:  We'll -- this witness will read and sign and then we'll order electronic transcripts.

MR. GREENAMYRE:  Yeah.  Go off the record.

(Off the record.)

LYON REPORTING, INC.

102

(Deposition concluded at 12:05 p.m.)


(Pursuant to Rule 30(e) of the Federal Rules

of Civil Procedure and/or O.C.G.A.9-11-30(e),

signature of the witness has been reserved.)

103

Benjamin Hendren Vs. John Patton et al

The preceding deposition was taken in the matter, on the date and at the time and place set out on the title page hereof.

It was requested that the deposition be taken by the reporter and that same be reduced to typewritten form.

It was agreed by and between counsel and the parties that the deponent will read and sign the transcript of said deposition.

Said jurat is to be returned within 30 days following receipt of the transcript to the following address:

Lyon Reporting, Inc
P.O. Box 81124
Atlanta, Georgia  30340

104

CERTIFICATE

STATE OF_____
COUNTY/CITY OF_____

Before me this day personally appeared
Jamar Reed who, being duly sworn, states
that the foregoing transcript of his/her
deposition, taken in the matter, on the date
and at the time and place set out on the title
page hereof, constitutes a true and accurate
transcript of said deposition.


_____


SUBSCRIBED and SWORN to before me this

_____day of _____2025 in the

jurisdiction aforesaid.


_____    _____
My Commission Expires        Notary Public


        [ ] No changes made to the Errata Sheet;

     therefore, I am returning only this signed,

     notarized certificate.


        [ ] I am returning this signed, notarized

     certificate and Errata Sheet with changes

     noted.

105

DEPOSITION ERRATA SHEET

Deponent:  Jamar Reed

Deposition Date: 06/25/2025

To Reporter:

I have read the entire transcript of my deposition taken in the captioned matter or the same has been read to me.  I request that the following changes be entered upon the record for the reasons indicated.  I have signed my name to the Errata Sheet and appropriate certificate and authorize you to attach both to the original transcript.

Page No._____ Line No._____

Change to:_____

Reason for Change:_____

Page No._____ Line No._____

Change to:_____

Reason for Change:_____

Page No._____ Line No._____

Change to:_____

Reason for Change:_____

LYON REPORTING, INC.

106

Deposition of Jamar Reed

Page No._____ Line No._____

Change to:_____

Reason for Change:_____

Page No._____ Line No._____

Change to:_____

Reason for Change:_____

Page No._____ Line No._____

Change to:_____

Reason for Change:_____

Page No._____ Line No._____

Change to:_____

Reason for Change:_____

Page No._____ Line No._____

Change to:_____

Reason for Change:_____

Signature:_____  Date:_____

Jamar Reed

LYON REPORTING, INC.

107

DISCLOSURE OF NO CONTRACT


I, Pia A. Kebede, Certified Court Reporter, do hereby disclose, pursuant to Article 10.B of the Rules and Regulations of the Board of Court Reporting of the Judicial Council of Georgia, that I am a Georgia Certified Court Reporter; that I appeared to report this deposition at the request of a court reporting firm contacted by the party taking the deposition to provide court reporting services for this deposition and there is no contract that is prohibited by O.C.G.A. 15-14-37(a) and (b) or Article 7.C of the Rules and Regulations of the Board for the taking of this deposition.

There is no contract to provide court reporting services between myself or any person with whom I have a principal and agency relationship, nor any attorney at law in this action, party to this action, or agent for an attorney at law in this action. Any and all financial arrangements beyond our usual and customary rates have been disclosed and offered to all parties.

This 25th day of June, 2025.




Pia A. Kebede, CCR, CER/CET-1012

6755-3684-0320-7900




LYON REPORTING, INC.

108

CERTIFICATE

STATE OF GEORGIA:

COUNTY OF DEKALB:


I hereby certify that the foregoing transcript was reported, as stated in the caption, and the questions and answers thereto were reduced to typewriting under my direction; that the foregoing pages represent a true, complete and correct transcript of the evidence given upon said deposition, and I further certify that I am not of kin or counsel to the parties in the case; am not in the employ of counsel for any of said parties; nor am I in any way interested in the result of said case.


_____

Pia A. Kebede, CCR, CVR

6755-3684-0320-7900


LYON REPORTING, INC.

**$**

**$500 (4)**
87:8;88:6,10,15

**A**

**Aaron (5)**
17:16;22:18;23:7,
13,16
**able (4)**
40:8;47:5;91:24;
92:12
**academy (3)**
13:23;63:22,23
**activated (1)**
19:3
**active (2)**
36:17;37:4
**activity (5)**
46:10,20,23;47:3,5
**actually (2)**
42:16;91:20
**add (5)**
6:11;53:1;98:8,23;
99:2
**addition (2)**
11:13,16
**additional (2)**
11:17;91:6
**addresses (1)**
12:6
**adult (1)**
12:8
**adults (1)**
12:7
**affirm (1)**
4:16
**afoot (1)**
47:5
**Again (9)**
7:4;14:3;36:16;
37:5;49:19;59:18;
60:19;62:2;69:12
**against (2)**
15:12;31:15
**agencies (3)**
13:8,10,24
**agency (1)**
13:2
**ago (3)**
24:11;46:15;72:20
**agree (27)**
26:8,13,21;27:4,
14;28:22;31:1,17;
33:4;34:19;44:10;
45:7;49:21;60:1;
66:14;67:3;68:3;
84:2;86:13;93:20;
94:10,15,22;95:3,22;
96:6,22
**agreement (2)**

4:10;26:11
**ahead (5)**
10:16,16;36:13;
52:2;80:11
**AJC (4)**
72:12,12,13,21
**al (2)**
4:8;89:21
**allegedly (1)**
54:24
**Allow (1)**
9:15
**along (3)**
56:5;75:8,22
**Alright (2)**
5:25;84:15
**always (1)**
6:20
**ambiguity (1)**
72:15
**Amendment (1)**
31:18
**among (1)**
82:5
**and/or (1)**
102:4
**anticipated (1)**
63:11
**APD (10)**
20:6;70:19,19;
71:8,23,25;81:18,22;
82:14;83:1
**appear (1)**
10:9
**appeared (1)**
70:7
**appears (4)**
65:15;85:8;101:8,
16
**application (1)**
14:2
**applications (1)**
13:18
**applied (4)**
13:7,24,25;14:3
**applies (1)**
38:8
**apply (1)**
13:10
**appreciate (1)**
5:3
**apprehend (1)**
24:4
**Approximately (5)**
42:11;52:15;53:19;
75:21;79:14
**area (15)**
9:1;20:18,20;21:3,
10,11,14,21,22,23;
23:16,17;25:18;
26:10;35:9
**areas (1)**
18:25

**argument (1)**
94:12
**arose (1)**
63:17
**around (13)**
9:3;13:24;15:6;
23:17;24:3,20,25;
27:25;28:3,17;72:3;
74:10,18
**arrest (36)**
10:9;17:3;24:14;
28:7;29:5;32:4,5,7,8,
12,17;34:18,25;35:3,
20;36:7,23;37:22,23,
23;38:2,3,3,5;45:20;
46:6;47:18,21,21,25;
48:8;49:2,12;50:1;
67:13;96:6
**arrested (37)**
10:12,18;26:15,17,
23;27:5,15;28:2,4,11,
14,16,23;29:13;33:3;
34:6,11,12,15;35:15,
24,25;38:14,14,15,
17,18,21;42:17;
44:12;46:17,18,19;
47:15;48:15;69:18;
91:20
**arrestee (1)**
32:15
**arrestees (3)**
60:23;62:24;63:14
**arrests (2)**
14:17;24:13
**arrived (1)**
44:13
**assault (4)**
31:15;83:23;84:3,6
**assert (4)**
7:18,24;51:6,18
**assessment (2)**
13:21,22
**assigned (3)**
18:22;19:14,14
**assistant (1)**
94:12
**assume (24)**
6:25;15:17;19:19;
27:2,3;35:10,14,19,
23;36:2,2,3,3,5,5;
42:13;56:19;57:15;
73:2,16,19;74:8;
88:5;97:7
**assumption (1)**
27:11
**Atlanta (9)**
9:1;10:5;12:9;
13:11,11,19;14:3;
19:3;48:10
**attacked (1)**
63:18
**attacking (2)**
63:4,8

**attention (2)**
67:6;92:21
**attorney (8)**
5:15,19;7:21;51:3,
5,9;64:7;94:13
**attorney-client (1)**
51:10
**available (1)**
57:11
**Avenue (1)**
20:20
**aware (25)**
17:1,6,21;26:17;
28:13;29:2,18,19;
30:5,9,11,15,20,21;
31:14;34:5,13,14,15;
50:10;76:11;84:9,18;
91:10,13
**Awesome (1)**
98:17

**B**

**back (34)**
6:10;21:5;25:14;
43:7,25;52:24;54:14;
55:13,18,18;56:4;
57:21;58:15;61:15;
65:19;66:6,10,16;
67:6;68:22,23;69:8,
12,21;70:17;72:3,4;
73:1,5;82:10;84:5;
89:16;91:22;100:16
**bad (2)**
91:17,21
**badass (1)**
73:1
**bankruptcy (4)**
8:8,9,11,12
**Based (18)**
21:20;27:7,8,10,10,
11;32:8;33:2,3,10;
44:7;45:24;47:15;
72:19,19;81:21;
93:16;97:18
**basis (9)**
18:24;19:4;29:3,5;
51:19;60:2;67:20;
93:20;97:10
**bearing (1)**
90:19
**becomes (1)**
22:6
**beginning (2)**
13:20;49:10
**behind (2)**
33:23;63:24
**belaboring (1)**
50:4
**belief (4)**
34:12;47:9;50:5,11
**believes (1)**
91:19

**below (3)**
22:25;38:3,3
**bench (4)**
10:11,20;11:1,2
**Benjamin (1)**
99:14
**Bernard (1)**
12:17
**besides (2)**
29:3;57:5
**best (1)**
68:17
**better (3)**
53:16;90:25;98:24
**big (1)**
87:2
**Bike (5)**
18:19,20,22;19:10;
20:9
**bikes (3)**
18:22;19:2,5
**bit (12)**
5:7;12:10;29:9,21;
33:13;45:6;57:21;
59:17;63:6;70:10;
74:11;97:22
**Blackstone (1)**
74:22
**block (2)**
25:3,3
**blocks (2)**
25:15,18
**Body (40)**
15:23,23,24,24;
16:3,25;17:6,9;
39:25;40:2,19,20,25;
41:23;43:5;53:19;
54:7;57:11;74:16;
76:9,10,11,13,15,19;
77:22;78:2,6,8;80:2,
17,19,23;81:9,16;
83:10;90:15;100:6,
11,13
**body-cam (1)**
15:16
**bolster (1)**
96:5
**bottom (5)**
89:7;91:6;96:13,
24;97:1
**bounce (1)**
74:10
**bounds (1)**
74:4
**box (1)**
38:2
**Brasfield (21)**
29:4,14;39:24;
40:2,11,21;41:9;43:6,
13,25;44:18;45:1;
46:16;55:19;56:16;
57:25;77:3;84:19;
87:25;88:2;90:19

**break (17)**
7:4,6,9,20;11:19;
29:8,20;47:12;50:15,
21;51:2,2;52:17;
97:21,24;98:16;99:1
**breaking (1)**
52:15
**brief (2)**
24:2;33:8
**briefly (1)**
100:22
**bring (2)**
58:5,13
**bringing (1)**
62:13
**broad (1)**
31:6
**broken (1)**
41:6
**brother (1)**
12:8
**brought (1)**
92:20
**Brown (1)**
12:24
**Bruce (1)**
81:19
**building (26)**
26:22;27:3,12,15,
23,25;28:3,17,23;
29:5;42:20,21,24,24;
43:21;44:19;45:10,
17;58:21,25;59:4,5,9,
20,24;93:24
**Bussey (2)**
45:9;63:18

**C**

**call (5)**
10:21;21:2;27:21;
55:8,11
**calls (19)**
19:12,12;31:22;
32:18;33:6,17;34:21;
35:21,22;36:10,10;
45:21;46:25;48:22;
77:14;80:20;87:10,
13;95:10
**cam (3)**
100:6,11,13
**came (7)**
13:4;20:1;43:9,16;
55:17,18;86:24
**camera (39)**
15:23,24,24,24;
16:3,25;17:6,8,9,15,
16;39:25;40:2,19,20,
25;43:5;53:19;54:7;
57:11;74:16,21;
76:10,11,11,13,15,
19;78:2,6,8;80:2,17,
19,23;81:10,16;

83:10;90:15
**cameras (2)**
41:23;77:22
**Campbell (2)**
9:5,7
**campus (1)**
19:5
**can (85)**
4:13;5:5;6:10;7:3;
10:20;12:7;13:16;
14:19;16:24;18:23;
19:15,15;21:18;22:3,
7;25:6;27:4;28:21;
31:1,9,9,17;33:3,24;
34:1;35:7,12;36:23;
37:8,24;44:4,6,15,24;
45:23;47:17;49:13,
14;50:15;51:12;52:4;
53:8,21;55:25;57:2;
58:14;59:17;61:6;
64:4;66:21;68:18;
69:8;70:17;71:24;
72:5;73:5;77:6,15;
78:16;80:22;82:10;
83:2,3,17;84:2,10;
86:13;88:10;89:22;
90:17,22;92:21;
94:24;97:21,23;
98:12;99:25;100:3,5,
16,19;101:5,9,12,17
**capacity (1)**
19:4
**Capitol (3)**
23:11,11;54:24
**Capitol- (1)**
23:13
**Caprice (1)**
12:17
**captured (2)**
17:1;43:4
**car (18)**
18:8,12;24:2;
25:25;43:7;44:1,11;
52:8;54:19,22;55:4,
18,19;64:6;65:18,20;
66:6;72:3
**cars (2)**
18:25;65:5
**case (16)**
12:4;27:4;32:24;
36:17;40:1;51:22,24;
81:1;84:18;87:23;
90:19;93:17;94:9;
98:4,5,8
**cause (21)**
28:6;32:7,12,17;
45:20,23;46:2,4,12,
18,22;47:3,9,17,20;
48:17,25;49:15,22;
50:1,6
**caused (3)**
86:17,20,20
**caveat (2)**

7:15;46:22
**CCPD (1)**
13:13
**cell (2)**
35:17;36:5
**Center (20)**
17:2,3,12,19;18:6;
21:6,17;22:17;23:3,
8;26:14;41:6;42:1;
43:8;54:15;68:23;
69:21;72:16;85:1;
94:15
**certainly (3)**
30:3;40:15;56:15
**certainty (1)**
44:11
**chain (1)**
71:19
**chance (2)**
39:15;98:25
**change (6)**
32:16,21;39:9;
40:8;53:3,19
**charge (1)**
84:6
**chargeable (3)**
82:6,20,24
**charged (3)**
84:2;94:9,13
**charges (1)**
82:15
**check (2)**
18:24,24
**check-the-box (1)**
96:5
**chest (7)**
79:19,22;80:13,16;
81:5,7,9
**Chief (1)**
81:19
**children (1)**
12:8
**Chris's (1)**
52:8
**circumstance (2)**
33:21;37:6
**City (1)**
13:11
**Civil (1)**
102:4
**clarify (1)**
29:20
**clarity's (1)**
5:17
**Clayton (7)**
9:8,9;11:1,10,10;
13:12,19
**clear (9)**
6:3,20;31:25;43:5;
47:13;51:16;63:12;
76:1;77:2
**clips (1)**
16:5

**close (2)**
43:21;97:25
**Closed (1)**
8:20
**closer (1)**
64:11
**closing (1)**
94:12
**cluster (2)**
10:4,5
**Cobb (1)**
9:7
**collected (1)**
33:2
**Colton (5)**
71:1,3,4,4,6
**comfortable (1)**
83:18
**coming (5)**
14:20;20:19,20,24;
73:15
**command (1)**
71:19
**comment (3)**
63:13;67:4,5
**comments (2)**
94:20;95:13
**committed (11)**
30:12,24;31:15;
32:9;48:18,25;49:9,
16;50:7,11;94:14
**committing (1)**
30:16
**conceded (1)**
94:13
**concern (2)**
62:24;63:17
**concerned (1)**
63:16
**concluded (1)**
102:1
**concludes (1)**
96:16
**concluding (2)**
94:19;95:13
**conclusion (16)**
31:23;32:19;33:7,
18;34:22;35:22;
36:11;45:22;47:1;
48:22;49:7,12;77:15;
87:11;95:11;97:2
**conduct (1)**
35:9
**confusing (1)**
6:22
**connect (1)**
19:3
**connected (1)**
99:20
**connection (5)**
84:17,19,20;90:6;
91:8
**connector (2)**

22:23,24
**consider (1)**
8:24
**consistent (1)**
93:25
**Constitution (3)**
95:8,16,17
**construction (2)**
73:16;86:21
**contacting (1)**
92:14
**contention (1)**
38:15
**context (4)**
57:11;72:5;80:14,
15
**continue (1)**
4:12
**continuing (1)**
97:7
**convenience (9)**
19:24;24:22;25:21;
35:15;44:13,16;
55:10,12;60:24
**Convention (1)**
94:15
**conversation (16)**
7:10;15:7;38:7;
40:1,12,25;51:8,17,
20;56:25;69:20;70:8;
76:10,12,19;83:22
**conversational (1)**
9:20
**conversations (5)**
7:8;14:16,19;15:6;
39:23
**Convocation (21)**
17:2,3,12,19;18:5;
21:6,10,11,17;22:17;
23:3,8;26:14;41:5;
42:1;43:8;54:15;
68:23;69:21;72:16;
85:1
**Cool (1)**
98:18
**copy (1)**
37:10
**corner (3)**
22:18;23:10;78:21
**counsel (4)**
4:10;7:8,10;51:20
**counties (1)**
12:9
**County (7)**
9:9;11:2,10,11;
13:12,20;99:13
**couple (12)**
4:5,11;5:16;25:14;
37:21;68:12;78:24;
89:17,18;93:19;
97:24;99:1
**COURT (20)**
4:3,15,21;5:17;

15:15,17;18:1;22:5,
11;91:17,21;92:16,
18,24;94:19;95:12,
16;96:15;97:1,2
**credential (1)**
72:18
**credentials (1)**
72:11
**crime (11)**
18:17;32:9;33:15,
19;48:18;49:1,8,9,15;
50:7,11
**crimes (1)**
94:14
**criminal (8)**
46:9,10,11,20,23;
47:3,5;59:12
**cross (1)**
94:21
**crossed (1)**
95:15
**Crumley (5)**
24:23;25:2,5,12,17
**curious (1)**
72:5
**current (1)**
81:18
**custody (1)**
48:4
**cut (2)**
89:7,10

**D**

**DA (2)**
91:14;92:3
**damage (16)**
85:8,10,12,18,23,
24,25;86:2,6,6,7,23;
87:1,2,2,23
**damaged (3)**
31:3,11;87:20
**dangerous (1)**
73:3
**date (2)**
37:23;38:3
**Davis (13)**
20:15;24:4,13;
47:8;56:16;65:10;
66:5,14,15;68:3,16,
16,17
**Davis's (1)**
67:4
**day (14)**
14:10,10,17;16:3,
13;18:3;19:1;20:18;
31:7;41:3;42:1;45:7;
85:2;91:14
**day-to-day (2)**
18:23;19:4
**decision (1)**
45:24
**decks (1)**

18:24
**def (1)**
89:21
**defendant (1)**
22:13
**defendants (1)**
96:18
**defendant's (1)**
96:6
**define (1)**
95:6
**definitely (2)**
76:1;88:10
**degree (1)**
9:12
**degrees (1)**
87:1
**demand (1)**
77:7
**Department (1)**
13:11
**depend (3)**
20:24;32:24;35:2
**depends (2)**
19:1;36:16
**depict (1)**
85:18
**depicted (1)**
55:20
**Deposition (15)**
4:1,7,11,13;5:12;
14:6,13,20;15:14;
52:23,24;53:2;92:11;
93:8;102:1
**Deputy (1)**
81:18
**description (2)**
43:24;44:1
**detail (2)**
27:20;45:6
**details (3)**
27:18;77:24;90:11
**detain (3)**
67:13,14;68:3
**detained (13)**
11:5;19:24;34:15;
35:4,25;45:12;46:6;
47:14,14;48:15;
50:12;59:23;91:20
**detainees (3)**
62:24,25;63:4
**detention (8)**
17:3;32:25;34:2;
35:19,25;36:19,20,22
**determination (1)**
87:19
**determine (2)**
49:8;52:17
**determines (2)**
33:25;34:23
**determining (1)**
34:16
**difference (1)**

32:3
**differences (1)**
87:5
**different (5)**
34:20;52:12;62:13;
78:10;92:21
**direct (2)**
19:4;67:6
**direction (1)**
20:23
**directly (1)**
66:16
**disagree (15)**
7:14;26:9;36:9,14;
93:21;94:22;95:3,22,
23;96:6,7,10,14,22;
97:7
**disagreement (3)**
26:11;97:10,15
**discretion (1)**
48:12
**discussion (2)**
7:18;88:4
**dispatched (6)**
19:11,12,15,16,16,
18
**District (2)**
4:9;94:13
**divorce (1)**
8:8
**do- (1)**
47:10
**document (5)**
64:4;84:16;89:18;
90:11,12
**documents (5)**
15:13,15,17;16:9,
23
**done (8)**
32:14;64:5;74:13;
83:17,19;85:18;
87:21;97:25
**door (4)**
41:8,9,21;70:8
**doors (1)**
41:5
**down (14)**
9:7;11:19;19:24;
21:7;23:17;29:8,21;
38:1;47:13;54:13;
61:1,13;93:7;101:18
**downtown (2)**
20:21;48:9
**drive (1)**
21:6
**driver's (1)**
68:15
**driving (1)**
24:3
**due (1)**
96:19
**duly (1)**
4:23

duration (1)
33:5
**during (3)**
7:9;34:1;51:2
**duty (1)**
19:25

**E**

**earlier (7)**
6:12;34:5,7;37:17;
38:12;54:24;77:23
**easier (2)**
53:12;99:20
**easily (1)**
96:15
**east (2)**
22:24;23:6
**easy (2)**
18:25;79:18
**effect (2)**
34:5;49:2
**eight (2)**
52:16,17
**eight-minute (1)**
51:1
**either (4)**
12:7;30:21;50:17;
71:13
**Elaborate (2)**
11:19;72:20
**electronic (1)**
101:23
**Elementary (2)**
10:1,3
**elevator (1)**
52:12
**else (5)**
21:7;31:15;35:6;
52:6;90:17
**employed (1)**
11:14
**employees (1)**
43:13
**employment (2)**
11:18,20
**end (4)**
24:22;45:7;82:4,5
**ending (1)**
81:16
**ends (3)**
25:24;53:23;74:17
**endurance (1)**
7:5
**enforcement (4)**
13:1,8;36:4;85:22
**enough (1)**
16:22
**entry (2)**
41:7,18
**et (2)**
4:8;89:21
**even (3)**

16:16;91:2;95:6
**everybody (2)**
19:25;20:4
**everybody's (1)**
19:23
**everything's (1)**
97:18
**evidenced (1)**
84:6
**exactly (1)**
24:9
**EXAMINATION (2)**
8:2;99:10
**examined (1)**
4:23
**example (1)**
96:4
**exchanged (1)**
40:11
**Excuse (1)**
23:1
**exercise (2)**
6:9;96:5
**Exhibit (14)**
21:25;22:2;37:14;
53:18,20;74:16;
81:16;84:6,10,12;
88:23,24;89:16;
90:16
**expect (2)**
90:24;92:18
**expressed (1)**
44:11
**extent (1)**
15:7
**exterior (1)**
41:25
**extra (1)**
37:10
**eyes (4)**
42:8,16;44:17;54:3

**F**

**face (4)**
7:15;44:17,18;
101:5
**face-to-face (1)**
62:21
**facing (1)**
61:3
**fact (4)**
27:3,4;86:21;93:8
**factors (3)**
34:18,19;35:7
**facts (2)**
35:10,11
**failure (1)**
10:8
**fair (6)**
6:17,24;16:22;
56:19;57:15;77:24
**far (4)**

**G**

46:10;51:18;92:14;
98:6
**faulty (1)**
93:17
**Federal (1)**
102:3
**feel (1)**
45:20
**felony (2)**
87:5,22
**few (4)**
10:5;16:12;99:6,12
**field (1)**
88:12
**figure (3)**
10:20;59:7;82:10
**file (2)**
8:12;53:22
**files (1)**
15:11
**filling (1)**
82:21
**find (4)**
25:6;26:10;64:4;
70:23
**fine (1)**
77:11
**finish (1)**
9:15
**firearm (1)**
30:24
**first (25)**
4:4,6,23;5:13;18:4;
19:17,23;20:18;21:3,
4,6,12,12,15;22:21;
24:15;25:20;31:18;
38:1;52:9;63:9;
75:25;92:6,11;95:2
**firsthand (1)**
31:2
**Five (3)**
11:12;84:16;98:15
**five-minute (1)**
98:16
**flip (1)**
22:21
**flipping (1)**
91:5
**floor (2)**
52:9,13
**folks (14)**
29:15;39:24;40:11,
21;43:25;44:18;
46:16;56:16;58:1;
62:7,9;64:20,25;77:3
**following (1)**
35:14
**follows (1)**
4:24
**follow-up (1)**
101:20
**foot (1)**
24:3

**footage (3)**
15:16;17:8;100:14
**Footnote (1)**
93:22
**forced (2)**
41:7,17
**form (93)**
5:20;10:24;11:6;
14:18;20:2,11,22;
21:9;23:22;24:6;
26:16;27:6,13;28:5,
25;29:7,16,24;30:6;
32:6;33:17;35:21;
36:8;37:1;38:19;
39:9;40:4,22;41:11,
13;42:2,9,25;44:5;
45:11;46:25;47:11,
19;48:6,11,20;49:3,
18,24;50:9;53:4,5;
54:20;56:22;57:7,17;
59:13;60:4;61:16,19,
23;64:12,16;65:24;
66:11;67:8;70:3;
71:16,20;73:18,24;
74:6;78:11;81:2,11;
82:8,22;86:1,14,22;
88:7,17;89:12;90:18,
21;91:1,23;92:23;
93:10;94:23;95:4,10,
24;96:8,20;97:11,17;
98:11
**forward (1)**
57:20
**found (1)**
94:6
**four (1)**
55:4
**Frank (1)**
53:15
**Frazier (1)**
83:10
**Frazier's (1)**
81:16
**free (1)**
68:6
**front (2)**
33:22;62:14
**FTA (1)**
10:8
**fucking (2)**
59:20;60:2
**full (3)**
6:16;11:9;94:4
**full-blown (2)**
32:17;34:17
**Fulton (7)**
21:8;22:18;23:7,
11,14,16;99:13
**further (3)**
65:2;101:10,18
**future (2)**
90:25;92:22

**gathering (1)**
33:1
**gave (2)**
38:23;76:22
**GED (1)**
9:13
**GED- (1)**
9:12
**general (8)**
21:3,10,14;23:16;
31:7,18;35:9;71:8
**generally (8)**
5:15;7:15,22;19:9;
33:4;77:23,24;92:15
**Georgia (5)**
4:9;13:23;15:12;
20:20;48:3
**Gerry (1)**
22:14
**gesture (3)**
79:6;80:15;81:12
**gestured (2)**
80:8,10
**gesturing (1)**
17:23
**gets (1)**
78:7
**given (1)**
5:8
**giving (1)**
5:12
**glare (2)**
78:19,21
**glass (1)**
41:7
**goes (1)**
79:21
**good (1)**
64:15
**Gorrie (20)**
29:4,14;39:24;
40:2,11,21;41:9;43:6,
25;44:18;45:2;46:16;
55:19;56:16;58:1;
77:3;84:19;87:25;
88:2;90:19
**granted (1)**
91:11
**granting (1)**
93:16
**GREENAMYRE (189)**
4:5,25;5:2,11,14;
6:5,15,19,24;7:3,13,
17;8:1,3;9:19;11:4,8;
14:21;20:7,14,25;
21:13;22:4,6,12,14,
16,20;23:1,2,23;24:7;
25:8,10;26:18;27:1,9,
16;28:8;29:1,10,17;
30:1,7;31:24;32:10,

22;33:12;34:3,24;
36:1,12;37:8,11,13,
15,25;38:8,10,22;
40:9;41:16;42:4,10;
43:3;44:9;45:14;
46:1;47:6,16,23;48:7,
13,21,23;49:4,20;
50:2,13,16,19,25;
51:12,15,25;52:5;
53:10,15,17,23;54:1,
3,5;55:2;56:11,23;
57:9,19,24;58:12,19;
59:16;60:6,10,17;
61:17,21;62:1,5;
64:14,18;65:9;66:2,
13;67:2,10;68:1,10,
21;69:11,14;70:5,15;
71:2,18;72:7,24;
73:10,21;74:2,9,20;
75:1,6,12,14,16,19;
76:5;77:18,21;78:13;
79:2,4,14,16;80:24;
81:6,14;82:2,11,13,
19,25;83:6,14;84:14;
86:4,15,25;87:16;
88:8,21;89:13;90:23;
91:4;92:1;93:1,11;
95:1,7,19,25;96:9,21;
97:14,20,23;98:1,14,
16,18,21;99:4,7,21,
24;101:21,24
**grew (1)**
8:25
**ground (1)**
55:6
**group (2)**
42:6;83:4
**growing (1)**
10:4
**GSU (4)**
13:25;14:2,3;20:6
**GSUPD (11)**
11:14,17;13:1;
18:15;19:25;44:11;
62:17;65:18;70:21;
77:24;84:18
**guess (5)**
31:8;33:14;61:11;
72:14;90:14
**guy (4)**
15:11;59:19;60:2;
67:11
**guys (2)**
67:21;83:3

**H**

**half (1)**
25:3
**halfway (1)**
38:1
**hand (5)**
4:16;21:24;79:21;

81:4,7
**handcuffed (1)**
55:5
**handcuffs (11)**
10:21;36:2,3;45:3,
8,15;47:8;48:17;
50:8;67:21;69:18
**hands (1)**
70:11
**hanging (1)**
28:16
**Hank (5)**
17:16;22:17;23:7,
13,16
**happen (1)**
61:22
**happened (5)**
8:17;14:22;46:10;
80:25;94:1
**happening (4)**
33:22,22;37:7;92:9
**Happy (1)**
99:21
**hard (11)**
15:5;35:3;39:13;
40:6;42:12;53:6,8;
57:1;72:19;73:9;
74:21
**Harvey (4)**
78:8;79:10,18;82:5
**Harvey's (1)**
80:18
**head (4)**
8:14;77:1;87:9,15
**hear (18)**
18:4;52:4;56:4,7,
13,25;57:25;58:14,
20,21;68:19;69:6,15;
72:25;75:8;83:1,8;
92:2
**heard (10)**
57:10;69:7;82:5,7,
9,15,20,23;83:7,25
**hearing (7)**
14:12;38:24;39:8;
92:7;99:13,13,14
**held (2)**
35:15;41:9
**help (5)**
22:19;46:21;83:3;
99:18,21
**helpful (3)**
22:7;59:18;84:5
**Hendren (37)**
4:8;17:5;26:13,22;
27:2,4;29:4,6,12;
30:12,16,23;31:3,11,
15;34:6,11,12;35:14;
38:14;45:7;47:8;
48:15,15;50:6;65:13;
67:4,7,13,21;68:4;
69:18;75:22;76:7,12;
89:21;99:15

Benjamin Hendren vs.
John Patton, et al.

Jamar Reed
June 25, 2025

**Hendren- (1)**
94:7
**hereby (1)**
4:13
**hesitate (1)**
78:23
**high (6)**
9:4,5,5,6,12;81:21
**higher-up (2)**
82:14;83:1
**highlight (1)**
5:16
**highlighted (1)**
24:21
**high-ranking (1)**
81:22
**Hill (1)**
21:8
**him- (1)**
30:5
**himself (1)**
80:12
**hired (1)**
13:19
**holding (2)**
35:17;36:5
**hole (1)**
86:10
**homeland (1)**
71:9
**honest (1)**
95:5
**hope (1)**
83:17
**hopefully (3)**
28:21;74:12;97:25
**hour (1)**
19:23
**hours (5)**
11:12;35:16,18;
36:6;98:6
**house (2)**
73:2,15
**hundred (2)**
24:12;50:3
**hung (1)**
28:10
**hurt (3)**
56:6;57:12;63:13
**hypothesis (1)**
57:3

**I**

**ID (11)**
58:14;75:10,24;
76:2,20,22,22,23;
77:6,7,10
**idea (5)**
18:9;57:12;65:17,
21;71:17
**identification (11)**
22:2;37:14;46:16;

53:20;62:18;67:12;
77:4;84:12;88:24;
95:14;96:18
**identified (1)**
45:16
**identify (1)**
64:6
**imagine (1)**
49:14
**immediately (5)**
12:5;45:16;76:6;
80:17;83:9
**impermissibly (3)**
94:21;95:6;96:16
**important (3)**
27:20;98:8,9
**inappropriate (1)**
62:21
**inaudible (1)**
77:17
**incident (8)**
8:17;14:10,11;
16:3;18:3;37:16;
84:20;89:17
**include (1)**
90:10
**included (2)**
12:11;90:11
**includes (1)**
5:19
**including (2)**
17:4;98:4
**Indeed (1)**
96:3
**indicated (1)**
78:8
**indicates (1)**
91:6
**individual (2)**
33:2;35:8
**individuals (10)**
21:15,21;54:23;
55:22;62:11,13;
63:18,25;64:11;
99:16
**information (25)**
31:2,10;33:1,2,25;
37:22;38:2,5;41:4,10,
15,17,20;42:5;43:2,7;
55:23;58:24;59:1,2;
67:15;85:16;87:14;
91:21;92:20
**initial (1)**
35:19
**in-law (2)**
12:14,16
**In-laws (1)**
12:11
**inside (11)**
17:12;26:14,22;
29:4;42:19;45:9,17;
54:24;59:8;64:6;
93:24

**Insignificant (2)**
86:5,6
**instead (1)**
86:12
**instruct (1)**
51:14
**instructing (1)**
5:22
**intentions (1)**
81:4
**interfere (1)**
29:21
**interfering (3)**
30:4,9;31:20
**interpretation (3)**
73:23,25;74:3
**interrogatory (2)**
9:11;10:6
**Interrupt (1)**
6:13
**intersection (1)**
23:7
**into (18)**
4:12;11:9;21:8;
23:17;25:24;26:5;
32:16;35:17;36:5,23;
41:6;42:23;45:15;
50:7,19;69:18;72:3;
85:1
**investigated (3)**
33:11;36:17,18
**investigating (1)**
85:23
**investigation (13)**
31:13;33:23;35:5,
9;36:24;37:3,4;49:7,
8,10,17,22;87:18
**investigative (2)**
34:1;78:1
**investigator (1)**
32:25
**invited (2)**
52:23,24
**involved (9)**
8:4;26:2;33:21;
37:7;63:5,21;91:16,
22;92:16
**involvement (2)**
16:6;55:7
**Isaiah (1)**
12:25
**issue (1)**
52:25
**issued (1)**
10:10
**items (1)**
85:9

**J**

**jacket (1)**
70:18
**jail (2)**

11:10,11
**Jamar (3)**
4:1,7,22
**Jason (1)**
12:24
**Jaywalking (3)**
30:19;48:2,9
**jobs (3)**
11:21,23,24
**John (1)**
12:24
**judge (1)**
97:15
**jumped (2)**
39:17,21
**June (1)**
4:2
**jury (2)**
12:3,5
**justification (1)**
32:11

**K**

**KANG (139)**
7:14,24;9:15,18;
10:24;11:6;14:7,18;
20:2,11,22;21:9;22:3,
19;23:22;24:6;25:6,
9;26:16,24;27:6,13;
28:5,25;29:7,16,24;
30:6;31:22;32:6,18;
33:6,17;34:21;35:21;
36:8,10;37:1,10,12,
24;38:19;40:4;41:13;
42:2,9,25;44:5;45:11,
21;46:25;47:11,19;
48:6,11,20,22;49:3,
18,24;50:9,15,17,22;
51:10,14,22;52:2;
53:5,21,25;54:2,20;
56:22;57:7,17;59:13;
60:4;61:16,19,23;
64:12,16;65:24;
66:11;67:8;70:3;
71:16;73:18,24;74:6;
77:14;78:11;79:13;
80:20;81:2,11;82:8,
22;86:1,14,22;87:10;
88:7,17;89:12;90:21;
91:1,23;92:23;93:10;
94:23;95:4,10,24;
96:8,20;97:11,17,21;
98:11,15,17;99:6,9,
11,18,23,25;100:3,4,
16,19,21;101:9,12,
13,17,22
**keep (2)**
49:17;91:5
**keeps (1)**
8:14
**kept (1)**
36:3

**kicked (1)**
82:23
**kind (10)**
8:5;9:3;10:22;
11:23,25;12:1;15:11;
31:6;33:25;73:8
**knew (4)**
27:7,11;29:12;59:3
**knowledge (4)**
73:4;85:17;86:16,
18

**L**

**lack (1)**
91:18
**laid (2)**
42:16;44:17
**language (2)**
97:12,19
**large (1)**
10:7
**last (11)**
12:18;13:5;14:12;
15:15,20;36:21,23;
59:17;94:4;96:1;
98:22
**later (3)**
16:17;69:19;94:6
**law (5)**
13:1,7;36:4;51:22;
85:22
**lawfully (1)**
29:13
**lawsuit (4)**
8:10;15:1,2,11
**lay (1)**
42:7
**layman's (1)**
94:24
**lead (1)**
33:15
**learned (2)**
15:1,3
**least (7)**
20:1;31:17;57:10;
59:8;62:6;77:7;85:25
**led (3)**
56:25;67:12,15
**left (2)**
74:24;97:22
**legal (14)**
8:5;31:22;32:18;
33:6,17;34:21;35:22;
36:11;45:21;47:1;
48:22;77:14;87:10;
95:11
**less (2)**
34:6;69:19
**liar (1)**
59:20
**Lieutenant (5)**
72:1;78:8;79:10;

80:18;82:5
**limit (2)**
36:20,22
**line (5)**
50:17;94:21;95:15;
96:23;98:22
**lines (3)**
56:5;75:8,23
**lineup (2)**
62:12,14
**lineups (2)**
62:18;63:23
**link (2)**
15:6,9
**listen (2)**
56:7;57:2
**literally (1)**
78:21
**little (15)**
5:7;12:10;29:8,21;
33:13;39:19;45:6;
57:20;63:6;74:11;
75:25;94:19;95:12;
96:4;97:22
**L-O (1)**
12:19
**location (3)**
34:20;37:22;38:3
**locations (1)**
37:22
**long (10)**
7:5;11:5;31:19;
36:22,23;37:2,3,5;
52:7,19
**longer (1)**
33:15
**look (11)**
16:9;38:1;53:13;
84:5;85:8;89:16,20;
93:22;94:3;96:1,13
**looked (1)**
78:14
**looking (4)**
23:5;76:19;85:7;
88:9
**looks (10)**
54:9;70:19;71:4;
78:7;79:17,18;80:13;
83:11;85:14;89:4
**lot (5)**
9:3;20:3,5;50:20;
92:9
**Lowe (3)**
12:17,18,20
**L-O-W-E (1)**
12:20
**lower (1)**
64:25
**lying (2)**
44:19;60:2

**M**

**main (1)**
90:5
**making (1)**
24:13
**man (2)**
94:6,13
**many (2)**
42:7,23
**mark (11)**
37:8;60:19;65:14;
68:2,12;69:19;72:3;
74:18;75:20;81:18;
82:4
**marked (10)**
21:25;22:2;37:13,
14;53:20;84:10,12;
88:23,24;93:13
**marks (1)**
86:17
**Martin (7)**
21:22;23:18,20;
24:16,20;54:14;55:6
**mask (1)**
61:8
**masks (5)**
61:5,13,15;62:7;
64:25
**matter (3)**
10:7;25:20;31:18
**matters (2)**
16:22;44:25
**may (17)**
5:19;6:20;7:20,20;
10:19,19;16:5;21:15;
33:15;35:6;40:10;
44:6;45:3;53:12,12;
71:12;98:4
**maybe (8)**
11:20;18:25;24:20;
26:8;38:14;69:2;
70:18;97:23
**mean (12)**
10:14;15:17;19:19;
35:4;46:21;49:13,16;
69:24;72:10;88:18,
19;101:16
**meant (2)**
81:5,13
**media (2)**
15:9,10
**Memorial (1)**
18:9
**memory (5)**
6:5,9;20:19;61:18;
90:24
**mentioned (2)**
34:18;36:21
**message (2)**
88:25;89:5
**metro (2)**
12:9,9
**Metropolitan (1)**
9:1

**middle (2)**
6:2;94:18
**midst (1)**
69:20
**mid-testimony (1)**
51:19
**might (7)**
57:12;63:14;75:9,
23;76:1;98:3;99:18
**might've (1)**
28:4
**mild (1)**
85:14
**mind (1)**
22:9
**mine (1)**
16:1
**minute (7)**
6:10,11;20:1;24:4;
60:7;69:19;82:4
**minutes (7)**
52:16,18;53:19;
75:15;97:24;98:15;
99:1
**misdemeanor (2)**
48:3;87:6
**modify (1)**
53:3
**moment (1)**
48:16
**more (13)**
27:18;33:13;34:6;
35:11;64:9;80:4;
81:15;83:18;88:10;
90:11,25;96:5;99:1
**Morrow (3)**
9:5,7,12
**Most (5)**
11:24;24:20;60:19;
66:22;85:24
**motherfuckers (5)**
56:5,19;57:4,12;
63:13
**motion (7)**
78:16;91:8,10,17;
92:6;93:16;99:13
**motioned (1)**
78:7
**motioning (1)**
81:8
**mouse (1)**
100:6
**move (4)**
35:8;53:11;78:23;
100:5
**moved (2)**
9:3;35:6
**moving (2)**
30:12;35:7
**much (4)**
18:23;25:19;40:12;
64:9
**muddy (1)**

75:25
**multiple (2)**
94:20;95:13

**N**

**name (4)**
12:18;53:22;70:17,
17
**names (2)**
12:6,7
**narrower (1)**
31:9
**Natural (1)**
50:21
**near (2)**
24:22;25:21
**necessarily (1)**
17:15
**necessary (3)**
7:25;19:2;35:8
**need (14)**
7:22;12:6,6,15,22;
22:19;27:18;28:6;
31:9;32:11;35:11;
53:12;78:23;99:18
**needed (3)**
87:24,25;88:3
**needs (2)**
22:8;32:17
**news (2)**
15:9,10
**next (3)**
50:17;56:3;61:14
**nine (2)**
35:18;36:6
**nine-minute (1)**
72:3
**None (1)**
44:6
**non-witness (1)**
85:7
**Nor (1)**
49:25
**normal (1)**
73:3
**North (4)**
10:4;18:9;20:19;
25:14
**Northern (1)**
4:9
**northwest (2)**
22:18;23:10
**note (1)**
91:7
**notice (1)**
4:10
**number (5)**
34:18;35:6,6;
42:14;89:20
**number's (1)**
87:14

75:25
**multiple (2)**
94:20;95:13

**O**

**oath (2)**
4:24;39:1
**object (84)**
5:19;10:24;11:6;
14:18;20:2,11,22;
23:22;24:6;26:16;
27:6,13;28:5,25;29:7,
16,24;30:6;32:6;
33:17;35:21;36:8;
37:1;38:19;40:4;
41:13;42:2,9,25;
44:5;45:11;46:25;
47:11,19;48:6,11;
49:3,18,24;50:9;
51:10;53:5;54:20;
57:17;59:13;60:4;
61:16,19,23;64:12,
16;65:24;66:11;67:8;
70:3;71:16;73:18,24;
74:6;78:11;81:2,11;
82:8,22;86:1,14,22;
88:7,17;89:12;90:21;
91:1,23;92:23;93:10;
94:23;95:4,10,24;
96:8,20;97:11,17;
98:11
**objection (17)**
5:20;6:1;7:24;
21:9;26:24;31:22;
32:6,18;33:6;34:21;
45:21;48:20;56:22;
57:7;77:14;80:20;
87:10
**observation (1)**
30:22
**observe (4)**
29:23;30:2,3;47:5
**observed (1)**
29:22
**observing (1)**
30:16
**obtain (1)**
49:22
**Obviously (1)**
46:22
**OCGA9-11-30e (1)**
102:4
**off (22)**
8:13;40:19,20;
41:1;45:24;50:22;
61:13;77:1;78:9;
80:2,17,19,22;81:10;
83:10;87:9,14;89:7,
10;97:18;101:24,25
**offer (1)**
72:5
**office (1)**
13:14
**officer (25)**
13:4;20:15;24:13;

33:1;56:15;66:15;
67:4;68:3;69:1;
70:21;71:8;81:22;
85:23;91:16,19,22;
92:16,18,20,24;93:3,
6;94:5,5,19
**officers (9)**
15:1;20:3,5;65:18,
23;70:19;78:2;83:2;
92:14
**officials (1)**
31:19
**Oglesby (1)**
12:25
**once (5)**
10:14,17,25;36:16;
37:5
**one (36)**
5:13,18;7:19;16:5;
17:22;22:1;25:3,18;
28:16;34:10,13,19;
35:4,16;41:4,20;
43:18;56:4,16;57:25;
66:21;70:18,19;71:7,
9;72:3,12,21,25;
73:11;74:11;80:4;
81:15;84:2;91:15;
101:18
**ones (1)**
13:16
**ongoing (1)**
36:24
**only (13)**
13:1,16;16:1;35:3,
4;45:15;51:19;64:5;
67:3;74:16;77:19;
84:16;94:3
**opened (2)**
41:8;70:8
**opposed (2)**
44:12;71:14
**option (1)**
19:9
**order (2)**
93:16;101:23
**originally (2)**
15:3,7
**others (1)**
31:2
**Otherwise (1)**
7:19
**out (29)**
5:4;10:20,21;
11:10;12:10;17:16;
20:3,5;26:10;39:17,
21;54:19,22;55:4;
59:7,11;60:13;62:10,
13;64:10;66:23;
71:14;74:4;82:10,21;
83:3;87:22;92:13;
94:6
**outset (2)**
49:15;59:8

**outside (9)**
14:16;17:2,8;
42:20,24;52:23;
65:18;70:1;93:25
**over (14)**
19:19;39:15;58:5,
13;73:8;75:15;78:7;
80:15;81:8;82:23;
83:11;88:1,16;101:2
**own (1)**
17:8

**P**

**Pace (1)**
12:17
**page (12)**
38:1;45:9;63:19;
89:22,23;91:5;93:22;
94:3,17,18;96:13,24
**pages (2)**
84:16;85:6
**paint (1)**
88:16
**paper (1)**
16:9
**paperwork (1)**
8:14
**para- (1)**
9:23
**paragraph (6)**
94:4,5,17,18;95:2;
96:2
**parent (1)**
12:8
**parents (2)**
12:14,16
**parking (1)**
18:24
**part (20)**
10:7;19:7;24:20;
26:9;31:13;33:19;
43:20;44:24;53:18;
65:10,16;66:7;74:15;
81:16;87:3,18;89:7;
92:7,12;94:10
**partial (2)**
94:17;96:3
**particular (1)**
49:11
**parties (3)**
4:12;63:5,21
**pass (2)**
21:7;99:7
**passes (1)**
90:25
**PAT (1)**
13:21
**patrol (5)**
18:17;19:5,5,9,12
**patrolling (1)**
20:24
**Patton (6)**

4:8;75:8,21;80:2,
19;89:21
**Patton's (3)**
74:16;78:6;99:19
**pause (2)**
60:11;70:24
**pausing (4)**
56:12;60:18;68:11;
70:16
**paying (1)**
88:15
**pedestrian (3)**
30:16,18,19
**pending (1)**
4:8
**people (34)**
12:5,7;17:4;25:21,
24;26:5,6;42:12,12,
15,16,21;44:11,12,
17;45:1,2,3;54:18,21;
55:4,5,17,19;56:4;
59:23;66:6,10,16;
68:22;71:9;72:4,25;
73:3
**people's (3)**
15:24;16:2,6
**percent (3)**
24:12;50:3;85:4
**perfectly (1)**
77:11
**perhaps (1)**
14:14
**permissible (2)**
32:15;33:16
**person (12)**
21:4;34:19;40:2;
41:9;47:4,4;49:10;
59:22;70:11;71:9,10;
101:7
**personal (4)**
30:22;50:5;85:17;
86:16
**personally (1)**
30:16
**person's (2)**
32:8;101:5
**pertain (1)**
57:4
**phone (2)**
70:11;71:14
**photo (1)**
62:18
**photographs (1)**
85:18
**photos (7)**
84:16,17,18,22,24;
85:24;88:10
**physical (2)**
13:21,22
**pick (1)**
74:17
**picked (1)**
17:4

**picking (1)**
12:3
**picture (5)**
70:12;71:13;86:10,
11,12
**pictures (3)**
85:13,22;86:7
**pipe (1)**
58:15
**place (5)**
35:4,7;49:25;73:9;
75:15
**placed (2)**
36:20;45:8
**places (2)**
11:25;31:19
**plaintiff (1)**
22:13
**plaintiff's (2)**
22:10;93:13
**play (14)**
44:24;52:3;56:3;
57:2;59:17;60:7;
61:7;62:2;70:9;
74:24;76:3;99:25;
100:17;101:9
**played (1)**
82:3
**playing (38)**
56:10;57:8,23;
58:11,18;59:15;60:9,
16;62:4;65:8;67:1,
25;68:9,20;69:10,13;
70:14,25;72:6,23;
73:7;74:19,25;75:5,
11,13,18;76:4;78:12;
81:25;82:1,12,18;
83:5,13;100:2,18;
101:11
**Please (3)**
4:15;6:13;64:6
**pleasure (1)**
5:12
**pm (2)**
98:20;102:1
**point (19)**
19:23;35:16;37:24;
45:19;49:11;54:12;
56:3;59:3,22;60:22;
61:9;62:6;68:6;
76:15;77:2,12;80:19;
82:10;91:10
**pointing (3)**
65:13;75:21;81:9
**pole (1)**
17:15
**Police (3)**
13:11;63:21,23
**policies (1)**
62:17
**policy (1)**
77:25
**pops (1)**

77:19
**position (1)**
35:5
**possible (1)**
84:24
**potential (7)**
21:4;23:24;25:1;
51:19;63:17;83:23;
85:23
**precinct (3)**
18:12;35:17;36:5
**preference (2)**
80:18,21
**preparation (2)**
14:6;15:14
**prepping (1)**
14:13
**press (1)**
72:17
**presumably (2)**
85:22;87:25
**presume (2)**
96:12,14
**pretty (4)**
18:23;51:16;75:9,
23
**previously (8)**
21:24;37:13;54:8;
66:15,15;84:10;
88:22;93:13
**primarily (1)**
63:16
**primary (2)**
90:1,8
**prior (6)**
5:8;8:19;21:2;
39:24;57:14;77:3
**privilege (4)**
7:18;51:6,11,18
**privileged (2)**
7:9;51:20
**probable (21)**
28:6;32:7,12,17;
45:20,23;46:2,4,12,
18,22;47:3,9,17,20;
48:17,25;49:15,22;
50:1,6
**Probably (5)**
12:12,13;61:22;
76:20;98:24
**Procedure (1)**
102:4
**proceeding (1)**
8:5
**Proceedings (2)**
50:24;98:20
**process (5)**
11:3;13:20;55:17,
21;96:19
**produced (1)**
84:17
**professional (1)**
9:24

**promoted (1)**
13:5
**proper (3)**
35:9;62:15;63:23
**property (6)**
31:3,11;85:23;
87:1,20,23
**protest (1)**
94:10
**protester (1)**
85:19
**protesters (12)**
42:7;43:9;44:12;
57:5,13;58:25;59:4,
4;73:15;86:18,20;
93:23
**protesting (1)**
44:13
**protestor (1)**
23:24
**protestors (13)**
21:16;24:5,13,17;
25:1;41:8;42:6,19,20,
23;43:16;44:1;56:20
**protests (1)**
19:2
**provided (1)**
29:5
**prudent (2)**
32:8;47:4
**pub (1)**
25:12
**public (3)**
25:4;31:19,19
**pull (2)**
65:2;99:19
**punishable (1)**
48:4
**purposes (3)**
12:3;54:15;55:13
**pursuant (2)**
4:9;102:3
**pursuit (1)**
24:3
**put (12)**
22:7;35:17;36:2,5;
45:15;47:8;48:17;
50:7;61:14;67:20;
69:18;94:24

**Q**

**quick (5)**
33:24;34:1;70:9;
77:19;79:1
**quizzing (1)**
77:23

**R**

**radio (4)**
18:4;19:19;21:21;
59:1

**raise (1)**
4:15
**range (1)**
79:15
**ranking (1)**
81:21
**rather (2)**
85:24;93:6
**reach (2)**
83:4;92:13
**react (1)**
73:17
**read (2)**
15:20;101:22
**reads (1)**
96:15
**real (2)**
79:1;92:9
**realized (1)**
11:1
**really (9)**
10:7;22:1;35:2;
39:18,19;61:6;82:6,
20,24
**reason (9)**
29:11;30:23;33:10;
64:15,20,24;65:2;
76:14;77:11
**reasonable (6)**
32:8;33:9,10;47:4;
77:7;92:20
**recall (37)**
14:20;15:5,8;
21:18;24:9,12,25;
25:20;30:25;39:23;
40:1,5,6,20,24;41:14,
19,22,24;42:3;44:4,6,
8;45:4;52:24;54:17;
55:21;59:18;61:6;
62:19;70:4;85:20;
87:9,15;90:17,22;
101:14
**receive (1)**
33:24
**recently (3)**
39:7,14,16
**Recess (2)**
50:23;98:19
**recognize (4)**
54:6;66:21;69:1;
81:18
**recollection (6)**
6:7;43:11;61:12,
20;65:6;76:18
**record (8)**
5:6;6:3;31:19;
50:22;51:16;74:15;
101:24,25
**Recording (2)**
58:7,9
**red (2)**
25:24;58:6
**Reed (13)**

4:1,7,22,25;12:22,
24,24,25;25:15;
77:16;94:5,5;99:12
**Reed's (1)**
94:19
**reference (8)**
11:2;35:24;45:13;
56:20;57:4;65:22,25;
72:17
**referring (6)**
56:18;65:18,19;
66:4;78:16;94:7
**reflection (1)**
99:1
**refresh (1)**
6:7
**refused (1)**
77:10
**related (3)**
12:5;14:17;17:3
**released (2)**
35:18;36:6
**relevant (2)**
98:3,5
**remained (1)**
93:24
**remark (1)**
84:11
**re-mark (1)**
21:25
**remarked (1)**
88:23
**remember (12)**
8:13;16:19;21:20;
24:18;39:10;40:7,7;
44:7;53:7;76:23;
99:14;100:25
**rendered (1)**
96:17
**rendering (1)**
96:4
**repeat (1)**
6:2
**Rephrase (2)**
26:25;44:15
**replay (1)**
73:5
**report (9)**
16:10;29:3,14;
37:16;89:17;90:1,5,9,
15
**reported (1)**
31:2
**REPORTER (5)**
4:3,15,21;22:5,11
**Reporter's (2)**
5:17;18:1
**represent (8)**
25:2;42:22;52:20;
55:3;76:9;84:15;
93:15;94:7
**re-read (2)**
39:14,16

**research (1)**
87:13
**reserved (1)**
102:5
**resources (1)**
33:20
**respecting (1)**
98:5
**respond (4)**
19:2,15,20;89:2
**responded (2)**
54:21,25
**responding (1)**
54:17
**response (6)**
9:11;18:19,20,22;
59:19;89:9
**responses (1)**
10:7
**responsibility (1)**
19:8
**restaurant (1)**
11:25
**restaurants (1)**
12:2
**result (3)**
13:17;14:4,5
**resumed (2)**
50:24;98:20
**retain (1)**
51:20
**review (1)**
15:14
**reviewed (2)**
39:7;54:8
**revisit (1)**
39:9
**Richmond (1)**
25:4
**right (255)**
4:6,15;5:2,11,20;
6:9,19,24;7:3,6;8:4,
20,24;9:10;11:9;
12:13;13:1;14:14;
15:23;16:19,23;18:1,
3,15;19:8;20:1,17;
22:17,20,20,21,22,23,
23,24,25;23:3,4,8,15;
24:8,9,15;25:18;26:8,
11;27:3,19;28:19,22,
24;29:20;31:8,18;
32:2,11,12,14;35:1,
11,12,16;36:3,15;
37:21;38:2,4,11,23;
39:2,4,14,17,22;
40:13,16,18,19;41:3,
4,17;42:19,22;44:7;
45:3,5,15;46:2,23;
47:18;48:2,2,4,8,14,
14;49:6,15,17;50:3;
51:1;52:9,10;53:2,8,
11,12,16;54:6,10,19;
55:8,11,11,12,16;

56:2,12,15,18;57:10,
15,20,25;58:1,3,8,20;
59:7,12,17;60:11,15,
18,20,22;61:7;62:2,6,
7,9;63:1,3;64:19,24;
65:23;66:16,22,25;
67:3,16,24;68:2,6,11,
22,24;69:4,6,17,17,
22;70:6,9,10,16;71:5,
12,24;72:2,25;73:14,
22;74:10,15,17,23;
75:2,4,4,17,20;76:17;
77:10;78:5,5,14,19,
24;79:5,5,6,10,11,20,
21,21,22;80:1,4,15;
81:17,22,25;82:3,14,
17;83:7,9,22,23;
84:22,23;85:5,12,20;
86:8,10;87:2,15,22;
88:5,6,14,22,22;89:5,
10,16;90:2,5,10,14,
17;91:5,16,17;92:15,
19,22;93:8,12,15;
96:12,24;98:2,6,12,
22;99:3,4;100:3,8,19;
101:17
**rights (2)**
69:7,22
**Rivers (1)**
10:1
**road (1)**
65:5
**roadway (1)**
30:19
**role (3)**
18:15;19:8;71:25
**route (1)**
92:14
**Rule (1)**
102:3
**Rules (1)**
102:3
**Running (6)**
25:22,23,24;26:5,
6;54:23

**S**

**Safety (4)**
62:11;63:9,17,20
**sake (4)**
5:17,17;9:21;18:1
**same (11)**
10:4,5;13:25;14:4,
5;19:8;26:24;39:1,4;
40:18;96:14
**saw (8)**
9:10,14,23;10:8;
15:6;26:5,5;44:20
**Sawyer (1)**
12:17
**saying (30)**
21:21;28:11;30:11,

Benjamin Hendren vs.
John Patton, et al.

Jamar Reed
June 25, 2025

15,22;31:14;34:11;
37:3,5;45:4,9;46:17,
18;47:14;50:5,10;
54:25;59:19,23;
60:12,12,19;62:20;
73:11;74:1,3;86:17;
92:16;95:16,18
**scattered (1)**
42:13
**scattering (2)**
42:15,16
**scene (11)**
35:15;36:3;44:2;
54:13,18;55:10,12;
59:2;77:25;78:2;
81:23
**scenes (1)**
33:23
**school (7)**
9:4,5,5,6,12;10:1,3
**scope (1)**
32:15
**scrape (1)**
86:12
**scrapes (2)**
85:14;88:14
**screen (2)**
22:8;100:22
**screenshot (1)**
89:4
**scuffs (1)**
86:20
**search (1)**
91:16
**seat (3)**
56:4;66:10;73:1
**second (11)**
21:5;25:6;46:15;
60:12;61:8;68:12;
74:24;77:20;93:22;
94:17;101:18
**secondary (2)**
11:17,21
**seconds (5)**
56:3;61:14;69:17;
80:1;83:15
**section (1)**
19:6
**security (3)**
12:1;62:23;71:9
**security-type (1)**
11:24
**seeing (2)**
24:25;25:21
**seemed (1)**
19:22
**selected (1)**
55:22
**selection (1)**
55:17
**sense (1)**
86:10
**sent (1)**

88:25
**sentence (5)**
95:2;96:2,3,15;
97:6
**sentences (1)**
94:4
**Sergeant (10)**
4:7,25;13:5;75:21;
77:16;80:1,18;83:10;
99:12,19
**seven (2)**
35:18;36:6
**several (1)**
47:13
**severity (2)**
33:15,19
**shape (6)**
39:9;40:22;41:11;
53:4;71:20;90:18
**share (1)**
64:7
**Sheila (1)**
12:22
**Sheriff's (1)**
13:14
**shift (1)**
19:16
**shirt (1)**
81:22
**shit (2)**
73:1,3
**short (4)**
16:13;33:5,8;80:4
**shorter (1)**
16:16
**shorthand (1)**
55:9
**Shortly (1)**
83:11
**show (15)**
6:8;16:5,11,22;
51:22;61:12;72:11;
74:11,23;78:5,16,24;
84:9;93:12;96:23
**showing (1)**
62:14
**shows (1)**
71:9
**show-up (12)**
54:15;55:14;62:12,
16;63:24;64:5;91:20;
93:17;94:21;95:14;
96:3,16
**show-ups (2)**
62:18;63:22
**siblings (1)**
12:22
**side (3)**
60:23;68:15;78:25
**sidewalk (1)**
59:11
**sign (5)**
85:8,10,11,12;

101:23
**signal (1)**
5:21
**signature (1)**
102:5
**significant (3)**
85:24,25;86:2
**signs (1)**
41:25
**Similar (1)**
75:25
**sister (1)**
12:8
**sister-in-law (1)**
12:15
**sit (2)**
31:10;64:19
**site (3)**
21:11;73:16;86:21
**sitting (3)**
61:1,12;93:7
**situation (3)**
5:6;10:9;49:14
**six-minute (3)**
68:2;69:19;75:20
**size (1)**
42:5
**small (1)**
87:2
**smashed (1)**
41:7
**Smith (5)**
69:2,4,6,21;83:11
**solemnly (1)**
4:16
**somebody (11)**
8:6;47:18;48:9;
56:13;58:24;68:12;
87:23,24;88:4,16;
91:19
**Somebody's (1)**
68:15
**someone (10)**
8:6;20:10,12;28:7;
34:16;48:2;58:14;
70:20;87:18;101:2
**Sometimes (1)**
10:19
**somewhere (3)**
25:17;35:6;77:18
**soon (3)**
5:4;49:22;97:21
**sorry (24)**
9:17;10:15;12:18;
21:12;22:12;24:11;
30:9;39:21;50:3;
59:17;66:20;67:19;
69:11;75:7,12,14;
79:3,5;82:16;87:4,
12;96:11,24;97:6
**sort (1)**
39:19
**sorted (1)**

10:21
**Sotto (1)**
38:7
**source (2)**
31:11;86:19
**south (5)**
18:9;20:21;23:6;
25:3,3
**speaking (1)**
92:15
**specific (3)**
37:24;43:15;64:20
**specifically (1)**
17:11
**specify (1)**
53:21
**speculation (3)**
35:21;36:10;80:20
**spend (1)**
50:20
**spoken (1)**
91:14
**spouse (1)**
12:8
**squishy (1)**
39:20
**stamp (1)**
100:20
**stand (2)**
64:11,21
**start (7)**
6:1;52:22;53:2;
69:12;72:2;81:25;
98:2
**starting (10)**
60:8;70:10;75:17;
78:6;79:21;81:8;
94:5;96:2;97:1,6
**starts (3)**
80:15;94:18;96:23
**State (3)**
13:23;15:12;48:3
**statement (5)**
7:14;59:19;60:3;
91:19;97:8
**statements (2)**
85:7;90:16
**status (1)**
51:21
**step (1)**
71:14
**stickers (3)**
22:4,10,10
**still (4)**
5:21;11:13;36:19;
39:25
**stipulations (1)**
4:11
**stop (23)**
26:6;29:22,25;
30:3,10;32:4,16,25;
33:16;34:25;49:16,
21;54:14,17;55:1,4,7;

75:9,24;76:1;100:3,
19;101:12
**stopped (2)**
25:25;26:1
**stopping (1)**
81:8
**stops (2)**
33:4;80:16
**store (9)**
19:24;24:22;25:21;
35:15;44:14,17;
55:10,12;60:24
**stores (1)**
12:2
**streamlined (1)**
5:7
**Street (13)**
21:22;22:18;23:8,
14,16,18,21;24:16,
21;25:15;54:14;55:6;
61:3
**stuff (3)**
74:12,13;82:24
**Subaru (3)**
25:24;26:3,5
**subjected (1)**
34:17
**substance (1)**
51:23
**substantive (1)**
14:22
**sued (2)**
8:5,6
**suggestive (5)**
94:22;95:6;96:17;
97:13,19
**Summer (1)**
21:8
**supermarket (1)**
25:5
**supervisor (1)**
80:22
**supplement (2)**
90:7,9
**supplemental (3)**
16:13,16;91:7
**support (1)**
80:22
**supposed (1)**
13:20
**suppress (5)**
91:8,11,18;93:16;
99:13
**suppression (4)**
14:12;18:17;38:24;
39:8
**sure (61)**
5:14;6:16;7:17;8:1,
15;12:4;15:4;16:20;
18:7,14;20:23;21:1;
26:2,7;28:17;30:11;
38:13;39:14;40:12,
15;42:18;43:10,18;

44:22,25;46:13;48:5;
49:13;52:4;56:21;
58:9,15;64:13,17,22;
66:5;69:25;73:11;
75:9,23;76:24;78:20;
80:21;81:3,4,12,20;
84:4,23;85:11,21;
87:17;88:2;89:1,3;
92:6,10;93:5,9;99:9,
23
**surveillance (1)**
17:19
**suspected (2)**
24:5,17
**suspicion (1)**
77:8
**suspicious (1)**
21:4
**swear (3)**
4:3,14,16
**switch (2)**
23:12;78:25
**sworn (2)**
4:23;5:8
**system (1)**
89:21

**T**

**talk (10)**
5:18,23;14:7;
35:12;51:2,5,23;
76:6;81:8;98:3
**talked (9)**
5:15;7:21;14:9,25;
37:16;52:1;98:6,7,9
**talking (21)**
54:22;57:16;66:8,
9;70:1,2,4;73:4,9,15,
20;74:8;75:22;77:17,
22;78:1,1;80:16,16;
81:9;90:18
**talks (1)**
78:7
**Tamika (1)**
12:24
**taps (1)**
80:16
**taught (2)**
10:4;63:23
**teach (1)**
63:22
**teacher (1)**
9:23
**team (3)**
18:19,20,22
**technically (1)**
10:17
**telling (2)**
74:7;92:4
**tells (1)**
51:13
**tent (1)**

63:25
**terms (3)**
32:14;34:16;94:25
**Terry (7)**
32:4,16,25;33:4,
16;34:17,25
**test (2)**
6:6;7:5
**testified (6)**
4:24;15:16;16:17;
54:23;91:7;94:6
**testify (1)**
14:11
**testimony (11)**
4:17;5:8;6:16;
15:18;38:13,23;39:7,
23;51:24;52:25;
93:23
**textbook (1)**
96:4
**Thanks (1)**
98:18
**thereafter (3)**
67:5;76:6;83:9
**thinking (1)**
27:19
**though (1)**
80:23
**thought (1)**
46:15
**three (1)**
88:9
**threshold (4)**
87:8,17;88:1,5
**throws (1)**
6:1
**times (1)**
47:13
**timestamp (3)**
77:16;79:13;100:5
**tiny (1)**
86:12
**today (10)**
4:17;5:3,5;6:17;
14:6;15:14;26:10;
29:12;31:10;64:19
**told (3)**
52:3;85:18;92:3
**took (5)**
51:1;52:12;84:22,
24;85:21
**top (6)**
8:14;22:22,22;
77:1;87:9,14
**totality (2)**
33:21;37:5
**totally (1)**
50:4
**touched (2)**
80:12,13
**touches (1)**
79:18
**towards (2)**

21:23;101:3
**traffic (12)**
18:5;21:21;26:6;
29:22,25;30:3,10;
54:13,17;55:1,4,7
**trained (1)**
64:2
**training (2)**
20:10,12
**transcript (1)**
15:18
**transcripts (1)**
101:23
**transported (3)**
34:20;35:17;36:4
**tremendously (1)**
83:3
**trespassing (2)**
41:25;59:12
**tried (1)**
98:3
**trouble (2)**
94:19;95:13
**true (1)**
35:20
**truth (3)**
4:18,18,19
**Truthful (1)**
39:4
**try (5)**
5:3,18;6:2,8,19
**trying (5)**
55:9;59:7;70:23;
82:9;92:17
**turn (7)**
10:14,17;78:8;
80:19,22;89:22;94:3
**turned (5)**
40:2,19,19,25;78:2
**turning (2)**
39:25;81:10
**turns (4)**
36:23;80:2,17;
83:10
**tweak (3)**
6:12;53:1,4
**two (18)**
14:13;16:5;24:4;
35:16,23;43:6,15;
44:11;45:1;55:17,22;
62:9;66:21;67:5,21;
85:13;90:16;94:4
**two-plus (1)**
98:6
**typically (3)**
8:16;19:3,6
**Tysheena (1)**
12:24
**T-Y-S-H-E-E-N-A (1)**
12:25

**U**

**Um (1)**
93:5
**under (3)**
4:24;39:1;49:25
**understood (8)**
7:1,13;26:4;38:12;
50:14;53:11;55:8;
72:22
**unit (3)**
18:18;19:6,15
**units (2)**
19:16,20
**unless (4)**
5:22;51:12;77:7;
92:2
**unlike (1)**
7:9
**unlocked (2)**
41:8,21
**unreasonable (3)**
73:22;74:5;86:9
**unreliable (1)**
96:18
**up (27)**
5:25;8:25;9:7;
10:4;14:20;17:4;
21:5;22:7,21;25:24;
28:10;48:4;52:12;
54:14;55:13,13;
56:25;61:12;64:11,
21;65:2;70:8;71:10;
74:18,23;77:19;
99:19
**use (1)**
55:9
**used (2)**
86:3;97:19
**Usually (1)**
87:12

**V**

**value (1)**
87:19
**vehicle (8)**
20:9,13,17;36:4;
60:13;63:24;66:23;
70:1
**vehicles (1)**
18:23
**verify (4)**
72:9,13,15,21
**version (1)**
62:12
**versus (3)**
22:13;42:24;87:2
**vest (1)**
101:3
**via (1)**
57:11
**video (68)**
5:8;15:13;16:25;
17:1,7,9,9,11,14,19,

20;24:1;44:24,25;
45:6;50:20,21;52:4;
54:6,7;55:20;56:10;
57:8,23;58:11,18;
59:15;60:9,16;61:8;
62:4;65:8;67:1,25;
68:9,20;69:10,13;
70:14,25;72:6,23;
73:7;74:11,12,13,16,
19,25;75:5,11,13,18;
76:4,11;78:12;80:4;
82:1,12,18;83:5,13,
17;99:19;100:2,18;
101:11,18
**violate (2)**
69:7,22
**Violating (3)**
95:8,15,17
**violation (6)**
30:13,17,18,24;
47:18;96:19
**violence (1)**
73:17
**voce (1)**
38:7
**vs (1)**
89:21

**W**

**walk (2)**
11:9,10
**walking (3)**
66:23;74:22;101:2
**walks (1)**
83:11
**wall (4)**
85:14;86:11,12;
88:15
**Walter (1)**
38:8
**warrant (7)**
10:10,11,12,20;
11:1,2;91:18
**watch (1)**
15:25
**watched (1)**
16:2
**way (24)**
6:13;17:22;22:21;
30:4;34:10,13;39:9;
40:22;41:4,10,20;
43:18;53:4,13,13,16;
58:1;62:15;63:24;
71:19;73:12;90:18;
94:20;95:14
**wear (1)**
61:8
**wearing (3)**
44:3;61:5;62:7
**WEBER (1)**
22:15
**week (2)**

Benjamin Hendren vs.
John Patton, et al.

Jamar Reed
June 25, 2025

14:13;15:21
**what's (15)**
21:24;25:9;30:18;
32:3;33:10,22,22;
35:2;36:16;37:7;
84:10;86:3;87:8;
93:21;100:5
**whatsoever (1)**
90:20
**whenever (1)**
7:6
**white (1)**
81:22
**whole (3)**
4:18;50:20;80:14
**who's (2)**
66:4;100:6
**wife (1)**
8:14
**wild (1)**
86:9
**within (4)**
18:15;69:17;80:1;
83:15
**without (6)**
46:23;59:24;72:8,
15;76:19;77:23
**witness (99)**
4:4,14,20;5:1,10,
13;6:4,14,18,23;7:2,
12,23;9:17;10:23,25;
11:7;14:19;20:3,12,
23;21:10;22:3;26:17,
25;27:7,14;28:6;
29:8,25;32:7,20;33:8,
19;34:23;35:23;36:9;
37:2;38:20;40:5;
41:14;42:3;43:1;
44:6;45:12,23;47:2,
12,20;48:12;49:19,
25;50:10;52:3;53:6,
14;54:21;57:18;
59:14;60:5;61:20,24;
64:6,13,17;65:25;
66:12;67:9;70:4;
71:1,17;73:8,19,25;
74:7;78:25;79:3;
80:21;81:3,12;82:9,
23;86:2,23;87:12;
88:18;90:16,22;91:2,
24;92:24;94:24;95:5,
12;97:12,18;98:12;
101:22;102:5
**witnesses (13)**
29:4;42:6;43:6;
45:2;62:25;63:4,14;
65:19;67:5;69:21;
78:1;94:20;95:14
**witnesses' (1)**
96:17
**women (1)**
44:2
**wonder (2)**

56:5;63:12
**word (1)**
86:3
**words (4)**
22:21;25:4;34:5;
40:11
**work (6)**
11:13,16;13:2;
19:4;78:1;88:12
**working (2)**
52:7;72:21
**works (1)**
71:23
**worried (3)**
63:3,6,8
**worry (1)**
63:12
**worth (1)**
88:19
**write (1)**
90:8
**written (2)**
62:17;64:4
**wrong (2)**
51:21;92:25
**wrote (3)**
16:13;90:6,9

**Y**

**year (3)**
8:13;13:5;48:4
**years (1)**
10:5
**yellow (3)**
22:10;100:7;101:3
**Yep (1)**
69:16
**yesterday (1)**
4:11
**you- (1)**
51:25
**You-all (6)**
52:9,12;58:5,13,
14;82:14

**Z**

**Zack (6)**
50:15;77:15;97:21;
99:18;100:16;101:19
**zoom (2)**
57:20;81:17
**zoomed (1)**
22:8

**0**

**0029 (2)**
89:22,24

**1**

**1 (2)**
93:13,22
**1:24-cv-2921 (1)**
4:8
**1:38 (1)**
56:2
**1:48 (1)**
56:12
**10 (4)**
12:9;56:3;61:14;
83:15
**10:34 (1)**
50:23
**10:42 (1)**
50:24
**100 (1)**
85:4
**11 (4)**
96:13,24;97:2,6
**11:55 (1)**
98:19
**12 (3)**
53:19;97:3,7
**12:00 (1)**
98:20
**12:05 (1)**
102:1
**15 (1)**
6:10
**168 (1)**
53:24
**169 (2)**
53:23,25

**2**

**2 (4)**
53:18,20;74:16;
81:16
**2:20 (1)**
57:22
**2:57 (1)**
60:8
**20 (5)**
22:25;23:5,5,6;
56:3
**2022 (1)**
8:17
**2025 (1)**
4:2
**25 (1)**
4:2
**25:58 (1)**
81:17
**26- (1)**
82:3
**27:40 (1)**
82:4
**29 (1)**
89:24

**3**

**3 (3)**
21:25;22:2;85:6
**3:54 (1)**
60:18
**30e (1)**
102:3
**36 (1)**
91:5

**4**

**4 (1)**
85:6
**4:17 (1)**
62:6
**4:34 (1)**
78:6
**45 (2)**
6:11;69:17
**45:00 (1)**
79:14
**45:07 (1)**
79:5
**45:11 (1)**
79:15
**45:14 (1)**
79:17

**5**

**5 (2)**
85:6;94:3
**5:22 (1)**
74:18
**5:26 (1)**
65:14
**5:27 (1)**
75:17
**5:41 (1)**
99:24
**5:45 (3)**
75:20;77:19;99:23
**5:54 (1)**
74:23
**5:55 (1)**
75:4
**5:56 (1)**
100:6

**6**

**6 (2)**
88:23,24
**6:03 (1)**
100:20
**6:10 (1)**
101:14
**6:11 (1)**
77:19
**6:35 (1)**
69:12
**6:40 (1)**
68:12

**698 (1)**
81:17

**7**

**7 (4)**
84:10,12;90:16;
94:17
**75 (1)**
23:6

**8**

**8 (6)**
37:8,12,14;70:10;
84:6;89:17
**8:07 (1)**
70:10
**8:24 (1)**
70:16
**85 (1)**
23:7

**9**

**9:04 (1)**
74:17

ORIGINAL

104

CERTIFICATE

STATE OF _GEORGIA_

COUNTY/CITY OF _ATLANTA, FULTON COUNTY_

Before me this day personally appeared Jamar Reed who, being duly sworn, states that the foregoing transcript of his/her deposition, taken in the matter, on the date and at the time and place set out on the title page hereof, constitutes a true and accurate transcript of said deposition.

_____

SUBSCRIBED and SWORN to before me this _5 TH_ day of _SEPT._ 2025 in the jurisdiction aforesaid.

_FEB. 19, 2028_                          _Ana Embry_

My Commission Expires          Notary Public

[ ] No changes made to the Errata Sheet;

therefore, I am returning only this signed,

notarized certificate.

[X] I am returning this signed, notarized

certificate and Errata Sheet with changes

noted.

ORIGINAL

105

DEPOSITION ERRATA SHEET

Deponent:  Jamar Reed

Deposition Date: 06/25/2025

To Reporter:

I have read the entire transcript of my deposition taken in the captioned matter or the same has been read to me.  I request that the following changes be entered upon the record for the reasons indicated.  I have signed my name to the Errata Sheet and appropriate certificate and authorize you to attach both to the original transcript.

**SEE ATTACHED SHEET FOR CHANGES**

Page No._____ Line No._____

Change to:_____

Reason for Change:_____

Page No._____ Line No._____

Change to:_____

Reason for Change:_____

Page No._____ Line No._____

Change to:_____

Reason for Change:_____

LYON REPORTING, INC.

ORIGINAL

106

Deposition of Jamar Reed

Page No._____ Line No._____

Change to:_____

Reason for Change:_____


Page No._____ Line No._____

Change to:_____

Reason for Change:_____


Page No._____ Line No._____

Change to:_____

Reason for Change:_____


Page No._____ Line No._____

Change to:_____

Reason for Change:_____


Page No._____ Line No._____

Change to:_____

Reason for Change:_____


Signature:_____ Date: 9/5/25
             Jamar Reed

# ERRATA SHEET CONTINUED DEPOSITION OF JAMAR REED (06/25/2025)

Having read the transcript of my deposition, I wish to make the following changes:

| Page | Line | Changes | Reasons |
|---|---|---|---|
| 20 | 4-5 | "I don't know, just about everybody. I can't say" should be "I don't know, just about everybody I can't say" | To correct transcription error |
| 25 | 4 | "public" should be "Publix" | To correct transcription error |
| 32 | 25 | "investigator" should be "investigative" | To correct transcription error |
| 54 | 24 | "Capitol" should be "Convocation Center" | To clarify my testimony |
| 63 | 24-25 | "behind a tent" should be "behind tint" | To correct transcription error |
| 66 | 4 | "who's referring to me says" should be "or who he's referring to when he says that" | To correct transcription error |
| 78 | 25 | "I going to I switch this side" should be "I'm going to switch to this side" | To correct transcription error |

| 80 | 22 | "A supervisor can have support and turn off your body camera though" should be "A supervisor can have a subordinate turn off their body camera though" | To correct transcription error |

PLAINTIFF'S EXHIBIT 2

Fulton County Superior Court
***EFILED***NY
Date: 8/12/2024 2:51 PM
Che Alexander, Clerk

## IN THE SUPERIOR COURT OF FULTON COUNTY
## STATE OF GEORGIA

STATE OF GEORGIA,

v.

LAUREL LECKERT and
REGINA DICKHOUSE,

Defendants.

)
)
)
)
)
)
)
)
)
)
)

Case No. 23SC189700

## ORDER

Defendants Laurel Leckert and Regina Dickhouse moved to suppress pretrial identification evidence, familiarly called a "showup," because they claimed that Georgia State University ("GSU") police officers used impermissibly suggestive tactics to ensure a positive identification that ultimately rendered the identification unreliable. That identification led to the Defendants' arrest in this case and ultimately their prosecution.

After two days of evidence and testimony, this Court agrees. The Defendants' motion to suppress pretrial identification and the fruits of that identification is hereby **GRANTED**.

## FACTUAL FINDINGS

On July 29, 2022, employees of Brasfield & Gorrie were inside the newly-built Convocation Center at Georgia State University located at 455 Capitol Avenue in Atlanta, which was not yet open to the public. Brasfield & Gorrie is the

1

prime contractor for the controversial Atlanta Public Safety Training Center, known by its more infamous moniker, "Copy City." At approximately 1 p.m., a group of 50 to 60 "Stop Cop City" protestors entered the building chanting—their ire directed at Brasfield & Gorrie—and some are alleged to have caused damage inside the building.[1] The protestors were dressed similarly in various forms of black and camouflage, and they had masks over their faces.

The protestors were corralled out of the building by Brasfield & Gorrie employees and greeted on the outside by Officer Anthony Ewing with GSU Police. Officer Ewing testified that he directed the protestors to stop what they were doing and disburse. When asked whether the protestors complied with his order, he confirmed that they did.[2] The record is unclear about why Officer Ewing then asked other officers to pursue any protestors leaving the area. In the nearby Summerhill neighborhood, GSU officers stopped seven individuals, including the Defendants, and detained them.

GSU Officer Jamar Reed was called to assist, and specifically to bring Brasfield & Gorrie employees to the scene of the detention for a showup

---

[1] There was testimony that not all of the protesters were inside the building; some remained on the outside.

[2] Although the State ultimately charged the Defendants with willful obstruction of law enforcement officers for "oppos[ing] Officer A. Ewing . . . by running after being told to stop" in violation of O.C.G.A. § 16-10-24(a), the testimony and Officer Ewing's report of incident confirm that he told the protestors to stop and leave and that they complied.

2

identification. Officer Reed's body camera was activated from the time he began speaking with Brasfield & Gorrie workers at the Convocation Center until the showup was complete, and that footage was admitted into evidence. The footage shows Officer Reed bringing two employees—who were later identified as Jackson Bussey and Moses Paige—to the scene of the detention. Officer Reed starts off fairly enough, stating that the witnesses would just stay in the back of the car "and you just say, 'That was them,' or not." If he had stopped there, Defendants would have little room to quarrel.

But Officer Reed did *not* stop there. Once Bussey and Paige were in his patrol vehicle and headed to the showup, Officer Reed continued to explain what was required of them. "Yeah we got 'em. We just want to bring y'all over here . . . so y'all can ID 'em for us." Officer Reed went on: "They [the protestors] say they didn't go to the building . . . so because they sayin' that, we want to positively get some witnesses to say . . . so we can say, 'y'all verified, y'all saw them in the building, these are the ones we have." Bussey and Paige appear to be easy to influence, as Paige immediately responded: "They did went in the building. They fuckin' lyin'." Query how Paige could know the seven detainees were lying about having been in the building before he even arrived at the scene of the showup to see which seven individuals had been detained.

At no time did Officer Reed attempt to establish where Bussey and Paige

3

were inside the building during the protest, their vantage point, exactly what they observed, or any other fact that might confirm whether they had sufficient time, proximity, and opportunity to observe any protester and thus to make a reliable identification. Nor did he ask Bussey or Paige to describe with particularity anyone they saw committing crimes. Given that the protestors were dressed similarly and all wore facemasks, it was crucial to determine what if any characteristics could distinguish the seven detained individuals from dozens of individuals at the protest.

When Officer Reed arrived at the scene with Bussey and Paige, he parked roughly one block away, what appears to be 40-50 feet from where the Defendants and five others are detained on the ground. The video shows that the detainees were facing perpendicular to the vehicle and they were never asked to come closer, nor did Bussey or Paige exit the vehicle to get closer to the detainees prior to being asked to confirm the identification. The detainees' faces were covered with masks during the entire identification. Bussey and Paige immediately confirmed "that's them," meaning the protestors inside the Convocation Center who committed crimes while inside. Another officer (later identified as GSU police trainee DeRonald Davis) is then heard saying, "Which one or two can you say you recognize the most," but then Officer Reed exited the car and the witnesses' answer is not heard on his body camera. The record does not make clear which

4

one or two Bussey and Paige were ultimately able to identify with any specificity, although later footage implies that the ultimately confirmed that all detainees were at the protest.

Once the showup was over, Bussey and Paige then identified a man standing on the sidewalk with a camera as "the video guy" who was taking video footage inside the Convocation Center. Paige says "that's a lie" if the man claimed not to have been at the there. Bussey and Paige were adamant that it was the same person, Paige saying, "that's him. . . that's his fuckin' ass." Officer Reed told the witnesses that the man claimed to be with the Atlanta Journal Constitution newspaper, but Paige then said "you got his ass. He can't lie about that. I remember his ass." Officer Reed testified that later, he found out that the man was not charged in this case and was not part of the protest. In her closing argument, the Assistant District Attorney conceded that the man was not charged because he had not committed any crimes at the Convocation Center.[3]

In the end, the only evidence suggesting that the two witnesses had reliably identified the Defendants is the fact that the Defendants were dressed similarly to

---

[3] The State seemed to think this argument was helpful to its case. But by conceding that the man had not committed any crimes in the building nor was he responsible under the State's "party to the crime" argument (that anyone present and participating in the protest was responsible for any crimes committed by some), the State undermined the credibility of its own witnesses, who were adamant that the man was present and part of the protest.

5

the 50 to 60 people who were at the scene, some of whom were inside the Convocation Center and some of whom were not.

On September 21, 2023 — over a year after the protest — the District Attorney secured a three-count indictment charging the Defendants with second-degree burglary for entering the Convocation Center with the intent to commit a felony, in violation of O.C.G.A. § 16-7-1(c); criminal damage to property for damaging the door and walls of the Convocation Center, in violation of O.C.G.A. § 16-7-23; and obstructing a law enforcement officer by disobeying Officer Ewing's directive to stop protesting and running, in violation of O.C.G.A. § 16-10-24(a).

## APPLICATION OF LAW

Pretrial identification procedures like the showup that occurred here are "widely condemned" because of their "inherently suggestive" nature. *See Foster v. California*, 394 U.S. 440, 443 (1969); *see also Butler v. State*, 290 Ga. 412, 414-15, 721 S.E.2d 876 (2012). Showups and any subsequent in-court identifications based on such showups are subject to exclusion when police procedures led the witnesses "to an all but inevitable identification of the defendant as the perpetrator," or they otherwise tell the witness, "'This is our suspect.'" *Williams v. State*, 275 Ga. 622, 623, 571 S.E.2d 385 (2002); *see also Foster*, 394 U.S. at 443 (the police told the witness "this is the man," which "so undermined the reliability of eyewitness identification as to violate due process").

6

This Court must first determine whether the showup here crossed the line from *inherently* suggestive to *impermissibly* suggestive. *Wallace v. State*, Ga. App. 452, 454, 671 S.E.2d 911 (2009). Even impermissibly suggestive showups may be excused, though, unless the totality of circumstances show that there is a substantial likelihood of "irreparable misidentification." *Id.* Factors that inform the Court's "totality" analysis include: (1) the opportunity of the witness to view the suspects at time of the crime; (2) the witness's degree of attention at the time of the crime; (3) the accuracy of the witness's pre-identification description of the suspect; (4) the level of certainty the witness demonstrated at the showup; and (5) the time between the crime and the identification. *See Neil v. Biggers*, 409 U.S. 188, 199-200 (1972).

This Court has little trouble concluding that Officer Reed's multiple comments to the witnesses on the way to the showup identification crossed the line and were impermissibly suggestive. While he initially told the witnesses they would be asked to identify the suspects "or not," he then repeatedly said they were just needed to confirm that the suspects were at the Convocation Center. He told the witnesses that police already "got 'em" and that the witnesses just needed to "ID 'em for us," so that police could later say "y'all verified, y'all saw 'em in the building, these are the ones we have." Indeed, the showup here was a textbook example of what *not* to do, rendering it little more than a check-the-box exercise to

7

bolster the Defendants' arrest.

This Court further concludes that the suggestive nature of the showup was so conducive to misidentification that it violated Due Process. *See Neil*, 409 U.S. at 196. Officer Reed did nothing to establish in advance of the showup whether the witnesses were in close proximity to or had sufficient time or attention to observe any of the 50 to 60 protestors, much less the seven detained at the showup. Nor did he ask the witnesses to describe with any particularity who they saw committing crimes. The first three *Neil* factors thus weigh in Defendants' favor. The fifth factor—time between the crime and the confrontation—weighs in favor of the government, since the time lapse appears to have been roughly 30 minutes, give or take.

Regarding the fourth factor, Bussey and Paige identified the detainees immediately upon pulling up and were certain "that's them," but this Court finds that the speed of the identification weighs *against* the credibility of the witnesses. Officer Reed parked Bussey and Paige several yards away from the detainees, and Bussey and Paige never got out of the car. They saw seven people seated on the ground—all wearing facemasks—who were facing perpendicular to them and who were never brought closer for more reliable identification. The detainees were dressed similar to the three-score other protestors at the Convocation Center, but there was little more than common dress to identify the seven detainees as the

8

specific individuals who allegedly committed crimes while inside the building.

Further, Bussey and Paige allowed their anger and bias to show both during their expletive-laden identification at the scene and again during their testimony at the hearing. Their bias towards helping the police hold the detainees accountable was evident even before the identification. Again, this Court questions how Paige could be so certain that the detainees were "fuckin' lyin'" about not being in the Convocation Center before he even arrived at the showup. And that anger showed again when Paige took the stand in the suppression hearing. This Court had the opportunity to measure Paige's demeanor and his clear outrage at the protestors who disrupted his workday almost two years ago. While this Court understands Paige's anger and frustration, this Court questions whether his snap judgment that the Defendants were those same individuals who allegedly caused destruction at the Convocation Center was clouded by his bias to hold any protestor accountable.

Finally, Bussey and Paige were certain that the man standing with the camera on the street was inside the Convocation Center videoing as part of the protest. Through expletive-laden commentary, Paige in particular was adamant that the man was one of the alleged criminals and that he "can't lie about that. I remember his [expletive beginning with "a"]." But it appears Paige was wrong, as the man was ultimately not arrested and the State concedes that he committed no

9

crimes that day, nor was he a party to any crime. This undermines the credibility of the witnesses' positive identifications of any of the detainees, including Defendants.

This Court concludes that, under the totality of the circumstances, there was a substantial likelihood that the witnesses misidentified the seven detainees as the individuals within the Convocation Center who committed the alleged crimes.

While the Court considered the caselaw cited by the State at the suppression hearing, it finds that law of limited persuasive value. By citing cases reviewed for clear error where the trial courts denied motions to suppress, the State's caselaw stands for little more than the proposition that reviewing courts will defer to this Court's findings absent a clear mistake of fact. That other trial courts, presented with different facts and different circumstances, might have allowed pretrial identification procedures does little to inform this Court's determination of whether the procedures *here* crossed the line. And this Court has little trouble finding that they did.

Indeed, in the cases this Court reviewed where defendants unsuccessfully move to suppress and where the trial courts' decisions were upheld on appeal, there are several common factors simply not supported by the record here. The witnesses were close in proximity to the suspects at the time of the crime; they had sufficient time to observe the suspects and could articulate in advance of the

10

showup specific details characteristics (facial features, distinctive clothing, hairstyles) unique to the suspects; the witnesses observed one or two suspects, not 50 to 60 who all looked relatively similar; and the police asked the witnesses whether they could identify any of the suspects rather than telling the witnesses they just needed to verify that police had the right suspects. *See, e.g., Yancey v. State,* 232 Ga. 167, 168-69 (1974) (witness observed suspect for 20 minutes during robbery; view unimpaired; compelled to face suspect from five feet away); *White v. State,* 350 Ga. App. 218, 219, 223 (2019) (witness saw burglar "for a while" during crime; was 40-50 feet away, saw his face clearly, described hair, physique, and clothes; did not see men in handcuffs); *Porter v. State,* 341 Ga. App. 632, 638 (2017) (victims robbed by a man and woman, where the woman kissed one of the victims as part of the ruse; they saw her "at close range"; *Singleton v. State,* 324 Ga. App. 141, 142-43 (2013) (victim robbed at gunpoint by two men who "had worn nothing covering their faces"; victim described facial features in advance); *Tucker v. State,* 316 Ga. App. 119, 121-22 (2012) (victim had plenty of time to see men walk up; gave detailed description of physiques and clothing before showup); *Thomas v. State,* 269 Ga. App. 116, 118 (2004) (victim was close to suspect during robbery, looked directly into his face; police did not suggest suspect was involved in crime).

The circumstances here are qualitatively different than any case this Court was given or otherwise read. This Court easily concludes that the showup here

11

was impermissibly suggestive such that it rendered the witnesses' identification of the Defendants unreliable in violation of Due Process. The Defendants' motion to suppress the showup and the fruits of that showup is **GRANTED**.

This the 12th day of August, 2024.

Respectfully submitted,

_____

Hon. Kevin M. Farmer
Superior Court Judge
Atlanta Judicial Circuit

12



PLAINTIFF'S
EXHIBIT
3
PENGAD 800-631-6989



PLAINTIFF'S
EXHIBIT

PENGAD 800-631-6989

Sgt. Reed GSUPD >

Wed, Jul 10 at 09:09

**Photojournalist sues GSU police after they arrest him for taking pictures**

fox5atlanta.com                    Hendren v. Patton, et al.  DEF  0319



**Georgia State University**

**Police Department**

**Case Log Photo**

**15 EDGEWOOD AVE ATLANTA, GA 30303**

PHONE: 404-413-3230                    FAX: 404-413-3231                    police@gsu.edu

PLAINTIFF'S EXHIBIT

7

Case Number: 22-0798

---

**Georgia State University Police Department**
**Witness Statement**

Case # ___22-0798___

Name ___Moses Paige___   Check One: Faculty___ Staff___ Student___ Other ✓

GSU ID#/OLN _____   E-Mail _____

Address ▓▓▓▓▓▓▓▓▓   city, state, zip ▓▓▓▓▓▓▓▓▓

D.O.B. ▓▓▓▓▓   Gender Male ✓ Female ___

Home Phone: _____   Work Phone: ▓▓▓▓▓▓

Statement Received By: _____   Date _____

Incident Date _____   Time _____   Campus _____

Incident Location _____

**O.C.G.A. 16-10-20 :** A person who knowingly and willfully falsifies, conceals, or covers up by any trick, scheme, or device a material fact; makes a false, fictitious, or fraudulent statement or representation; or makes or uses any false writing or document, knowing the same to contain any false, fictitious, or fraudulent statement or entry, in any matter within the jurisdiction of any department or agency of state government or of the government of any county, city, or other political subdivision of this state shall, upon conviction thereof, be punished by a fine of not more than $1,000.00 or by imprisonment for not less than one nor more than five years, or both.

**Describe What Happened:**

Protesters come in build about 200.cloc and when in and Protest we Run them out!!

Signature of person making statement: ___Moses Paige___

Witness: _____

Pg. 1                    GSUPD Witness Statement                    Rev. 02/17

---

| PRINT DATE AND TIME | PRINTED BY | PAGE NO. |
| --- | --- | --- |
| 04/10/2025 09:20 | CHRISTOPHER STROZIER | 1 of 5 |

Hendren v. Patton et al - DEF 0321



**Georgia State University**

**Police Department**

**Case Log Photo**

**15 EDGEWOOD AVE ATLANTA, GA 30303**

PHONE: 404-413-3230                    FAX: 404-413-3231                    police@gsu.edu

Case Number: 22-0798

**Georgia State University Police Department**
**Witness Statement**

Case # 22-0798

Name Jackson Bussey    Check One: Faculty___ Staff___ Student___ (Other)

GSU ID#/OLN _____    E-Mail _____

Address _____    city, state, zip _____

D.O.B. _____    Gender Male ✓ Female _____

Home Phone: _____    Work Phone: _____

Statement Received By: _____    Date _____

Incident Date_____    Time_____    Campus_____

Incident Location _____

O.C.G.A. 16-10-20: A person who knowingly and willfully falsifies, conceals, or covers up by any trick, scheme, or device a material fact; makes a false, fictitious, or fraudulent statement or representation; or makes or uses any false writing or document, knowing the same to contain any false, fictitious, or fraudulent statement or entry, in any matter within the jurisdiction of any department or agency of state government or of the government of any county, city, or other political subdivision of this state shall, upon conviction thereof, be punished by a fine of not more than $1,000.00 or by imprisonment for not less than one nor more than five years, or both.

Describe What Happened:

A Group of 50-60 people came into the building chanting. Us workers did our best to get them out of the building. They were defiant and made us physically push them out of the building. An unknown camo of all black and black mask. End of statement

Signature of person making statement: Jackson B

Witness: Jackson Bussey

Pg 1                    GSUPD Witness Statement                    Rev. 02/17

Hendren v. Patton, et al. DEF 0322



**Georgia State University**

**Police Department**

**Case Log Photo**

**15 EDGEWOOD AVE ATLANTA, GA 30303**

PHONE: 404-413-3230        FAX: 404-413-3231        police@gsu.edu

Case Number: 22-0798

| PRINT DATE AND TIME | PRINTED BY | PAGE NO. |
|---|---|---|
| 04/10/2023 10:28 | CHRISTOPHER STROZIER | 3 of 5 |

Hendren v. Patton et al   DEF 0323



**Georgia State University**

**Police Department**

**Case Log Photo**

**15 EDGEWOOD AVE ATLANTA, GA 30303**

PHONE: 404-413-3230                    FAX: 404-413-3231                    police@gsu.edu

Case Number: 22-0798



**Georgia State University**

**Police Department**

**Case Log Photo**

**15 EDGEWOOD AVE ATLANTA, GA 30303**

| PHONE: 404-413-3230 | FAX: 404-413-3231 | police@gsu.edu |

Case Number: 22-0798

Hendren v. Patton, et al. DEF 0325