Exhibit O

Fulton County Superior Court
***EFILED***NY
Date: 8/12/2024 2:51 PM
Che Alexander, Clerk

## IN THE SUPERIOR COURT OF FULTON COUNTY
## STATE OF GEORGIA

| | |
|---|---|
| **STATE OF GEORGIA,** | ) |
| | ) |
| **v.** | ) |
| | )   **Case No. 23SC189700** |
| **LAUREL LECKERT and** | ) |
| **REGINA DICKHOUSE,** | ) |
| | ) |
| **Defendants.** | ) |

## ORDER

Defendants Laurel Leckert and Regina Dickhouse moved to suppress pretrial identification evidence, familiarly called a "showup," because they claimed that Georgia State University ("GSU") police officers used impermissibly suggestive tactics to ensure a positive identification that ultimately rendered the identification unreliable. That identification led to the Defendants' arrest in this case and ultimately their prosecution.

After two days of evidence and testimony, this Court agrees. The Defendants' motion to suppress pretrial identification and the fruits of that identification is hereby **GRANTED**.

## FACTUAL FINDINGS

On July 29, 2022, employees of Brasfield & Gorrie were inside the newly-built Convocation Center at Georgia State University located at 455 Capitol Avenue in Atlanta, which was not yet open to the public. Brasfield & Gorrie is the

1

prime contractor for the controversial Atlanta Public Safety Training Center, known by its more infamous moniker, "Copy City." At approximately 1 p.m., a group of 50 to 60 "Stop Cop City" protestors entered the building chanting — their ire directed at Brasfield & Gorrie — and some are alleged to have caused damage inside the building.[1] The protestors were dressed similarly in various forms of black and camouflage, and they had masks over their faces.

The protestors were corralled out of the building by Brasfield & Gorrie employees and greeted on the outside by Officer Anthony Ewing with GSU Police. Officer Ewing testified that he directed the protestors to stop what they were doing and disburse. When asked whether the protestors complied with his order, he confirmed that they did.[2] The record is unclear about why Officer Ewing then asked other officers to pursue any protestors leaving the area. In the nearby Summerhill neighborhood, GSU officers stopped seven individuals, including the Defendants, and detained them.

GSU Officer Jamar Reed was called to assist, and specifically to bring Brasfield & Gorrie employees to the scene of the detention for a showup

_____

[1] There was testimony that not all of the protesters were inside the building; some remained on the outside.

[2] Although the State ultimately charged the Defendants with willful obstruction of law enforcement officers for "oppos[ing] Officer A. Ewing . . . by running after being told to stop" in violation of O.C.G.A. § 16-10-24(a), the testimony and Officer Ewing's report of incident confirm that he told the protestors to stop and leave and that they complied.

2

identification. Officer Reed's body camera was activated from the time he began speaking with Brasfield & Gorrie workers at the Convocation Center until the showup was complete, and that footage was admitted into evidence. The footage shows Officer Reed bringing two employees—who were later identified as Jackson Bussey and Moses Paige—to the scene of the detention. Officer Reed starts off fairly enough, stating that the witnesses would just stay in the back of the car "and you just say, 'That was them,' or not." If he had stopped there, Defendants would have little room to quarrel.

But Officer Reed did *not* stop there. Once Bussey and Paige were in his patrol vehicle and headed to the showup, Officer Reed continued to explain what was required of them. "Yeah we got 'em. We just want to bring y'all over here . . . so y'all can ID 'em for us." Officer Reed went on: "They [the protestors] say they didn't go to the building . . . so because they sayin' that, we want to positively get some witnesses to say . . . so we can say, 'y'all verified, y'all saw them in the building, these are the ones we have." Bussey and Paige appear to be easy to influence, as Paige immediately responded: "They did went in the building. They fuckin' lyin'." Query how Paige could know the seven detainees were lying about having been in the building before he even arrived at the scene of the showup to see which seven individuals had been detained.

At no time did Officer Reed attempt to establish where Bussey and Paige

3

were inside the building during the protest, their vantage point, exactly what they observed, or any other fact that might confirm whether they had sufficient time, proximity, and opportunity to observe any protester and thus to make a reliable identification. Nor did he ask Bussey or Paige to describe with particularity anyone they saw committing crimes. Given that the protestors were dressed similarly and all wore facemasks, it was crucial to determine what if any characteristics could distinguish the seven detained individuals from dozens of individuals at the protest.

When Officer Reed arrived at the scene with Bussey and Paige, he parked roughly one block away, what appears to be 40-50 feet from where the Defendants and five others are detained on the ground. The video shows that the detainees were facing perpendicular to the vehicle and they were never asked to come closer, nor did Bussey or Paige exit the vehicle to get closer to the detainees prior to being asked to confirm the identification. The detainees' faces were covered with masks during the entire identification. Bussey and Paige immediately confirmed "that's them," meaning the protestors inside the Convocation Center who committed crimes while inside. Another officer (later identified as GSU police trainee DeRonald Davis) is then heard saying, "Which one or two can you say you recognize the most," but then Officer Reed exited the car and the witnesses' answer is not heard on his body camera. The record does not make clear which

4

one or two Bussey and Paige were ultimately able to identify with any specificity, although later footage implies that the ultimately confirmed that all detainees were at the protest.

Once the showup was over, Bussey and Paige then identified a man standing on the sidewalk with a camera as "the video guy" who was taking video footage inside the Convocation Center. Paige says "that's a lie" if the man claimed not to have been at the there. Bussey and Paige were adamant that it was the same person, Paige saying, "that's him. . . that's his fuckin' ass." Officer Reed told the witnesses that the man claimed to be with the Atlanta Journal Constitution newspaper, but Paige then said "you got his ass. He can't lie about that. I remember his ass." Officer Reed testified that later, he found out that the man was not charged in this case and was not part of the protest. In her closing argument, the Assistant District Attorney conceded that the man was not charged because he had not committed any crimes at the Convocation Center.[3]

In the end, the only evidence suggesting that the two witnesses had reliably identified the Defendants is the fact that the Defendants were dressed similarly to

---

[3] The State seemed to think this argument was helpful to its case. But by conceding that the man had not committed any crimes in the building nor was he responsible under the State's "party to the crime" argument (that anyone present and participating in the protest was responsible for any crimes committed by some), the State undermined the credibility of its own witnesses, who were adamant that the man was present and part of the protest.

the 50 to 60 people who were at the scene, some of whom were inside the Convocation Center and some of whom were not.

On September 21, 2023 — over a year after the protest — the District Attorney secured a three-count indictment charging the Defendants with second-degree burglary for entering the Convocation Center with the intent to commit a felony, in violation of O.C.G.A. § 16-7-1(c); criminal damage to property for damaging the door and walls of the Convocation Center, in violation of O.C.G.A. § 16-7-23; and obstructing a law enforcement officer by disobeying Officer Ewing's directive to stop protesting and running, in violation of O.C.G.A. § 16-10-24(a).

## APPLICATION OF LAW

Pretrial identification procedures like the showup that occurred here are "widely condemned" because of their "inherently suggestive" nature. *See Foster v. California*, 394 U.S. 440, 443 (1969); *see also Butler v. State*, 290 Ga. 412, 414-15, 721 S.E.2d 876 (2012). Showups and any subsequent in-court identifications based on such showups are subject to exclusion when police procedures led the witnesses "to an all but inevitable identification of the defendant as the perpetrator," or they otherwise tell the witness, "'This is our suspect.'" *Williams v. State*, 275 Ga. 622, 623, 571 S.E.2d 385 (2002); *see also Foster*, 394 U.S. at 443 (the police told the witness "this is the man," which "so undermined the reliability of eyewitness identification as to violate due process").

6

This Court must first determine whether the showup here crossed the line from *inherently* suggestive to *impermissibly* suggestive. *Wallace v. State*, Ga. App. 452, 454, 671 S.E.2d 911 (2009). Even impermissibly suggestive showups may be excused, though, unless the totality of circumstances show that there is a substantial likelihood of "irreparable misidentification." *Id.* Factors that inform the Court's "totality" analysis include: (1) the opportunity of the witness to view the suspects at time of the crime; (2) the witness's degree of attention at the time of the crime; (3) the accuracy of the witness's pre-identification description of the suspect; (4) the level of certainty the witness demonstrated at the showup; and (5) the time between the crime and the identification. *See Neil v. Biggers*, 409 U.S. 188, 199-200 (1972).

This Court has little trouble concluding that Officer Reed's multiple comments to the witnesses on the way to the showup identification crossed the line and were impermissibly suggestive. While he initially told the witnesses they would be asked to identify the suspects "or not," he then repeatedly said they were just needed to confirm that the suspects were at the Convocation Center. He told the witnesses that police already "got 'em" and that the witnesses just needed to "ID 'em for us," so that police could later say "y'all verified, y'all saw 'em in the building, these are the ones we have." Indeed, the showup here was a textbook example of what *not* to do, rendering it little more than a check-the-box exercise to

7

bolster the Defendants' arrest.

This Court further concludes that the suggestive nature of the showup was so conducive to misidentification that it violated Due Process. *See Neil*, 409 U.S. at 196. Officer Reed did nothing to establish in advance of the showup whether the witnesses were in close proximity to or had sufficient time or attention to observe any of the 50 to 60 protestors, much less the seven detained at the showup. Nor did he ask the witnesses to describe with any particularity who they saw committing crimes. The first three *Neil* factors thus weigh in Defendants' favor. The fifth factor — time between the crime and the confrontation — weighs in favor of the government, since the time lapse appears to have been roughly 30 minutes, give or take.

Regarding the fourth factor, Bussey and Paige identified the detainees immediately upon pulling up and were certain "that's them," but this Court finds that the speed of the identification weighs *against* the credibility of the witnesses. Officer Reed parked Bussey and Paige several yards away from the detainees, and Bussey and Paige never got out of the car. They saw seven people seated on the ground — all wearing facemasks — who were facing perpendicular to them and who were never brought closer for more reliable identification. The detainees were dressed similar to the three-score other protestors at the Convocation Center, but there was little more than common dress to identify the seven detainees as the

8

specific individuals who allegedly committed crimes while inside the building.

Further, Bussey and Paige allowed their anger and bias to show both during their expletive-laden identification at the scene and again during their testimony at the hearing. Their bias towards helping the police hold the detainees accountable was evident even before the identification. Again, this Court questions how Paige could be so certain that the detainees were "fuckin' lyin'" about not being in the Convocation Center before he even arrived at the showup. And that anger showed again when Paige took the stand in the suppression hearing. This Court had the opportunity to measure Paige's demeanor and his clear outrage at the protestors who disrupted his workday almost two years ago. While this Court understands Paige's anger and frustration, this Court questions whether his snap judgment that the Defendants were those same individuals who allegedly caused destruction at the Convocation Center was clouded by his bias to hold any protestor accountable.

Finally, Bussey and Paige were certain that the man standing with the camera on the street was inside the Convocation Center videoing as part of the protest. Through expletive-laden commentary, Paige in particular was adamant that the man was one of the alleged criminals and that he "can't lie about that. I remember his [expletive beginning with "a"]." But it appears Paige was wrong, as the man was ultimately not arrested and the State concedes that he committed no

9

crimes that day, nor was he a party to any crime. This undermines the credibility of the witnesses' positive identifications of any of the detainees, including Defendants.

This Court concludes that, under the totality of the circumstances, there was a substantial likelihood that the witnesses misidentified the seven detainees as the individuals within the Convocation Center who committed the alleged crimes.

While the Court considered the caselaw cited by the State at the suppression hearing, it finds that law of limited persuasive value. By citing cases reviewed for clear error where the trial courts denied motions to suppress, the State's caselaw stands for little more than the proposition that reviewing courts will defer to this Court's findings absent a clear mistake of fact. That other trial courts, presented with different facts and different circumstances, might have allowed pretrial identification procedures does little to inform this Court's determination of whether the procedures *here* crossed the line. And this Court has little trouble finding that they did.

Indeed, in the cases this Court reviewed where defendants unsuccessfully move to suppress and where the trial courts' decisions were upheld on appeal, there are several common factors simply not supported by the record here. The witnesses were close in proximity to the suspects at the time of the crime; they had sufficient time to observe the suspects and could articulate in advance of the

10

showup specific details characteristics (facial features, distinctive clothing, hairstyles) unique to the suspects; the witnesses observed one or two suspects, not 50 to 60 who all looked relatively similar; and the police asked the witnesses whether they could identify any of the suspects rather than telling the witnesses they just needed to verify that police had the right suspects. *See, e.g., Yancey v. State*, 232 Ga. 167, 168-69 (1974) (witness observed suspect for 20 minutes during robbery; view unimpaired; compelled to face suspect from five feet away); *White v. State*, 350 Ga. App. 218, 219, 223 (2019) (witness saw burglar "for a while" during crime; was 40-50 feet away, saw his face clearly, described hair, physique, and clothes; did not see men in handcuffs); *Porter v. State*, 341 Ga. App. 632, 638 (2017) (victims robbed by a man and woman, where the woman kissed one of the victims as part of the ruse; they saw her "at close range"; *Singleton v. State*, 324 Ga. App. 141, 142-43 (2013) (victim robbed at gunpoint by two men who "had worn nothing covering their faces"; victim described facial features in advance); *Tucker v. State*, 316 Ga. App. 119, 121-22 (2012) (victim had plenty of time to see men walk up; gave detailed description of physiques and clothing before showup); *Thomas v. State*, 269 Ga. App. 116, 118 (2004) (victim was close to suspect during robbery, looked directly into his face; police did not suggest suspect was involved in crime).

The circumstances here are qualitatively different than any case this Court was given or otherwise read. This Court easily concludes that the showup here

11

was impermissibly suggestive such that it rendered the witnesses' identification

of the Defendants unreliable in violation of Due Process. The Defendants' motion

to suppress the showup and the fruits of that showup is **GRANTED**.

This the 12th day of August, 2024.

Respectfully submitted,

_____

Hon. Kevin M. Farmer
Superior Court Judge
Atlanta Judicial Circuit

12