**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

BENJAMIN HENDREN,

    Plaintiff,

       v.

JOHN PATTON, et al.

    Defendants.

Civil Action File
No.: 1:24-cv-2921-TWT

**PLAINTIFF'S RESPONSE TO GSU DEFENDANTS'
STATEMENT OF MATERIAL FACTS**

**The Protest**

1.    On the afternoon of July 29, 2022, approximately 30 to 40 individuals wearing masks, dark clothing, and camouflage entered Georgia State University's convocation center to protest the construction of the Atlanta Public Safety Training Center—a controversial project known as "Cop City." See Doc. 59 at 4–5, 11; Exhibit A (Deposition of Jackson Bussey (Bussey Dep.) at 53).

**RESPONSE:**    **Undisputed. But Plaintiff never entered that building and was not at the convocation center on that day.  Hendren Dep. 121:8–23; Doc. 65, Pl. Ex. 11 "Unicorn Riot YouTube Video" at 0:25–0:27; 2:33 (a videographer can be seen in the reflection); Reed Video at 5:50**

**(Hendren has different pants, shoes, shirt, hair, camera, facial hair, etc. than man who was at site).**

2.    The convocation center was, at that time, under construction by co-Defendant Brasfield & Gorrie, LP (a construction company), and was not open to the public. See Doc. 59 at 4; Exhibit A (Bussey Dep. at 56).

**RESPONSE:    Disputed in part and immaterial in part.**

**There was no notice of any kind that the building was closed to the public—much less the kind of "express or explicit" notice that is required for criminal trespass. *State v. Harper*, 303 Ga. 144, 810 S.E.2d 484 (2018). The proper inquiry is whether there was express or explicit notice—not whether the building was in fact open to the public.**

**The doors were not locked. *See* Ewing Dep. 14:21–23.**

**There was no signage. *See* Ewing Dep. 14:17–18.**

**There was no fencing. *See generally* Doc. 65, Pl. Ex. 11 "Unicorn Riot YouTube Video."**

3. Brasfield & Gorrie is the same company that was constructing "Cop City." Doc. 59 at 4.

**RESPONSE:    Undisputed.**

4.    According to Jackson Bussey and Moses Paige (two construction workers), the protestors in the center were "screaming, yelling [and] chanting"

"Stop Cop City" and "Stop Brasfield Gorrie." See Doc. 59 at 5; Exhibit A (Bussey Dep. at 53); Exhibit B (Deposition of Moses Paige (Paige Dep.) at 25).

**RESPONSE:**    **Disputed in part.**

**Video shows that there was not screaming, but instead mild chanting for a short period. *See generally* Doc. 65, Pl. Ex. 11 "Unicorn Riot YouTube Video."**

5.    At least *four* of the protestors were carrying guns in holsters, which made the construction workers "scared for their [lives]." See Exhibit B (Paige Dep. at 18–19).

**RESPONSE:**    **Disputed.**

**That appears to be one of a number of fanciful falsehoods by Mr. Paige. No holster or weapon is visible in any video. *See generally* Doc. 65, Pl. Ex. 11 "Unicorn Riot YouTube Video." Mr. Paige never mentioned this before his deposition, nor did any other officer or witness.**

**Mr. Paige lied repeatedly. He falsely said Plaintiff was in the building, but when confronted with objective proof in the form of video that showed that the "video guy" was not Plaintiff, he suddenly recalled for the first time that there were *two* or maybe *four* "video guys." Paige Dep. 40 ("It might have been four video guys.")**

He said the protestors caused extensive damage to the construction site, including by kicking holes in the wall, Paige Dep. 34:25–35:4, but that was not true, Doc. 64-10 at 143–145, and no officer testified that he told them this supposed fact.

Paige said violence was inflicted upon him at the entrance of the building, and he testified people were "trying to kick our butts," Paige Dep. 35:1–7, but the video shows that was not true or possible, *see generally* Doc. 65, Pl. Ex. 11 "Unicorn Riot YouTube Video" at 2:10–2:40.

Plaintiff was also never at the location. See Response to SUMF 1.

6.    Both Bussey and Paige witnessed one of the protestors inside the center holding a camera and either filming or taking pictures of the protest. See Exhibit A (Bussey Dep. at 54–55); Exhibit B (Paige Dep. at 13–14).

RESPONSE:    Disputed in part.

To be clear, there was only one person with a camera videoing or taking pictures. *See generally* Doc. 65, Pl. Ex. 11 "Unicorn Riot YouTube Video." But, when confronted with objective proof in the form of video that showed that the "video guy" was not Plaintiff, he suddenly recalled for the first time that there were *two* or maybe *four* "video guys." Paige Dep. 40 ("It might have been four video guys.").

Plaintiff was also never at the location.  See Response to SUMF 1.

7.    Bussey described this person as a tall, lanky white male with long, shaggy hair who was wearing "darker clothes and pants and … a longer shirt or jacket" and was carrying a camera and possibly a camera bag. See Exhibit A (Bussey Dep. at 15–16).

**RESPONSE:    Disputed in part.**

**Bussey's description of the person doing the video recording is flatly inconsistent with objective evidence. *See generally* Doc. 65, Pl. Ex. 11 "Unicorn Riot YouTube Video" at 0:25–0:27; 2:33 (the videographer can be seen in the reflection); *cf. Scott v. Harris*, 550 U.S. 372 (2007).**

**The videographer apparently had short and non-shaggy hair, was wearing a light gray t-shirt (not a longer shirt or jacket), and had markedly different clothes than Plaintiff, who was never at the location. See Response to SUMF 1.**

8.    Bussey instructed the protestors to leave the center, and they complied with his request. See Exhibit A (Bussey Dep. at 35).

**RESPONSE:    Undisputed.**

**This is a critical point. Because there was no express or explicit notice not to enter, and because all the protestors swiftly left when**

**asked, there was no ground to detain for criminal trespass under Georgia law.**

9.     However, as the protestors neared the exit, they began pushing and shoving Bussey, and one of them shoved him into the door. See Exhibit A (Bussey Dep. at 36, 38, 55–56); Exhibit B (Paige Dep. at 22–23).

**RESPONSE:     Disputed.**

**This is flatly contradicted by video evidence. *See generally* Doc. 65, Pl. Ex. 11 "Unicorn Riot YouTube Video" at 2:10–2:40; *cf. Scott v. Harris*, 550 U.S. 372 (2007).  Plaintiff was also never at the location. See Response to SUMF 1.**

10.     Around this time, Defendant Anthony Ewing (a Georgia State police officer) witnessed the protestors "jostling with the construction workers" at the convocation center and "called it out over the radio." See Exhibit C (Deposition of Anthony Ewing (Ewing Dep.) at 13).

**RESPONSE:     Disputed in part as to "jostling."**

**To the extent "jostling" means push, elbow, or bump against roughly, the video shows that did not happen. *See generally* Doc. 65, Pl. Ex. 11 "Unicorn Riot YouTube Video" at 2:10–2:40; *cf. Scott v. Harris*, 550 U.S. 372 (2007).**

11.     Officer Ewing then inserted himself between the protestors and construction workers to separate them. Id.; Exhibit A (Bussey Dep. at 56).

**RESPONSE:**     Disputed in part.

**The protestors were all on their way out and they continued leaving when Ewing arrived.** *See generally* **Doc. 65, Pl. Ex. 11 "Unicorn Riot YouTube Video" at 2:10–2:40.**

12. The protestors fled the scene. See Exhibit C (Ewing Dep. at 13).

**RESPONSE:**     Disputed in part.

**It is unclear whether the protestors continued to leave as instructed or whether they ran after following orders to leave. Ewing did not apparently pursue them.  Plaintiff, in contrast, was both not at the scene and drove to the location of the later arrest (after hearing radio traffic about the arrests) in order to video the actions of officers in his role as a photojournalist, a fact he stated to the officers repeatedly. Hendren Dep. 65:11–21; Davis Video at 3:45–4:00.**

<u>Detention of the Protesters</u>

13.    In response to the radio call, Sergeant Patton, while driving his patrol car, saw a group of people wearing dark clothing running away, including four women who jumped into a red vehicle. See Exhibit D (Deposition of John Patton (Patton Dep.) at 22, 33–38).

**RESPONSE:     Undisputed, but not material because nothing in this fact is inculpatory as to Plaintiff.**

14.     Sergeant Patton pulled the vehicle over and (with the help of other officers) ordered the four women out of the vehicle, detained them, and placed them on a curb outside of a residential convenience store. See Exhibit E (Patton Video at 0:00–2:31).

**RESPONSE:     Undisputed, but not material because nothing in this fact is inculpatory as to Plaintiff.**

15.     In response to the radio call, Officer Blaxstone drove toward the convocation center and saw "a lot of people … running from the scene." See Exhibit F (Deposition of Jeremiah Blaxstone (Blaxstone Dep.) at 11–12).

**RESPONSE:     Undisputed, but not material because nothing in this fact is inculpatory as to Plaintiff.**

16.     Officer Blaxstone then detained a woman who was trying to hide behind a bush behind the convenience store. Id. at 12–13.

**RESPONSE:     Undisputed, but not material because nothing in this fact is inculpatory as to Plaintiff.**

17.     Officer Blaxstone placed her in handcuffs and moved her to the front of the convenience store with the other female suspects. Id. at 13–15.

**RESPONSE: Undisputed, but not material because nothing in this fact is inculpatory as to Plaintiff.**

18.   In response to the radio call, Officer Davis detained a masked woman wearing all black on a street that runs along the side of the convenience store. See Exhibit H (Deposition of DeRonald Davis (Davis Dep.) at 40).

**RESPONSE:**   **Undisputed, but not material because nothing in this fact is inculpatory as to Plaintiff.**

19.   Officer Reed was in his patrol vehicle when he heard Officer Ewing's radio transmission. See Exhibit I (Deposition of Jamar Reed (Reed Dep.) at 20).

**RESPONSE:**   **Undisputed, but not material because nothing in this fact is inculpatory as to Plaintiff.**

20.   Officer Reed's body cam footage shows him attempting to chase a suspect on foot and then in his patrol vehicle, but to no avail. See Exhibit J (Reed Video #1 at 0:00-3:14.

**RESPONSE:**   **Undisputed, but not material because nothing in this fact is inculpatory as to Plaintiff.**

21.   By the time Officer Reed arrived at the convenience store, the female suspects had already been detained and were sitting on the curb. Id. at 3:11–3:33.

**RESPONSE:**   **Undisputed, but not material because nothing in this fact is inculpatory as to Plaintiff.**

22.     Shortly after the female suspects had been placed on the curb, Plaintiff arrived at the scene. See, e.g., Exhibit E (Patton Video at 3:16–3:24).

**RESPONSE:     Undisputed.**

23.     According to Plaintiff, he had been sitting in his car across from the Nathan Deal Judicial Center when he heard Officer Ewing's call on his police scanner. See Exhibit K (Deposition of Benjamin Hendren (Hendren Dep.) at 55, 62).

**RESPONSE:     Undisputed.**

24.     Plaintiff was, at the time, on assignment for the Atlanta-Journal Constitution and was covering "the breaking news morning shift." Id. at 57.

**RESPONSE:     Undisputed.**

25.     When Plaintiff heard someone on the scanner mention "protest" and then "Martin Street," he plugged "Martin Street" into his GPS and "drove until [he] saw police lights." Id. at 65–66.

**RESPONSE:     Undisputed.**

26.     Plaintiff parked next to the convenience store, got out of his vehicle, walked across the street from the convenience store, and took several photos of the detainees. Id. at 66–67, 71.

**RESPONSE:     Disputed in part.**

**Plaintiff testified that he may have taken photos at that point, but was not certain. It could have been video.**

27.    Sergeant Patton noticed Plaintiff shortly after his arrival and told Officer Reed that he was "pretty sure" Plaintiff "was there too" and so "we might as well stop him and ID him too." See Exhibit E (Patton Video at 5:52–5:57).

**RESPONSE:**    **Undisputed.**

**This is another critical point. Patton is stating that he "might as well" detain Plaintiff, despite knowing that he (Patton) was never at the convocation center, so that he would have no way of knowing if Plaintiff was there.**

28.    Officer Reed therefore walked over to Plaintiff to talk to him. See Exhibit J (Reed Video #1 at 5:55–6:01).

**RESPONSE:**    **Undisputed.**

29.    Before Officer Reed had a chance to ask any questions, Plaintiff informed him that "I wasn't there" and "I'm freelance with the AJC." Id. at 6:01–6:09.

**RESPONSE:**    **Disputed.**

**Plaintiff's comment came in response to a question directed to him by Reed. *See id.* Plaintiff's comment was reasonable because he had just heard Patton say that he should be detained because he was there.**

-11-

30.    Officer Reed asked Plaintiff for his credentials, but he did not have any on him, and the interaction ended. Id. at 6:09–6:17.

**RESPONSE:    Undisputed, however, Hendren offered to provide his video footage, later retrieved his press credentials that Defendants reviewed, and offered to let the officers speak with his superiors at the *Atlanta Journal Constitution*. Hendren Dep 129:4–8 (offer to review); *id.* 78:10–19 (hang up on editor); Brooks Video at 16:53–18:00 (holding badge).**

31.    Several minutes later, Sergeant Patton told another officer that "I'm sure the camera man [referring to Plaintiff] was with them [the detained suspects] … but I can't 100% say he was running with them. I want to grab him too, but I can't. I'm not a hundred percent sure, but I'm pretty sure." Exhibit E (Patton Video at 13:12–13:30).

**RESPONSE:    Undisputed.**

   ***See also* Response to ¶ 27, *supra*.**

32.    The officers' body cam footage shows that Plaintiff was, at times, wearing a black hoodie and black pants. See, e.g., Exhibit J (Reed Video #1 at 6:00).

**RESPONSE:    Disputed in part.**

   **When it started raining, briefly, Plaintiff put on a raincoat. The raincoat had a hood, which he used, but it is not a "hoodie," which**

**describes a sweatshirt. Hendren was not wearing the same dark or camouflage clothing as the other protestors, although he did put on a black raincoat when it began to rain briefly. Patton Video at 3:18 (Plaintiff appears at intersection by convenience store in white t-shirt); *id*. at 16:17 (in white t-shirt at time he is arrested).**

33.   At other times, however, he had removed his black hoodie and was left with a white shirt underneath. See, e.g., Exhibit E (Patton Video at 3:16–3:24).

**RESPONSE:   Disputed in part for the same reasons in ¶ 32, *supra*.**


**The Showup**

34.   Shortly after Officer Reed spoke to Plaintiff, he and Officer Davis drove together to the convocation center to pick up Bussey and Paige for a "showup." Exhibit J (Reed Video #1 6:21–7:28).

**RESPONSE:   Undisputed.**

35.   As Officer Reed explained to Bussey and Paige, this required them to "sit in the back seat [of the patrol vehicle] … ride by and [look at the suspects] and … say if that was them or not." See Exhibit L (Reed Video #2 at 0:00– 0:07).

**RESPONSE:   Undisputed that this is what Reed said, but this is not how a showup is supposed to be done. *See* Doc. 64-12 at 7 ("[T]he**

showup here was a textbook example of what *not* to do . . . ."); Exhibit B, GSU PD SOP 18c at 13–14 ("Show ups should not be conducted with more than one witness; the witnesses should not be permitted to communicate before or after the show up regarding the identification of the suspect."); *id.* ("Instruct the witness prior to the show-up that the person he/she is looking at may or may not be the perpetrator. Assure the witness that the investigation will continue regardless of whether identification is obtained."); *id.* ("Words or conduct of any type by officers that may suggest to the witness that the individual is or may be the perpetrator should be scrupulously avoided.").

36.    To that end, Bussey and Paige got into the back of the patrol vehicle, and Officer Reed and Officer Davis drove them to the convenience store. Id. at 0:51–3:49.

RESPONSE:    *See* Response to ¶ 35, *supra.*

37.    On the ride over, Officer Reed told Bussey and Paige: "We got them. We just want to bring y'all over here … so y'all can id them for us because they said they were not in … the building." Id. at 2:27–2:38.

RESPONSE:    Undisputed.

This is a flagrant departure from proper practice. *See* Response to ¶ 35, *supra.*

-14-

38.    Paige responded that "they did … they [are] fucking lying," and Bussey chimed in that "one of them shoved my ass. I know which one it is too." Id. at 2:38–2:41.

**RESPONSE:    Undisputed.**

**This fact shows that Reed and Davis knew that Bussey and Paige were primed to lie and primed to say whatever Reed and Davis wanted them to say.**

39.    Officer Reed continued: "Because they're saying that, we want to positively get some witnesses to say … y'all verify y'all saw them in the building. These are the ones we have." Id. at 2:41–2:53.

**RESPONSE:    Undisputed. *See* Response to ¶ 38, *supra*.**

40.    When they arrived at the convenience store, Bussey and Paige both positively identified the women sitting on the curb. Id. at 3:50–4:03 (stating "yeah, that's them" multiple times).

**RESPONSE:    Disputed in part.**

**There is no dispute they said that while in the police vehicle, but this was not a positive identification. *See generally* Doc. 64-12 ("This Court easily concludes that the showup here was impermissibly suggestive such that it rendered the witnesses' identification of the Defendants unreliable in violation of Due Process.").**

41.    Officer Reed exited the patrol vehicle and informed Sergeant Patton of the positive identification. Id. at 4:01–5:10.

**RESPONSE:    Disputed in part. *See* Response to ¶ 40, *supra*.**

42.    When Officer Reed returned to the patrol vehicle, Officer Davis pointed at Plaintiff—who was standing on the opposite side of the street as the female detainees—and asked Officer Reed: "Did they say he's a part of them?" Id. at 5:21–5:27.

**RESPONSE:    Undisputed.**

**Plaintiff notes that the "they" in this sentence—Paige and Bussey—were in the car, such that this was a prompt to have them point the finger at Plaintiff.**

43.    Officer Reed responded that Plaintiff "has on a press badge. I'm not sure. He could possibly be." Id. at 5:29–5:33.

**RESPONSE:    Undisputed.**

**Plaintiff notes that at this time, Plaintiff had retrieved his press credentials.**

44.    One of the construction workers then informed the officers that "that's the … video guy." Id. at 5:34–5:37.

**RESPONSE:    Undisputed that they said this, but disputed that this is true and disputed that Defendants could reasonably credit this statement under the circumstances.**

First, Plaintiff was not there and was not the "video guy." Hendren Dep. 121:8–23; Doc. 65, Pl. Ex. 11 "Unicorn Riot YouTube Video" at 0:25–0:27; 2:33 (a videographer can be seen in the reflection); Reed Video at 5:50 (Hendren has different pants, shoes, shirt, hair, camera, facial hair, etc. than man who was at site). Bussey and Paige's statements to the contrary are false.

Second, Reed and Davis knew that Bussey and Paige would say anything at this point—no matter whether it was true or not. *See generally* Doc. 64-12.

Third, in deposition, when video evidence showed that Plaintiff was not the person recording at the scene, Paige testified that there were a lot of video guys. Paige Dep. 40 ("It might have been four video guys.")

Fourth, there was no evidence that any "video guy" violated any criminal law.

45.    The other construction worker agreed, saying "yeah, that's the video guy … get his ass, that's the video guy, he was videoing inside [the convocation center]."1 Id. at 5:37–5:47.

RESPONSE:    Undisputed that they said this, but disputed that this is true and disputed that Defendants could reasonably credit this statement under the circumstances. *See* Response to ¶ 44, *supra*.

-17-

46.    As a result of Bussey and Paige's identification, Officer Reed and Officer Davis detained Plaintiff, explaining that "you've just been ID'ed as the guy on the inside shooting video." Id. at 5:47–5:56.

**RESPONSE:    Undisputed that Reed said this, but disputed that Plaintiff was identified or that Defendants could credit this statement under the circumstances.** *See* **Response to ¶ 44,** *supra.*

FN 1. Even several years later, when the construction workers were shown a still photo of Plaintiff from Officer Reed's body cam during their depositions, they were adamant that Plaintiff was the "video guy" that they saw filming in the convocation center. See Exhibit A (Bussey Dep. at 65–66); Exhibit B (Paige Dep. at 14).

**RESPONSE:    Undisputed that they said this, but this fact is inculpatory as to Bussey and Paige. Plaintiff was not the "video guy" as is shown clearly on video.** *See generally* **Doc. 65, Pl. Ex. 11 "Unicorn Riot YouTube Video" at 0:25–0:27; 2:33 (the videographer can be seen in the reflection);** *cf. Scott v. Harris***, 550 U.S. 372 (2007).**

**This adamacy in the face of objective fact is evidence of falsehoods.** *See also* **Paige Dep. 40 ("It might have been four video guys.").**

47.    They walked Plaintiff across the street, handcuffed him behind his back, and sat him down on the curb in front of the convenience store. Id. at 5:56–6:13.

**RESPONSE:    Undisputed.**

48.    Over the next few minutes, the construction workers positively identified Plaintiff at least two more times. Id. at 6:50–7:00 ("That's him right there … he got a video") and 9:26–9:41 ("We got his ass. He can't lie about that. I remember him").

**RESPONSE:    Undisputed that they said this, but disputed that this is true and disputed that Defendants could reasonably credit this statement under the circumstances. *See* Response to ¶ 44, *supra*.**

## The Aftermath

49.    Initially, Sergeant Patton was going to issue criminal trespass warnings to everyone because "I wasn't going to take them to jail just for being on the property." See Exhibit D (Patton Dep. at 47–48); Exhibit E (Patton Video at 6:33–7:16).

**RESPONSE:    Undisputed, but Patton's full explanation is worth highlighting.**

**He testified that he didn't know of any crime that had been committed by anyone. Patton Dep. 47:9–48:9. *See also* Reed Dep. 48:16–**

19 ("Did you believe at the moment he was put in handcuffs that there was probable cause to believe that he had committed any crime? A. No.").

50.    However, a female officer with the Atlanta Police Department informed Sergeant Patton that there had been property damage and an assault at the convocation center and so the Department was trying to figure out if any of the detainees were responsible. Exhibit E (Patton Video at 27:20–28:00).

RESPONSE:    Disputed.

For one, the female officer depicted here is a GSU PD officer, as can be seen from the badge on her shoulder.

For two, this person only states that there *may have been* property damage, not that there was.

In fact, there was no damage. Bussey Dep. 43:13–16 ("you're not aware of any damage of any kind done by the protesters on that day? A. That's correct.").

51.    As a result, Sergeant Patton decided to "hold off" on issuing the warnings or uncuffing the detainees and let the Department "figure out what they want to do." Id. at 39:58–40:30.

RESPONSE:    Undisputed that Patton decided to continue the detention of all of the people, including Plaintiff, despite there being

**no inculpatory fact about Plaintiff having touched anyone or damaged any property.**

52.    Plaintiff spoke to several officers while he was detained, mainly to protest his innocence and explain that he was working freelance for the AJC. See, e.g., Exhibit M (Davis Video at 3:32–4:25, 6:11–6:35); Exhibit E (Patton Video at 24:30–25:46).

**RESPONSE:    Undisputed.**

53.    During one such conversation, Officer Oliver Brooks (a non-party) asked Plaintiff if anyone could corroborate his claim that he was in a parking lot near the Nathan Deal Judicial Building. Exhibit N (Brooks Video at 17:54–18:05).

**RESPONSE:    Undisputed. But not material.**

**This is not material because justification for a seizure is measured at its inception. *Davis v. City of Apopka*, 78 F.4th 1326, 1333 n.1 (11th Cir. 2023) ("Probable cause is measured at the time of the arrest, not at some time before or after.").**

54.    Plaintiff said no because he was there alone. Id.

**RESPONSE:    Undisputed.**

**But Plaintiff also was on the phone with an editor who could prove he was working for the newspaper, but Defendants refused to**

speak with the editor despite Plaintiff's requests that the officers do so. Hendren Dep. 78:10–19.

55.    Officer Brooks later asked Plaintiff how he got to the convenience store. Id. at 23:05–23:17.

**RESPONSE:    Undisputed.**

56.    When Plaintiff explained that he drove there in his car, Officer Brooks asked him where his car was, but Plaintiff refused to tell him. Id.

**RESPONSE:    Disputed in part. Plaintiff first told the officer that he got there because he had a "police scanner."**

**Immaterial in part because justification for a seizure is measured at its inception. *Davis v. City of Apopka*, 78 F.4th 1326, 1333 n.1 (11th Cir. 2023) ("Probable cause is measured at the time of the arrest, not at some time before or after.").**

**Further, invocation of constitutional rights cannot be considered inculpatory as a matter of law. *See Hardigree v. Lofton*, 992 F.3d 1216, 1227 (11th Cir. 2021) ("[O]ne fact that cannot constitutionally be considered when determining whether reasonable suspicion or probable cause exist[ is] the fact that Hardigree did not consent to a search." (citing *United States v. Boyce*, 351 F.3d 1102, 1110 (11th Cir. 2003)).**

Finally, why would Plaintiff have trust in the GSU Defendants to consider the location of his car as exculpatory after they declined the invitation to look at his camera, or talk to his editor, which are much more conclusive sources of proof than the location of where his car was parked? If he had told them the location of his car, it would have likely been towed, despite it being parked lawfully. *See* Patton Dep. 84:5–14 ("A. No, sir; I stayed at the scene because I was towing one of the -- the Subaru. I had to wait for a tow truck to come, and I don't have a cage in my car. Q. What goes into the decision to -- to tow or not tow a car like that, where it's parked lawfully? A. I was instructed to tow it. I'm not sure if investigations wanted to put a hold on the vehicle -- I'm -- I'm not sure. I was just instructed to tow it." (form objection excised)).

57.    Officer Brooks explained that divulging the location of his car might help his story make sense, but Plaintiff again refused. Id. at 23:20–23:27.

RESPONSE:    Disputed in part. *See* Response to ¶ 56, *supra*.

Plaintiff also notes that Defendants knew his car was close because he went to retrieve items, including his press credentials, in between when he was first engaged and when we was arrested.

58.     Ultimately, Plaintiff and the female detainees were transported to the Georgia State Police headquarters at the old Turner Field. See Exhibit K (Hendren Dep. at 83).

**RESPONSE:     Undisputed.**

59.     Two officers with the Atlanta Police Homeland Security Division questioned him at the headquarters and looked at the photos on his camera and work cell phone. Id. at 83–84.

**RESPONSE:     Undisputed.**

60.     The officers released Plaintiff without issuing any warnings or charges. Doc. 59 at 14.

**RESPONSE:     Undisputed.**

**But Plaintiff was held for seven hours and transported to a jail before that happened. Hendren Dep. 79:15–17 (hours); 83:3–8 (holding cell).**

Respectfully submitted, this 15th day of December, 2025.

*/s/Gerald Weber*
Gerald Weber
Georgia Bar No. 744878

LAW OFFICES OF GERRY WEBER, LLC
Post Office Box 5391
Atlanta, GA 31107
404-522-0507
wgerryweber@gmail.com

-25-

/s/*Zack Greenamyre*
Zack Greenamyre
Georgia Bar No. 293002
/s/ *Samantha Funt*
Samantha Funt
Georgia Bar No. 943783

MITCHELL SHAPIRO GREENAMYRE & FUNT, LLP
881 Piedmont Avenue
Atlanta, Georgia 30309
Phone: 404-812-4747
Fax: 404-812-4740
zack@mitchellshapiro.com
sam@mitchellshapiro.com

## <u>CERTIFICATE OF SERVICE AND CERTIFICATE OF COMPLIANCE</u>

I hereby certify that in accordance with LR 5.1A, I have this date electronically filed the within and foregoing in the above-styled civil action with the Clerk of Court by using the Court's CM/ECF system, which will automatically send notice of same to attorneys of record.

Pursuant to LR 7.1(D), I further certify that the within and foregoing has been prepared in accordance with Local Rule 5.1(B) and is in a 13-point Century Schoolbook font.

This 15th day of December, 2025.

*/s/Zack Greenamyre*
Zack Greenamyre
Georgia Bar No. 293002
