IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

BENJAMIN HENDREN,

    Plaintiff,

      v.

JOHN PATTON, et al.,

    Defendants.

CIVIL ACTION FILE
NO. 1:24-CV-2921-TWT

## OPINION AND ORDER

This is a civil rights case. It is before the Court on the GSU Defendants'[1]

Motion for Summary Judgment [Doc. 64]. As set forth below, the GSU

Defendants' Motion for Summary Judgment [Doc. 64] is GRANTED.

## I.   Background[2]

This case involves an alleged unlawful arrest of a photojournalist while

he was documenting a protest in and around a construction site at the GSU

Convocation Center. Defendant John Patton is a sergeant with the Georgia

State University Police Department ("GSUPD"), and Defendants Jamar Reed,

Anthony Ewing, Deronald Davis, and Jeremiah Blaxstone are officers with the

---

[1] The Court uses the term "GSU Defendants" in this Order to refer only
to the Movant-Defendants, who are John Patton, Jamar Reed, Anthony Ewing,
DeRonald Davis, and Jeremiah Blaxstone.

[2] The operative facts on the Motion for Summary Judgment are taken
from the parties' Statements of Undisputed Material Facts and the responses
thereto. The Court will deem the parties' factual assertions, where supported
by evidentiary citations, admitted unless the respondent makes a proper
objection under Local Rule 56.1(B).

GSUPD. (2d Am. Compl. ¶¶ 8-12 [Doc. 59]). At all relevant times, Plaintiff Benjamin Hendren was a credentialed, freelance photojournalist working for the Atlanta Journal-Constitution (the "AJC"). (*Id.* ¶¶ 7, 25).

On July 29, 2022, approximately 30 to 40 individuals wearing masks, dark clothing, and camouflage entered Georgia State University's convocation center to protest the construction of the Atlanta Public Safety Training Center, as part of a project otherwise known as "Cop City." (GSU Defs.' Statement of Undisputed Material Facts ¶ 1 [Doc. 64-1]). Defendant Brasfield & Gorrie was involved in the construction of the Atlanta Public Safety Training Center. (*Id.* ¶¶ 2-3). During the protest, the protesters made statements like "Stop Cop City" and "Stop Brasfield Gorrie." (*Id.* ¶ 4; Pl.'s Response to GSU Defs.' Statement of Undisputed Material Facts ¶ 4 [Doc. 71-1]).

During the protest, Defendants Jackson Bussey and Moses Paige, two construction workers for Defendant Brasfield & Gorrie, were on site. (*See* GSU Defs.' Statement of Undisputed Material Facts ¶ 4). Defendants Bussey and Paige witnessed one of the protestors inside the center holding a camera and either filming or taking pictures of the protest. (*Id.* ¶ 6). Defendant Bussey instructed the protestors to leave the construction site, and they ultimately complied with the request. (*Id.* ¶ 8-9). During the protestors' compliance with the instructions by Defendant Bussey, Defendant Ewing witnessed the protestors "jostling with the construction workers" at the convocation center and "called it out over the radio." (*Id.* ¶ 10). Defendant Ewing then inserted

himself between the protestors and construction workers to separate them. (*Id.* ¶ 11). The protestors fled the scene afterwards. (*Id.* ¶ 12). The GSU Defendants soon detained several protestors who fled the scene away from the construction site. (*See id.* ¶¶ 13-22). Several protestors wore dark or black clothing. (*See id.* ¶¶ 1, 13, 18).

At the time of these events, the Plaintiff was on assignment for the AJC and was covering "the breaking news morning shift." (*Id.* ¶ 24). While the Plaintiff has testified that he was not at the convocation center, this fact is disputed by the parties. (Pl.'s Statement of Undisputed Material Facts ¶ 1 [Doc. 71-2]; GSU Defs.' Response to Pl.'s Statement of Undisputed Material Facts ¶ 1 [Doc. 79-2]). The Plaintiff wore a white shirt, black pants, and a black hoodie or raincoat. (GSU Defs.' Statement of Undisputed Material Facts ¶¶ 32-33; Pl.'s Response to GSU Defs.' Statement of Undisputed Material Facts ¶ 32). The Plaintiff arrived at the scene after hearing Defendant Ewing's communications over his police scanner. (*Id.* ¶¶ 23, 25). After parking next to a convenience store, the Plaintiff got out of his vehicle, walked across the street from the convenience store, and began taking photos of the detainees. (*Id.* ¶ 26). Defendant Patton noticed the Plaintiff shortly after his arrival and told Defendant Reed that he was "pretty sure" the Plaintiff "was there too" and that "we might as well stop him and ID him too." (*Id.* ¶ 27).

Defendant Reed walked over to the Plaintiff to talk to him. (*Id.* ¶ 28). Before Defendant Reed had a chance to ask any questions, the Plaintiff

informed him that he was not at the protest and that he was freelance with the AJC. (*Id.* ¶ 29). Defendant Reed asked the Plaintiff for his credentials, but he did not have any on him, and the interaction ended. (*Id.* ¶ 30). Later, Defendant Patton repeated his belief that the Plaintiff was at the protest to another officer. (*Id.* ¶ 31). But during his deposition, Defendant Patton did not remember seeing the Plaintiff at any time previously. (Pl.'s Statement of Undisputed Material Facts ¶ 8; GSU Defs.' Response to Pl.'s Statement of Undisputed Material Facts ¶ 8).

Shortly after Defendant Reed spoke to the Plaintiff, Defendants Reed and Davis drove back to the construction site and picked up Defendants Bussey and Paige for a "showup." (GSU Defs.' Statement of Undisputed Material Facts ¶ 34). Defendant Reed explained to the two that the "showup" would require them to "sit in the back seat [of the patrol vehicle] . . . ride by and [look at the suspects] and . . . say if that was them or not." (*Id.* ¶ 35). On the ride over, Defendant Reed told Defendants Bussey and Paige "We got them. We just want to bring y'all over here . . . so y'all can id them for us because they said they were not in . . . the building." (*Id.* ¶ 37). Defendant Paige responded that "they did . . . they fucking lying." (*Id.* ¶ 38). Defendant Bussey chimed in that "one of them shoved my ass. I know which one it is too." (*Id.*). Defendant Reed continued: "Because they're saying that, we want to positively get some witnesses to say . . . y'all verify y'all saw them in the building. These are the ones we have." (*Id.* ¶ 39).

4

When they arrived, Defendants Bussey and Paige both positively identified the protestors sitting on the curb. (*Id.* ¶ 40). Defendant Davis then pointed at the Plaintiff, who was standing on the opposite side of the street from the protestors, and asked Defendant Reed: "Did [Defendants Bussey and Paige] say he's a part of them?" (*Id.* ¶ 42). Defendant Reed responded that the Plaintiff "has on a press badge. I'm not sure. He could possibly be." (*Id.* ¶ 43). Either Defendant Bussey or Paige then informed the officers that "that's the . . . video guy." (*Id.* ¶ 44). In response, either Defendant Bussey or Paige agreed, saying "yeah, that's the video guy . . . get his ass, that's the video guy, he was videoing inside [the convocation center." (*Id.* ¶ 45). As a result of the positive identification, Defendants Reed and Davis detained the Plaintiff, explaining that he was identified as the guy who was shooting video inside the convocation center. (*Id.* ¶ 46). Both Defendants Bussey and Paige positively identified the Plaintiff at least two more times. (*Id.* ¶ 48). After detaining the Plaintiff, they walked him across the street, handcuffed him behind his back, and sat him down on the curb. (*Id.* ¶ 47).

Some time after the arrest, Defendant Patton was going to issue criminal trespass warnings to everyone because he did not want to take them to jail just for being on the property. (*Id.* ¶ 49). But an unnamed officer informed Defendant Patton that there may have been property damage and an assault at the convocation center, so the officers tried to figure out if any of the detainees were responsible. (*Id.* ¶ 50; Pl.'s Response to GSU Defs.' Statement

of Undisputed Material Facts ¶ 50). This resulted in Defendant Patton holding off from issuing the warnings or uncuffing the detainees. (GSU Defs.' Statement of Undisputed Material Facts ¶ 51).

During the Plaintiff's detention, he spoke to several officers to protest his innocence and explained that he was working freelance for the AJC. (*Id.* ¶ 52). The Plaintiff offered to show that there were no images of the convocation center on his camera to prove his innocence. (Pl.'s Statement of Undisputed Material Facts ¶ 14). During one such conversation, Officer Brooks looked at the Plaintiff's press badge and told Defendant Blaxstone that "we have his ID right here." (*Id.* ¶ 4; GSU Defs.' Response to Pl.'s Statement of Undisputed Material Facts ¶ 4). Officer Brooks asked the Plaintiff if anyone could corroborate his claim that he was parked nearby, but no one could because he was there alone. (GSU Defs.' Statement of Undisputed Material Facts ¶¶ 53-54). Officer Brooks later asked the Plaintiff how he got to the location where the protestors were detained. (*Id.* ¶ 55). The Plaintiff explained that he got there by car but refused to tell Officer Brooks where his car was when Officer Brooks inquired further. (*Id.* ¶ 56). Even when Officer Brooks explained that divulging the location of his car might help his story make sense, the Plaintiff still refused. (*Id.* ¶ 57).

Ultimately, the Plaintiff and the other detainees were transported to the Georgia State Police headquarters, where two officers with the Atlanta Police Homeland Security Division questioned him and looked at the photos on his

6

camera and work cell phone. (*Id.* ¶¶ 58-59). Ultimately, the officers released the Plaintiff without issuing any warnings or charges. (*Id.* ¶ 60).

Based on these events, the Plaintiff filed suit against all Defendants under Section 1983 and state law. (*See generally* Compl. [Doc. 1]; Am. Compl. [Doc. 9]). After the parties completed discovery, the GSU Defendants filed this Motion for Summary Judgment. (*See generally* GSU Defs.' Mot. for Summ. J. [Doc. 64]).

## II.    Legal Standard

Summary judgment is appropriate only when the pleadings, depositions, and affidavits submitted by the parties show that no genuine issue of material fact exists, and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a), (c). A court should view the evidence and draw any inferences in the light most favorable to the nonmovant. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158-59 (1970). On cross-motions for summary judgment, a court views the facts "in the light most favorable to the non-moving party on each motion." *Greater Birmingham Ministries v. Sec'y of State, State of Ala.*, 992 F.3d 1299, 1317 (11th Cir. 2021). The party seeking summary judgment must first identify grounds that show the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). The burden then shifts to the nonmovant, who must go beyond the pleadings and present affirmative evidence to show that a genuine issue of material fact exists. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257 (1986).

7

### III.   Discussion

In his Second Amended Complaint, the Plaintiff pleads two substantive Section 1983 counts against the Defendants: one for a violation of his Fourth Amendment right against unlawful seizure, and another for a violation of his First Amendment rights because of retaliatory actions taken against him. (2d Am. Compl. ¶¶ 104-15 [Doc. 59]). The Plaintiff also requests attorney's fees and punitive damages under these claims. (*Id.* ¶¶ 128-29). The GSU Defendants request summary judgment on all counts. (*See generally* Br. in Supp. of GSU Defs.' Mot. for Summ. J. [Doc. 64-2]). Before the Court evaluates the substantive issues on this Motion for Summary Judgment, the Court will first address an evidentiary issue raised by the Defendants related to a YouTube video introduced by the Plaintiff, as well as severe deficiencies within the Plaintiff's Statement of Undisputed Material Facts and Response to the GSU Defendants' Statement of Undisputed Material Facts.

### A. Evidentiary Issues

#### 1. YouTube Video

The Plaintiff relies heavily on an exhibit named "Unicorn Riot YouTube Video" throughout his Statement of Undisputed Material Facts and his Response to the GSU Defendants' Statement of Undisputed Material Facts. (*See generally* Unicorn Riot YouTube Video [Doc. 65]). The GSU Defendants make several objections to the Plaintiff's use of this exhibit, arguing that the video is inadmissible. Specifically, the GSU Defendants take issue with the fact

that the video is edited and there is a lack of authenticity and foundation under Federal Rules of Evidence 901 and 902.

On a motion for summary judgment, a court may only consider evidence "which can be reduced to an admissible form." *Rowell v. Bellsouth Corp.*, 433 F.3d 794, 800 (11th Cir. 2005). Similarly, "courts may consider unauthenticated documents on a motion for summary judgment if it is apparent that they will be admissible at trial." *Edwards v. Gwinnett Cnty. Sch. Dist.*, 977 F. Supp. 2d 1322, 1329 (N.D. Ga. 2013) (citation modified). "The 'admission of evidence is committed to the sound discretion of the trial court.'" *United States v. Broomfield*, 591 F. App'x 847, 851 (11th Cir. 2014) (quoting *United States v. Cole*, 755 F.2d 748, 766 (11th Cir. 1985)). "Before an item of evidence may be admitted, Federal Rule of Evidence 901(a) requires it to be authenticated with evidence 'sufficient to support a finding that the item is what the proponent claims it is.'" *Id.* (quoting Fed. R. Evid. 901(a)). "Proper authentication requires only that the proponent of the evidence make out a *prima facie* case that the proffered evidence is what it purports to be." *Id.* (citing *United States v. Belfast*, 611 F.3d 783, 819 (11th Cir. 2010)).

"Evidence may be authenticated by its 'appearance, contents, substance, internal patterns, or other distinctive characteristics . . . taken together with all the circumstances.'" *Id.* (quoting Fed. R. Evid. 901(b)(4)). "Authentication may be established 'solely through the use of circumstantial evidence.'" *Id.* (quoting *United States v. Smith*, 918 F.2d 1501, 1510 (11th Cir. 1990)). "Once

such a showing has been made, the court may admit the evidence, and the ultimate question of its reliability is reserved for the fact finder." *Id.* (citing *Belfast*, 611 F.3d at 819).

YouTube videos have been the subject of several evidentiary disputes across the nation on the issue of authentication. The less popular approach finds that YouTube videos can be self-authenticating under Federal Rule of Evidence 902(11) when a party proffers the certificate of a YouTube custodian verifying the videos' authenticity and the records meet the requirements of Federal Rules of Evidence 803(6)(A)-(C).[3] But in this Circuit, courts generally require the proffering party to provide witnesses capable of authenticating the content of the videos by showing (1) when the video was originally recorded, (2) what device made the recording, *or* (3) any witness testimony to the accuracy of the event or whether the video has been altered. *See, e.g., Marvel Tech. (China), Co. Ltd.*, 2025 WL 2644734 at *13; *McHale v. Crown Equip.*

---

[3] *See, e.g., Ratner v. Kohler*, 2018 WL 1055528, at *11 (D. Haw. Feb. 26, 2018) (citing *United States v. Hassan*, 742 F.3d 104, 132-34 (4th Cir. 2014)); *Saraceni v. MerchSource, LLC*, 2022 WL 283104, at *4 (E.D. Pa. Jan. 31, 2022); *but see Marvel Tech. (China), Co. Ltd. v. Individuals, P'ships and Unincorporated Assocs. Identified on Schedule "A"*, 2025 WL 2644734, at *13 (S.D. Fla. Sep. 15, 2025) ("even if Defendants eventually obtained a certification from a custodian of record and otherwise satisfied the remaining Rule 902(11) requirements, all a certification would establish under the circumstances is that the videos were indeed uploaded to YouTube on a particular date"); *United States v. Hunt*, 534 F. Supp. 3d 233, 254 (E.D.N.Y. 2021) ("a certification by a custodian in itself cannot be sufficient for purposes of authentication because . . . such a certification serves a limited role: it simply shows that a record was made at or near a certain time, that the record was kept in the course of a regularly conducted business activity, and that the making of the record was a regular practice of that activity").

*Corp.*, 2022 WL 4350702, at \*4 (11th Cir. Sep. 20, 2022); *Broomfield*, 591 F. App'x at 852 (affirming authentication decision of trial court when substantial evidence established (1) where and when the video was made and (2) who and what appeared in the video); *see also Carey v. Kirk*, 2022 WL 4597806 (S.D. Fla. Sep. 7, 2022) (excluding certain videos, in part, because the videos were edited compilations). The Court need not decide which applies here because the Plaintiff does not argue that the YouTube video is self-authenticating, that he can offer a certificate from a YouTube custodian, or that he will be able to do so. Thus, the Court looks to the evidence before it to determine whether the YouTube video can be authenticated.

Here, there is some evidence that the Unicorn Riot YouTube Video can be authenticated. Witness testimony suggests that the YouTube video accurately reflects the events of the protest. First, Defendant Bussey acknowledged that the length of the Unicorn Riot YouTube Video was similar to the length of time the protestors were on the construction site. (Bussey Dep. at 33:15-33:24 [Doc. 64-3]). Second, when Defendant Bussey was asked whether he could recall anything content-wise that was cut out from the video, Defendant Bussey stated that he could not. (*Id.* at 34:7-34:12). Implicitly, this also demonstrates the date the video was taken. Third, witness testimony acknowledged the accuracy of specific moments captured within the YouTube video. Defendant Bussey acknowledged that the protestors did not enter the construction site by forced entry, instead just walking through an unlocked

11

door. (*Id.* at 21:5-21:11). Additionally, Defendants Bussey and Paige acknowledged their own accurate presence within the video as the protestors moved through the construction site. (*Id.* at 30:13-31:17; Paige Dep. at 12:25-13:7 [Doc. 64-5]). Next, Defendant Paige noted that the YouTube video accurately represented "direct physical contact between a protestor and [ ] Bussey." (*See* Paige Dep. at 26:17-27:4).

But there is also ample evidence that cuts against authentication. Addressing the elephant in the room first, the video is clearly edited. Text is overlaid throughout the video, the video is cut several times, and faces of certain individuals are blurred. Second, witness testimony contradicts claims as to the accuracy of the YouTube video. For example, Defendant Paige discusses shoving between the protestors and Defendant Bussey going on for five to eight minutes, which exceeds the length of the YouTube video. (*See* Paige Dep. at 27:5-27:15). Defendant Paige also discusses property damage to the construction site when the YouTube video does not show any such damage. (*See id.* at 30:3-35:7; *but see* Bussey Dep. at 34:7-34:12 (stating that the YouTube video did not omit anything content-wise)). Finally, the Plaintiff offers little evidence as to the identity of who recorded or edited the YouTube video. While Plaintiff's counsel and Defendant Bussey posits that the "video guy" that Defendant Bussey saw at the construction site could be behind the YouTube video, nothing shows that Plaintiff's counsel can produce this individual at trial. (*See id.* at 14:22-15:2).

12

After reviewing all the evidence, the Court will not consider the Unicorn Riot YouTube Video as evidence in evaluating this Motion for Summary Judgment. While the Plaintiff can offer when and where the video was made with relative certainty, the Plaintiff has not presented enough evidence showing who and what was in the YouTube video to authenticate the evidence, especially where the video was edited. *See Broomfield*, 91 F. App'x at 852. The Plaintiff does not even know the individuals who recorded and edited the video. Under the circumstances, the Court is unconvinced that the Plaintiff will be able to authenticate the Unicorn Riot YouTube Video at trial. Thus, the Court excludes the video from consideration on this Motion for Summary Judgment. *See Rowell*, 433 F.3d at 800; *Edwards*, 977 F. Supp. 2d at 1329.

### 2. Local Rules Violations

The Court now addresses the Plaintiff's Local Rules violations. The Local Rules for the Northern District of Georgia require that a non-movant's statement of additional material facts conform with the requirements for a movant's statement of material facts. LR 56.1(B)(3), NDGa. The rule governing a movant's statement of material facts states:

> A movant for summary judgment shall include with the motion and brief a separate, concise, numbered statement of the material facts to which the movant contends there is no genuine issue to be tried. Each material fact must be numbered separately and supported by a citation to evidence proving such fact. *The Court will not consider any fact*: (a) not supported by a citation to evidence (including page or paragraph number); (b) supported by a citation to a pleading rather than to evidence; (c) stated as an issue or legal conclusion; or (d) set out only in the brief and not in the movant's statement of undisputed facts.

LR 56.1(B)(1), NDGa. Further, the Local Rules also contains the following requirements with regard to a non-movant's response to the movant's statement of undisputed facts:

> (1)   [The response] shall contain individually numbered, *concise, nonargumentative responses* corresponding to each of the movant's numbered undisputed material facts.
>
> (2)   This Court will deem each of the movant's facts as admitted unless the respondent: (i) directly refutes the movant's fact with concise responses *supported by specific citations to evidence* . . .; (ii) states a valid objection to the admissibility of the movant's fact; or (iii) points out that the movant's citation does not support the movant's fact or that the movant's fact is not material or otherwise has failed to comply with [Local Rule 56.1(B)(1)].

LR 56.1(B)(2)(a)(1)-(2), NDGa (emphasis added).

Both the Plaintiff's Statement of Additional Material Facts and the Plaintiff's Response contain several deficiencies with regard to these Local Rules. Apart from the citations to inadmissible evidence (the Unicorn Riot YouTube Video), the majority of the Plaintiff's additional facts and responses are argumentative, non-concise, contain legal conclusions when such conclusions are not required, and are either not material or do not directly address the GSU Defendants' Statement of Undisputed Material Facts. (*See, e.g.,* Pl.'s Response to GSU Defs.' Statement of Undisputed Material Facts ¶¶ 2, 4-7, 8, 9-12, 26-27, 29-33, 35-46, 48-51, 52, 56-57, 60). Indeed, one such response takes up nearly a page with more citations to case law than actual citations to the evidence. (*See id.* ¶ 56). Such responses are strictly prohibited

14

under the language of the Local Rules as to both filings. As the Court engages in an analysis of the substantive counts within the GSU Defendants' Motion for Summary Judgment, the Court will address these violations as they arise and the proper remedy in each instance.

### B. Unlawful Seizure

The Court now turns to the substantive counts against the GSU Defendants. The Plaintiff brings a Section 1983 claim against the Defendants for unlawful seizure under the Fourth Amendment in Count I. (*See* 2d Am. Compl. ¶¶ 104-07). "Under the Fourth Amendment, an individual has a right to be free from unreasonable searches and seizures and an arrest is a seizure of the person." *Case v. Eslinger*, 555 F.3d 1317, 1326 (11th Cir. 2009) (citation modified). "A seizure occurs for Fourth Amendment purposes, however, only when, by means of physical force or a show of authority, a person's freedom of movement is restrained." *United States v. Perez*, 443 F.3d 772, 778 (11th Cir. 2006) (citation modified).

"There are three broad categories of police-citizen encounters for purposes of [the Court's] Fourth Amendment analysis: (1) police-citizen exchanges involving no coercion or detention; (2) brief seizures or investigatory detentions; and (3) full-scale arrests." *Id.* (citation omitted). The first category does not implicate any Fourth Amendment scrutiny. *Id.* (citation omitted). The second category "'involves reasonably brief encounters in which a reasonable person would have believed that he or she was not free to leave.'" *Id.* (citation

omitted). The third category involves situations where "'the totality of circumstances indicate that an encounter has become too intrusive to be classified as a brief seizure.'" *Id.* (citation omitted). To justify a Fourth Amendment seizure under the second category, there must exist "a reasonable, articulable suspicion that the person has committed or is about to commit a crime." *Id.* (citation omitted). But to justify a Fourth Amendment seizure under the third category, "the 'reasonableness' . . . turns on the presence or absence of probable cause." *Case*, 555 F.3d at 1326 (citation omitted); *Perez*, 443 F.3d at 778 (citation omitted). "The existence of probable cause at the time of arrest constitutes an absolute bar to a section 1983 action for false arrest." *Case*, 555 F.3d at 1326-27 (citation modified). Although the GSU Defendants dispute whether the seizure-at-issue falls under the second or third category, the GSU Defendants focus their whole qualified immunity argument on the third category. (Br. in Supp. of GSU Defs.' Mot. for Summ. J., at 12). Thus, the Court need not decide this issue and will conduct its qualified immunity analysis as if the GSU Defendants arrested the Plaintiff.

"Probable cause to arrest exists when law enforcement officials have facts and circumstances within their knowledge sufficient to warrant a reasonable belief that the suspect had committed or was committing a crime." *Case*, 555 F.3d at 1327 (citation modified). It requires there to be a "probability or substantial chance of criminal activity, not an actual showing of such activity." *Id.* (quoting *Illinois v. Gates*, 462 U.S. 213, 245 n. 13 (1983)).

16

"Probable cause does not require overwhelmingly convincing evidence, but only 'reasonably trustworthy information.'" *Id.* (citation omitted).

"If a constitutional violation occurred because the officer lacked probable cause, [a court then] ... consider[s] whether arguable probable cause existed." *Id.* "The officer may still be shielded from liability because his 'actions did not violate 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Id.* (quoting *Hope v. Pelzer*, 536 U.S. 730, 739 (2002)). "Absent probable cause, an officer is still entitled to qualified immunity if arguable probable cause existed." *Id.* (citation omitted). "Arguable probable cause exists where reasonable officers in the same circumstances and possessing the same knowledge as [a defendant] could have believed that probable cause existed to arrest." *Id.* (citation modified). "'Indeed, it is inevitable that law enforcement officials will in some cases reasonably but mistakenly conclude that probable cause is present, and in such cases those officials should not be held personally liable.'" *Grider v. City of Auburn, Ala.*, 618 F.3d 1240, 1257 (11th Cir. 2010) (citations omitted). "Whether an officer possesses arguable probable cause depends on the elements of the alleged crime and the operative fact pattern." *Id.* (citations omitted).

The parties acknowledge that the Plaintiff was arrested for criminal trespass under Georgia law. (*See* Br. in Supp. of GSU Defs.' Mot. for Summ. J., at 14; Pl.'s Br. in Opp'n to GSU Defs.' Mot. for Summ. J., at 10-11 [Doc. 71]; *see also* 2d Am. Compl. ¶¶ 99-100). Under Georgia's statute for criminal trespass,

17

"[a] person commits the offense of criminal trespass when he . . . knowingly and without authority . . . [e]nters upon the land or premises of another person . . . for an unlawful purpose." O.C.G.A. § 16-7-21(b)(1). The GSU Defendants argue that under this provision and the operative facts, they had actual or arguable probable cause to arrest the Plaintiff. (*See* Br. in Supp. of GSU Defs.' Mot. for Summ. J., at 14-15). The Plaintiff disagrees, arguing that (1) there is a jury question over whether the GSU Defendants had arguable probable cause to arrest the Plaintiff for criminal trespass and (2) the GSU Defendants manufactured the show-up that led to the arguable probable cause. (*See* Pl.'s Br. in Opp'n to GSU Defs.' Mot. for Summ. J., at 10-24).

The Court looks to the underlying operative facts leading up to the arrest of the Plaintiff. Soon after the protestors fled the construction site, several Defendants, including Defendant Patton, responded to a radio call from Defendant Ewing to detain the fleeing protestors. (*See* GSU Defs.' Statement of Undisputed Material Facts ¶¶ 10-22). When the Plaintiff arrived at the location of where other protestors were detained, Defendant Patton mentioned that he was "pretty sure" that the Plaintiff was with the group of protestors he was tracking down who had fled from the convention center. (*Id.* ¶ 27). The protestors who Defendant Patton saw flee the convention center were wearing dark clothing and those arrested at the scene were, in part, wearing dark or black clothing. (*See id.* ¶¶ 13, 18). During the Plaintiff's interaction with the GSU Defendants, the Plaintiff was wearing black pants, a white shirt, and a

18

black raincoat or hoodie that he put on at times during the relevant time period. (*See id.* ¶¶ 32-33; Pl.'s Response to GSU Defs.' Statement of Undisputed Facts ¶¶ 32-33). Thus, Defendant Patton's belief that the Plaintiff could have been at the protest was not wholly unfounded.

The GSU Defendants had further reason to suspect the Plaintiff when Defendant Reed approached him. (*See* GSU Defs.' Statement of Undisputed Material Facts ¶ 28). When Defendant Reed approached, the Plaintiff identified himself as a freelance reporter for the AJC. (*Id.* ¶ 29; Pl.'s Response to GSU Defs.' Statement of Undisputed Facts ¶ 29). But the Plaintiff failed to provide any credentials to Defendant Reed confirming his employment during that interaction. (*Id.* ¶ 30). In the GSU Defendants' point of view, the Plaintiff (1) was near the scene where other protestors were caught and arrested, (2) wore a similar color scheme to the arrested protestors, (3) was potentially identified as a protestor fleeing from the convocation center by Defendant Patton, and (4) failed to produce identification confirming his purported employment at the time Defendant Reed asked him to show identification. Still, the Defendants did not arrest the Plaintiff at that time and did not require the Plaintiff to stay at the location. (*See* GSU Defs.' Statement of Undisputed Material Facts ¶ 34; *see also* Pl.'s Statement of Additional Material Facts ¶ 10 [Doc. 71-2]). The GSU Defendants only arrested the Plaintiff soon after Defendants Bussey and Paige, who were present at the time of the protest, positively identified the Plaintiff as an individual who was

19

present at the construction site, making him liable for criminal trespass. (*See* GSU Defs.' Statement of Undisputed Material Facts ¶¶ 42-48). In the Court's view, the facts available to the GSU Defendants support a finding that at least arguable probable cause existed at the time of the arrest.

Still, the Plaintiff makes several arguments against the finding of arguable probable cause. First, the Plaintiff argues that, even if the positive identification by Defendants Bussey and Paige was reliable, it does not amount to probable cause because his presence at the construction site alone does not establish criminal trespass. (*See* Pl.'s Br. in Opp'n to GSU Defs.' Mot. for Summ. J., at 11). But the Eleventh Circuit is clear that "[s]howing arguable probable cause does not . . . require proving every element of a crime." *Brown v. City of Huntsville, Ala.*, 608 F.3d 724, 735 (11th Cir. 2010). The GSU Defendants either saw or were informed that the protestors were "jostling with the construction workers" after they were told to leave the premises by Defendant Bussey. (*See* GSU Defs.' Statement of Undisputed Material Facts ¶¶ 8-10). Thus, the GSU Defendants were informed that some of the protestors were engaging in conduct violative of the criminal trespass statute. And contrary to the Plaintiff's position, the identification by Defendants Bussey and Paige creates the particularized suspicion necessary to arrest the Plaintiff.

Second, the Plaintiff points to the fact that both Defendants Reed and Patton testified in their depositions that they did not believe probable cause existed to arrest the Plaintiff when he was put into handcuffs. (Pl.'s Br. in

20

Opp'n to GSU Defs.' Mot. for Summ. J., at 11-12 (citing Reed Dep. at 48:16-48:19, 48:24-49:2, 50:3-50:12 [Doc. 64-10], then citing Patton Dep. at 47:14-48:2 [Doc. 64-7])). But the Plaintiff's selected portions of their deposition testimonies omit relevant context. Defendant Patton's testimony discusses the protestors who were detained prior to the arrival of the Plaintiff, not the Plaintiff himself. (*See* Patton Dep. at 47:1-48:25). But even if this testimony is applied to the Plaintiff, Defendant Patton still planned to issue criminal trespass warnings to the detained protestors for their presence on property that was not open to the public. (*See id.* at 48:2-48:9). Contrary to the Plaintiff's attempt to speak for Defendant Patton, Defendant Patton's intent to issue criminal warnings shows that he believed that probable cause existed for criminal trespass. In Defendant Reed's deposition testimony, Defendant Reed actually testified that he believed that there was probable cause to arrest the Plaintiff after Defendants Bussey and Paige positively identified him. (Reed Dep. at 45:5-45:25). The record of the deposition testimony then makes clear that, in order to get acceptable testimony for his side, Plaintiff's counsel thoroughly confused Defendant Reed over pages of testimony to get him to say that he had no probable cause to believe that a crime was committed. (*Id.* at 48:14-48:19). When the Plaintiff attempted to get Defendant Reed to explain why, it is clear Defendant Reed only said so because he believed an investigation must occur before a crime is committed, which is far divorced from the probable cause analysis. (*See id.* at 49:5-49:12). Ultimately, the

21

excluded context is key to finding that neither piece of deposition testimony is particularly persuasive to the Plaintiff's position.

Third, the Plaintiff asserts that arguable probable cause does not exist because he offered exculpatory information to the Defendants after his arrest. (Pl.'s Br. in Opp'n to GSU Defs.' Mot. for Summ. J., at 12-13). Specifically, the Plaintiff was on the phone with his editor while detained and also offered to show the Defendants the lack of pictures involving the construction site on his camera. (Pl.'s Statement of Additional Material Facts ¶ 14, 16; GSU Defs.' Response to Pl.'s Statement of Additional Material Facts ¶ 16 [Doc. 79-2]). This argument is unpersuasive, primarily because the existence of exculpatory information does not automatically defeat a finding of arguable probable cause. *Davis v. City of Apopka*, 78 F.4th 1326, 1342 (11th Cir. 2023). Indeed, "arresting officers . . . are not required to sift through conflicting evidence or resolve issues of credibility, so long as the totality of the circumstances present a sufficient basis for believing that an offense has been committed." *Paez v. Mulvey*, 915 F.3d 1276, 1286 (11th Cir. 2019) (citation modified). But an officer cannot turn a blind eye toward such evidence when considering probable cause. *Davis*, 78 F.4th at 1343. Here, the majority of the evidence offered by the Plaintiff can be characterized as showing that he worked for the AJC. But the Supreme Court has repeatedly held that a reporter's job title does not immunize him from state criminal prosecution on First Amendment grounds. *See, e.g., Cohen v. Cowles Media Co.*, 501 U.S. 663, 668-69 (1991). Even if the

22

Plaintiff provided this information after his arrest, the fact that he works for the AJC does not remove him from criminal liability for trespassing within the convocation center. Further, other evidence arose after his arrest providing the GSU Defendants further reason to suspect the Plaintiff. When Officer Brooks asked the Plaintiff if anyone could corroborate his claim that he was away from the construction site, he admitted that no one could. (GSU Defs.' Statement of Undisputed Material Facts ¶¶ 53-54). Still, Officer Brooks gave the Plaintiff another opportunity to verify his story when he asked him where he parked his car, but the Plaintiff refused to disclose the car's location, even when told that such information could help clear his involvement. (*See id.* ¶¶ 55-57). Thus, even if the information provided by the Plaintiff could be considered exculpatory, it does not defeat the finding of arguable probable cause here.

Finally, the Court arrives at the Plaintiff's argument that, because the show-up by Defendants Bussey and Paige was determined to be unconstitutional by Fulton County Superior Court Judge Farmer, the identification cannot support a finding of arguable probable cause to arrest the Plaintiff. (*See* Pl.'s Br. in Opp'n to GSU Defs.' Mot. for Summ. J., at 20-24; *see also* Judge Farmer Op. & Or. [Doc. 64-12]). But this ruling has little to do with the Plaintiff. The state court case involves improper comments made by Defendants Reed and Davis as to the protestors and positive identifications made by Defendants Bussey and Paige *before* they identified the Plaintiff, who was seated separately and away from the rest of the protestors. (*See generally*

23

Judge Farmer Op. & Or.). As to the Plaintiff, Defendant Reed concluded the positive identification was when Defendant Davis reminded him about the Plaintiff. (GSU Defs.' Statement of Undisputed Material Facts ¶¶ 41-42). The only comments Defendants Reed and Davis made were to each other, not to Defendants Bussey and Paige. (*See id.* ¶¶ 42-43). While Defendants Bussey and Paige may have been in earshot, Defendants Reed and Davis made no substantive comments explicitly insinuating that the Plaintiff was also at the protest. (*See id.*). Defendants Bussey and Paige identified the Plaintiff soon after. (*Id.* ¶¶ 44-45). Thus, there is little reason for the GSU Defendants to doubt this identification separate from the remaining protestors. This is especially true when both Defendants Bussey and Paige refer to the Plaintiff as "the video guy", showing that the identification was based off personal knowledge and not suggestive techniques. (*Id.*). Although the Plaintiff also argues that a violation of police department policy renders the show-up unreliable, this argument alone cannot defeat a finding of arguable probable cause, especially when considering the Plaintiff's own conduct.

In sum, the GSU Defendants had at least arguable probable cause to arrest the Plaintiff based on the totality of the circumstances. Because the existence of arguable probable bars a section 1983 action for unlawful seizure, *Case*, 555 F.3d at 1327, the Court grants summary judgment as to the Plaintiff's unlawful seizure claim.

24

## C. First Amendment Retaliation

The Plaintiff also brings a Section 1983 claim against the Defendants for retaliation in violation of the Fourth Amendment in Count II. (*See* 2d Am. Compl. ¶¶ 108-15). But the existence of arguable probable cause for an arrest also defeats a First Amendment retaliation claim. *Prospero v. Sullivan*, 153 F.4th 1171, 1188-89 (11th Cir. 2025). Thus, because the Court has concluded that the Plaintiff's Fourth Amendment claim is barred by the existence of arguable probable cause, the Plaintiff's First Amendment claim against the GSU Defendants fails as well.

## D. Punitive Damages and Attorney's Fees

The Plaintiff's remaining counts plead for punitive damages and attorney's fees. (*See* 2d Am. Compl. ¶¶ 128-29). Since none of the substantive claims against the Defendants have survived, the Plaintiff's derivative claims for litigation expenses and punitive damages also fail. *See, e.g., Lacy v. Clayton Cnty.*, 2018 WL 4899431, at *3 (N.D. Ga. Oct. 9, 2018) ("Because the Plaintiff's underlying § 1983 claim is dismissed, the Plaintiff's claim for punitive damages should also be dismissed."); 42 U.S.C. § 1988(b) (allowing courts to award attorney's fees to the "prevailing party"). Thus, the Court grants the GSU Defendants summary judgment on the derivative counts.

## IV.    Conclusion

For the foregoing reasons, the GSU Defendants' Motion for Summary Judgment [Doc. 64] is GRANTED.

SO ORDERED, this  15th  day of May, 2026.


THOMAS W. THRASH, JR.
United States District Judge